# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BAUSCH & LOMB INCORPORATED & PF CONSUMER HEALTHCARE 1 LLC, ) ) ) ) | |
| Plaintiffs, ) ) | C.A. No. 20-cv-01463-GBW-CJB |
| v. ) ) | HIGHLY CONFIDENTIAL |
| SBH HOLDINGS LLC, ) ) | CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER |
| Defendant. ) ) | |

**REPLY EXPERT REPORT**
<u>**OF ELIZABETH J. JOHNSON, PH.D.**</u>

## <u>TABLE OF CONTENTS</u>

Page

I.      PROFESSIONAL EXPERIENCE AND QUALIFICATIONS...........................................1

II.     MATERIALS CONSIDERED .........................................................................................1

III.    SUMMARY OF OPINIONS ...........................................................................................2

IV.     INSTRUCTIONS ON THE LAW ...................................................................................6

V.      A PERSON OF ORDINARY SKILL IN THE ART (POSA)...........................................7

VI.     PROSECUTION HISTORIES.........................................................................................8

        A.      The '297 Patent File History......................................................................... 8

        B.      '297 Patent Reexamination History ........................................................... 12

        C.      '668 Patent Application Prosecution History ............................................. 14

        D.      '522 Patent Prosecution History ................................................................ 15

VII.    REPLY OPINIONS ......................................................................................................16

        A.      Dr. Kaser's "Reasonably Close" Arguments Are Flawed .......................... 16

        B.      Dr. Kaser Relies on Misleading Studies to Support His Doctrine of Equivalents Opinion on Vitamin C.......................................................................................... 18

        C.      Dr. Kaser Fails to Rebut the Opinions in My Infringement Report..................... 23

        D.      Prosecution History Estoppel..................................................................... 25

        E.      Opinions on Infringing Alternative Products, Settlement Agreements, and SBH's Products.......................................................................................................... 29

        F.      Validity ..................................................................................................... 31

## I.  PROFESSIONAL EXPERIENCE AND QUALIFICATIONS

1.      I am the same Elizabeth J. Johnson who submitted a report on behalf of Bausch & Lomb regarding infringement of U.S. Patent No. 6,660,297 ("the '297 patent") and U.S. Patent No. 8,603,522 ("the '522 patent") by SBH, dated February 20, 2024 ("February 20, 2024 Infringement Report"), and a rebuttal expert report, dated April 5, 2024, responding to SBH's Disclosure/Opinion of Unretained Expert Witness Zac Denning ("April 5, 2024 Rebuttal Report").[1]

2.      My professional and educational experience, qualifications, and other background information are described in my February 20, 2024 Infringement Report, as well as my *curriculum vitae* which is attached to that report.  I may testify about my background as summarized in that report and my *curriculum vitae*.

## II.  MATERIALS CONSIDERED

3.      In addition to relying upon my knowledge and experience, I reviewed SBH's "Rebuttal Expert Report of Matthew Kaser, D. Phil. to the Opening Expert Reports" ("Kaser Report"), the "Expert Report of Brian Buss" ("Buss Report"), and the documents cited herein in forming my opinions for this report.  A list of the materials that I have considered in preparing this report is attached as **Exhibit 1**.

4.      I have not made any exhibits that provide a summary of my opinions or illustrate points made in this report, but I expect to do so for use at trial in accordance with the Court's orders.  I reserve the right to offer additional rebuttal testimony to any evidence or argument

---

[1] I have been informed that the Court recently granted Bausch & Lomb's motion to strike SBH's Disclosure/Opinion of Unretained Expert Witness Zac Denning.

advanced by SBH, and I may also comment on any additional reports submitted by SBH and supplement this report as appropriate.

### III.   SUMMARY OF OPINIONS

5.      In my February 20, 2024 Infringement Report, I concluded that SBH's accused MacularProtect® Products, MacularProtect Complete® Products, and MacularProtect Complete® Drink Mix Products ("SBH's Accused Products") meet the requirements of one or more claims of the '297 and '522 patents.  My analysis of SBH's Accused Products and the asserted claims is included in Exhibits 3-5 of my February 20, 2024 Infringement Report.

6.      Claim 19 of the '297 patent recites: "**[a.]** A composition comprising on a daily dosage basis: **[b.]** approximately 7 to 10 times the RDA of vitamin C; **[c.]** approximately 13 to 18 times the RDA of vitamin E; **[d.]** approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof; **[e.]** approximately 4 to 7 times the RDA of zinc and **[f.]** at least 1.6 mg and not more than approximately 2.4 mg copper **[g.]** into a suitable dosage form."  Claim 24 depends on claim 19 and recites: "The composition of claim 19 **[h.]** wherein the zinc is provided as zinc oxide and the copper as copper oxide."  Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.]** and **[c.]** – **[h.]** of claims 19 and 24 of the '297 patent.  Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.]** and **[c.]** – **[h.]** of claims 19 and 24 of the '297 patent are met and does not dispute infringement of claims 19 and 24 of the '297 patent on any ground involving those elements.

7.      Claim 31 of the '297 patent recites: "**[a.]** A retina stabilizing composition comprising on a daily dosage basis: **[b.]** approximately 7 to 10 times the RDA of vitamin C; **[c.]**

approximately 13 to 18 times the RDA of vitamin E; **[d.]** approximately 1 mg to 40 mg of lutein; **[e.]** approximately 0.04 mg to 40 mg of zeaxanthine; **[f.]** approximately 4 to 7 times the RDA of zinc and **[g.]** not less than 1.6 mg and not more than 2.4 mg copper; **[h.]** as a suitable dosage form for the stabilization of visual acuity loss in persons with early age-related macular degeneration." Claim 32 depends on claim 31 and recites: "The composition of claim 31 **[i.]** wherein the zinc is provided as zinc oxide and the copper as copper oxide." Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.]** and **[c.]** – **[i.]** of claims 31 and 32 of the '297 patent. Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.]** and **[c.]** – **[i.]** of claims 31 and 32 of the '297 patent are met and does not dispute infringement of claims 31 and 32 of the '297 patent on any ground involving those elements.

8.     Claim 1 of the '522 patent recites: "**[a.]** A method for stabilizing visual acuity loss in persons with early age-related macular degeneration comprising: **[b.]** administering a daily dosage **[c.]** of not less than approximately 420 mg and not more than approximately 600 mg vitamin C, **[d.]** not less than approximately 400 IU and not more than approximately 540 IU vitamin E; **[e.]** approximately 0.04 mg to 40 mg lutein-zeaxanthine combination, **[f.]** not less than approximately 60 mg and not more than approximately 100 mg zinc and **[g.]** at least 1.6 mg and not more than approximately 2.4 mg copper." Claim 4 depends on claim 1 and recites: "The method of claim 1 **[h.]** wherein said composition is supplemented with alpha-lipoic acid, phenolic compounds, anthocyanosides or a combination thereof." Claim 5 depends on claim 1 and recites: "The method of claim 1 **[i.]** wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof." Claim 6 depends on claim 1 and recites: "The

method of claim 1 **[j.]** wherein said daily dosage is administered orally in the form of one or more tablets taken daily." Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.]** – **[b]** and **[d.]** – **[j.]** of claims 1 and 4-6 of the '522 patent. Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.]** – **[b.]** and **[d.]** – **[j.]** of claims 1 and 4-6 of the '522 patent are met and does not dispute infringement of claims 1 and 4-6 of the '522 patent on any ground involving those elements.

9.    Claim 8 of the '522 patent recites: "**[a.]** A method of treating age-related macular degeneration **[b.]** consisting essentially of administering a daily dosage **[c.]** of not less than approximately 420 mg and not more than approximately 600 mg vitamin C, **[d.]** not less than approximately 400 IU and not more than approximately 540 IU vitamin E; **[e.]** approximately 0.04 mg to 40 mg lutein-zeaxanthine combination, **[f.]** not less than approximately 60 mg and not more than approximately 100 mg zinc and **[g.]** at least 1.6 mg and not more than approximately 2.4 mg copper, **[h.]** wherein the daily dosage stabilizes visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration." Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.]** – **[b.]** and **[d.]** – **[h.]** of claim 8 of the '522 patent. Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.]** – **[b.]** and **[d.]** – **[h.]** of claim 8 of the '522 patent are met and does not dispute infringement of claim 8 of the '522 patent on any ground involving those elements.

10.    Claim 11 of the '522 patent recites: "**[a.]** A method for treating visual acuity loss in persons with early age-related macular degeneration, **[b.]** the method comprising administering a daily dosage composition comprising: **[c.]** approximately 7 to 10 times the RDA

of vitamin C; **[d.]** approximately 13 to 18 times the RDA of vitamin E; **[e.]** approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof; **[f.]** approximately 4 to 7 times the RDA of zinc and **[g.]** at least 1.6 mg and not more than approximately 2.4 mg copper." Claim 15 depends on claim 11 and recites: "The method of claim 11 **[h.]** wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof." Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.] – [b.]** and **[d.] – [h.]** of claims 11 and 15 of the '522 patent. Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.] – [b.]** and **[d.] – [h.]** of claims 11 and 15 of the '522 patent are met and does not dispute infringement of claims 11 and 15 of the '522 patent on any ground involving those elements.

11.    Claim 16 of the '522 patent recites: "**[a.]** A method for treating visual acuity loss in persons with early age-related macular degeneration, **[b.]** the method comprising administering a daily dosage composition comprising: **[c.]** approximately 7 to 10 times the RDA of vitamin C, **[d.]** approximately 13 to 18 times the RDA of vitamin E, **[e.]** approximately 1 mg to 40 mg of lutein, **[f.]** approximately 0.04 mg to 40 mg of zeaxanthine **[g.]** approximately 4 to 7 times the RDA of zinc; and **[h.]** not less than 1.6 mg and not more than 2.4 mg copper." Claim 20 depends on claim 16 and recites: "The method of claim 16 **[i.]** wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof." Dr. Kaser in his Rebuttal Report does not provide any assertions of opinions with respect to infringement by SBH's Accused Products of elements **[a.] – [b.]** and **[d.] – [i.]** of claims 16 and 20 of the '522 patent.

Accordingly, I understand that Dr. Kaser does not dispute that elements **[a.] – [b.]** and **[d.] – [i.]** of claims 16 and 20 of the '522 patent are met and does not dispute infringement of claims 16 and 20 of the '522 patent on any ground involving those elements.

12.     I understand that Dr. Kaser in his Rebuttal Report does not provide any assertions or opinions with respect to whether SBH's actions induce end-users to carry out one or more of the claims of the '522 patent or contribute to such infringement.  Accordingly, I understand Dr. Kaser does not dispute that if customers using SBH's accused products directly infringe the claims of the '522 patent, SBH's actions encourage, recommend or promote the practice of all elements of the asserted claims of the '522 patent.

13.     For the reasons provided in this report and my February 20, 2024 Infringement Report, it is my opinion that amount of vitamin C in SBH's accused products infringes the amounts of vitamin C in the asserted claims of the '297 and '522 patents under the doctrine of equivalents.

14.     In my opinion, prosecution history estoppel does not prevent Bausch & Lomb from asserting infringement of the amount of vitamin C in SBH's accused products under the doctrine of equivalents.

15.     In my opinion, none of the products identified in Schedule 6 of the Buss Report would be considered an acceptable non-infringing alternative to the formulations of the Patents-in-Suit.

## IV.     <u>INSTRUCTIONS ON THE LAW</u>

16.     Bausch & Lomb's counsel provided me with the legal standards for assessing patent infringement, which are stated in paragraphs 19-26 of my February 20, 2024 Infringement Report.  I have applied these same legal standards when forming my opinions in this report.

17.    I have been informed that prosecution history estoppel can bar a patentee from asserting infringement under the doctrine of equivalents.  I have been informed that prosecution history estoppel can occur when a patent applicant either (1) makes a narrowing amendment to a claim ("amendment-based estoppel") or (2) surrenders claim scope through argument ("argument-based estoppel").  I have been informed that argument-based estoppel prosecution history will be found only if arguments constitute clear and unmistakable surrenders of subject matter during prosecution, when the prosecution history is examined as a whole and viewed from the perspective of a reasonable competitor.

## V.    A PERSON OF ORDINARY SKILL IN THE ART (POSA)

18.    As I stated in my opening report, in my opinion, a POSA at the time of the inventions would typically have been a medical doctor, doctor of optometry ("O.D.") or a person with a Masters or a Ph.D. degree in nutritional science, chemistry, biology, biochemistry, or a related discipline and a few years of practical experience in the nutritional supplement area, including an understanding of formulations that could be considered to prevent or treat visual acuity loss in patients diagnosed with AMD. Alternatively, a POSA at the time could have been a person with a Bachelor's degree with a greater number of years of experience.  The POSA would have, or would have access to, general information regarding AMD, the convenience and needs of patients who suffer from AMD, and background information.

19.    It appears that Dr. Kaser adopted my definition of a POSA (*see* Kaser Report ¶ 19).  Therefore, I understand there is no dispute on the qualifications of a POSA in this action and I have continued to apply my definition of a POSA in reaching my opinions in this action.

20.    In addition, as explained in my opening report, for my analysis, counsel asked me to assume that the pertinent time of the inventions is March 23, 2001, which is the filing date of

the patent application that ultimately issued as the '297 and '522 patents. Dr. Kaser agrees that

the pertinent time of the inventions is March 23, 2001 (*see* Kaser Report ¶ 17). Thus, I

understand there is no dispute on this issue.

## VI.    PROSECUTION HISTORIES

### A.    <u>The '297 Patent File History</u>

21.    The prosecution history of the '297 patent comprises over 500 pages, representing

correspondence between the PTO and Bausch & Lomb spanning more than two-and-a-half years.

(BAUSCH0001765-2334).

22.    On March 23, 2001, Bausch & Lomb filed the patent application that would lead

to the '297 patent, which issued on December 9, 2003. (BAUSCH0001765-1850).

23.    The originally filed claims were directed, *inter alia*, to formulations containing

five vitamins and minerals: vitamin C, vitamin E, vitamin A in the form of beta-carotene

(substituted or supplemented with lutein, zeaxanthine or a combination thereof), zinc, and copper

(BAUSCH0001791-98 (claims 1, 2, 10)).

24.    The limitation relating to vitamin C was never amended and appears in its original

form to this day: "approximately 7 to 10 times the RDA of vitamin C." (*See e.g.*, '297 patent,

claims 1 and 19).

25.    On July 3, 2002, the Examiner rejected all pending claims as being obvious in

light of U.S. Patent No. 6,103,756 (Gorsek)[2] alone and in light of Gorsek combined with an

---

[2] Gorsek claims a formulation for the "prevention, stabilization, reversal and treatment of age
related macular degeneration, cataracts, elevated ocular pressure, diabetic retinopathy and
glaucoma" (Gorsek at Abstract) and states that the "key to the unique formulation is a
combination of specific nutrients that help to protect and neutralize free radicals that may
damage vision in the body." (Gorsek at col. 1, ll. 26-28). Gorsek lists thirteen essential

article by Newsome (BAUSCH0001951-60).  The Examiner asserted that Gorsek disclosed

compositions containing vitamin C, vitamin A, vitamin E, zinc, copper, lutein and alpha-lipoic

acid. (BAUSCH0001956-57).  The Examiner noted the amounts of all of the ingredients in

Gorsek, including vitamin C, which was at amounts of 100 to 6000 mg.  (BAUSCH0001956-57).

The Examiner also rejected the claims in light of a prior art patent to LaHaye combined with

Gorsek and Newsome, arguing that LaHaye taught formulations of vitamin C, vitamin E, copper,

zinc, and Vitamin A. (BAUSCH0001958-59).[3]

26.    On October 15, 2002, Bausch & Lomb responded to the Examiner's arguments by

arguing that Gorsek and LaHaye disclosed very different formulations from the claimed

invention and taught a host of other vitamins and minerals as "essential" ingredients

(BAUSCH0001967-71):

> Gorsek, '756 teaches a formulation for treating macular degeneration
> comprising as **essential ingredients** vitamin C, vitamin E, vitamin A,
> magnesium, L-taurine, selenium, bilberry extract, a natural fruit with
> standardized anthocyanosides, lutein extract, lycopene, alpha lipoic acid,
> quercetin, rutin and citrus bioflavonoids, in addition to other non-essential
> ingredients.
>
> \*                    \*                    \*
>
> **Gorsek, '756 teaches away from the subject claimed formulation.**
> Gorsek, '756 teaches a formulation comprising among other essential
> ingredients, **3.5** times the %DV of Vitamin A, **16.7** times the %DV of
> vitamin C, **17** times the %DV of vitamin E, and among other non-essential
> ingredients, **1.6** times the %DV of zinc and **0.5** times the %DV of copper.
> Accordingly, the subjection [sic: subject] formulation as compared to the
> Gorsek, '756 formulation comprises approximately a 2 to 3 times **greater**
> amount of vitamin A, approximately **half** the amount of vitamin C,
> approximately within the **same** range of vitamin E, approximately 2 to 3

---

ingredients and twenty-three non-essential ingredients. (Gorsek at col. 1, ll. 56-65 and col. 2, ll. 1-7).  Gorsek characterized zinc and copper as non-essential ingredients. (*See id.*).

[3] LaHaye claims a formulation intended to "provide a treatment methodology for eye diseases." (LaHaye at col. 4, ll. 3-10).  The required components in the LaHaye formulation are "Vitamins C and E, zinc, copper, selenium, manganese, and at least one of L-cysteine, pyridoxine, and riboflavin."  (LaHaye at col. 4, ll. 11-14).

times **greater** amount of zinc and approximately **double** the amount of copper. Gorsek, '756 teaches away from the importance of the subject five ingredients and the essential formulation amounts disclosed and claimed in the subject application. The subject unique formulation as described and claimed is not made obvious in light of the teachings of Gorsek, '756. . . . Accordingly, the unique formulation of the present invention as disclosed and claimed in the subject application differs significantly from the teachings of Gorsek, '756 and D.A Newsome et al. whether considered individually or in combination.

\*                    \*                    \*

**LaHaye et al., '116 teaches away from the subject claimed formulation.** LaHaye et al., '116 teaches a formulation comprising among other essential ingredients **33.3** times the RDA of vitamin C, **2** times the RDA of Vitamin E, **6.7** times the RDA of zinc and **2** times the RDA of copper with no teaching with regard to vitamin A. Accordingly, the subject formulation as compared to the LaHaye et al., '116 formulation comprises approximately **3 to 5 times less** vitamin C, approximately **6 to 9 times more** vitamin E, approximately within the **same** range of zinc and approximately **half** the amount of copper. LaHaye et al., '116 teach away the importance of the subject five ingredients and the essential formulation amounts disclosed and claimed in the subject application. The subject unique formulation as described and claimed is not made obvious in light of the teachings of LaHaye et al., '116. . . . The unique formulation of the present invention as disclosed and claimed in the subject application differs significantly from the teachings of LaHaye et al., '116, Gorsek, '756 and D.A Newsome et al. whether considered individually or in combination.

27.    On January 15, 2003, the Examiner repeated the same grounds for rejection as before (BAUSCH0002120-27).

28.    During a February 19, 2003 interview, Bausch & Lomb and the Examiner discussed the pending claims and the prior art of record. The Examiner summarized the interview as follows: "The components in claimed composition and their criticality as opposed to those in the prior art were discussed. Applicant's representatives will submit an existing publication and additional data showing the unexpected results obtained by the inclusion of zinc and copper in the antioxidant combination of A, C and E." (BAUSCH0002131).

29.    On May 30, 2003, Bausch & Lomb attempted to convince the Examiner to

withdraw the obviousness rejections by repeating the same arguments as before

(BAUSCH0002204-11).

30.    Bausch & Lomb argued that Gorsek as a whole differed in several respects from

the invention, namely in terms of the type and amount of vitamin A, the amount of zinc, and the

amount of copper (BAUSCH0002226-27):

> **Rather, Gorsek teaches that zinc and copper are non-essential
> ingredients.** The AREDS study showed that an antioxidant combination
> (i.e., vitamin A in the form of beta carotene, vitamin C and vitamin E) was
> <u>not</u> effective without zinc and copper. Zinc and copper are essential
> ingredients in the present invention. See, for example, pages 17 and 18,
> paragraphs 33 and 34 of the present specification and page 1417 and 1432
> of AREDS Report 8. Gorsek thereby **<u>teaches away</u>** from the necessity of
> zinc **and** copper **with** the antioxidants to achieve an effective formulation.
> The present invention when compared to the teachings of Gorsek also
> differs in the **amount and type of vitamin A (Gorsek's natural
> carotenoids vs. applicants' beta carotene), the amount of zinc** and the
> **amount of copper.**

31.    Bausch & Lomb also addressed LaHaye and explained that "[t]he present

invention, compared to LaHaye, differs in the **amount of vitamin C** (7-10 times RDA vs. 33.3

times RDA), the **amount of vitamin E** (13-18 times RDA vs. 2 times RDA), the **amount of**

**copper** (RDA vs. 2 times RDA), and the **amount of vitamin A** (6-10 times the RDA of vitamin

A in the form of beta-carotene vs. RDA of vitamin A)" and posed the question: "Since LaHaye

states that the seven essential ingredients are <u>synergistic</u>, why would a person of ordinary skill in

the art vary the ingredients and their concentrations and still expect to obtain the described

synergistic results?" (BAUSCH0002228).

32.    On August 26, 2003, in the Notice of Allowance, the Examiner indicated that he

was allowing the patent to issue because "[t]he prior art fails to teach or suggest a composition

that contains the recited five essential components, vitamins A, C, E, zinc and copper in their

11

recited concentrations on a daily dosage basis wherein the synergism between the 5 components

provides a beneficial effect for treating macular degeneration.  The prior art did not show this

particular combination in theses [sic: these] particular concentrations on a daily basis to have a

synergistic effect on treating macular degeneration." (BAUSCH0002312).

**B.    '297 Patent Reexamination History**

33.    In 2007, Rexall Sundown, Inc. instituted an *inter partes* reexamination of the '297

patent.  The six year reexamination of the '297 patent by the PTO consists of over 1,000 pages of

correspondence between the PTO, Bausch & Lomb and Rexall (BAUSCH0002335-3808).  The

reexamination concluded with the issuance of a reexamination certificate on April 30, 2013.

(BAUSCH0003470-71).

34.    In Rexall's Request for *Inter Partes* Reexamination of U.S. Patent No. 6,660,297,

Rexall argued the term "approximately" with respect to the amounts of vitamin C, vitamin E and

zinc should be construed to have no scope beyond the claimed ranges based on prosecution

history estoppel during prosecution of the '297 patent, but that the term "approximately" with

respect to "approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene"

should be construed to include 25,000 to 50,000 IU (i.e., 5 to 10 times the RDA) of vitamin A in

the form of beta-carotene. (BAUSCH0002414-18).

35.    On December 21, 2007, the UPSPTO granted Rexall's Request for

Reexamination (BAUSCH0002544-62).

36.    On February 15, 2008, Bausch & Lomb filed an Amendment Under 37 C.F.R. §

1.53(D) and § 1.937(B) in response to the grant of reexamination.  The Patent Owner disagreed

with Rexall's proposed claim construction for "approximately."  In particular, Bausch & Lomb

disagreed that there was a clear and unambiguous disclaimer or disavowal during prosecution of

the '297 patent and urged the Examiner to conclude "that the term 'approximately' is well

accepted by the Court to avoid a strict numerical boundary to a recited range" and "that the term

be construed to extend the recited range to at least the next half integer." (BAUSCH0002593-

96).

      37.     On September 14, 2009, the Examiner issued an Action Closing Prosecution.

Regarding claim construction, the Examiner concluded:

> The Patent Owner has not provided a disclaimer or disavowal in the
> prosecution history regarding the claim term "approximately." In
> addition, the Patent Owner (Applicant during the original prosecution) has
> not clearly and unambiguously disclaimed or disavowaled any
> interpretation of the term "approximately" in order to distinguish the
> recited ranges of the claimed components from the ranges by the prior art.
> Accordingly, [Rexall]'s argument that Patent Owner should be estopped
> from taking a different position regarding the term "approximately," is not
> found persuasive. Thus, the term "approximately" is interpreted as
> meaning *comes near* or *nearly exact*, which are the ordinary and
> customary meanings of this term.

(BAUSCH0002738).

In addition, the Examiner stated:

> Patent Owner's comments and arguments are not found persuasive for
> interpreting the term "approximately" to be construed to only extend the
> recited range to at least the next half integer. . . . the claim term
> "approximately" when combined with the claimed amounts that ultimately
> relate to the amounts in mg or IU (which are obtained from multiples of
> the RDA) for each claimed vitamin and mineral such as zinc and copper,
> is interpreted as meaning *comes near* or *nearly exact* to the ranges in mg
> or IU, rather than the more narrower interpretation to be construed to only
> extend the recited range to at least the next half integer when relating to
> the multiples of the RDA. Patent Owner has provided a chart in their
> Response of 02/19/2008 on page 15 that includes a section that includes an
> "Amount under Proposed Claim Construction" to correlate to the claimed
> limitations of the vitamins and zinc.
>
> 16. However, a strict numerical boundary is not to be imposed on the
> claimed ranges of the '297 Patent as purported by the Patent Owner. The
> more limited proposed interpretations of the claim term "approximately"
> by the Patent Owner are not found persuasive to only extend the recited
> range to at least the next half integer.

(BAUSCH0002739-40).

38.    On November 13, 2009, Bausch & Lomb submitted a Patent Owner Response to Action Closing Prosecution Under 37 C.F.R. §§ 1.951(a) and 1.943 requesting, *inter alia*, that the Examiner reconsider the Examiner's proposed construction of the term "approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene," but did not seek reconsideration of the construction of the term "approximately" with respect to the amounts of vitamin C, vitamin E or zinc. (BAUSCH0002886-87).

39.    On November 30, 2011, the Examiner issued a Second Action Closing Prosecution in which the Examiner reiterated its claim construction for "approximately" regarding vitamin A in the form of beta-carotene. (BAUSCH0003146-48).

40.    On October 22, 2012, the Examiner issued a Third Action Closing Prosecution concluding that claims 1-4, 10, 18, 19 and 21-32 were patentable and confirming the patentability of claims 5, 6, 8, 9, 11, 12 and 14-17.  (BAUSCH0003337-72).

### C.    '668 Patent Application Prosecution History

41.    On August 15, 2003, Bausch & Lomb filed Application Ser. No. 10/641,668 ("the '668 application") as a continuation of the '297 patent application.  When the '668 application was filed, a Preliminary Amendment was filed containing three independent claims: one directed to a composition (claim 3), one directed to a method of use (claim 4), and one directed to a method of manufacture (claim 5).  (BAUSCH0121418-25).

42.    On July 14, 2004, the Examiner issued an Office Action.  The Examiner rejected independent claims 3 and 5 (directed to compositions and methods of manufacture) for obviousness-type double patenting ("OTDP") over the '297 patent.  However, claim 4 (the only independent claim directed to the method of use) was *not* rejected for OTDP over the '297 patent

14

(*See* July 14, 2004 Office Action at 4 ("*Claims 3, 5*, . . . are rejected under the judicially created doctrine of obviousness-type double patenting.") (emphasis added). (BAUSCH0121648).

43.    On October 12, 2005, the PTO issued a Notice of Abandonment of the '668 application. (BAUSCH0121654-55).

### D.    '522 Patent Prosecution History

44.    In 2005, Bausch & Lomb filed an application that would lead to the '522 patent, which issued in December 2013. The full prosecution history of the '522 patent comprises over 1700 pages of correspondence spanning eight years (2005-2013) between the PTO and Bausch & Lomb. (BAUSCH0000013-1764).

45.    The application that resulted in the '522 patent initially contained independent claims directed to: (1) compositions (claims 1, 2 and 3); methods of use (claim 4); and methods of manufacture (claims 5 and 6). (BAUSCH0000070-77).

46.    On December 11, 2008, the Examiner issued a Restriction Requirement to the three groups of claims, noting the "inventions are distinct." (BAUSCH0000276-82 at BAUSCH0000277). Specifically, the Examiner found the composition claims (claims 1-3) and the method of use claim (claim 4) to be distinct because "the product as claimed can be used in a materially different process of using that product." (*Id*. at BAUSCH0000277).

47.    On January 21, 2009, Bausch & Lomb elected to prosecute the claims directed to the methods of use. (BAUSCH0000286-90).

48.    On April 4, 2012, Bausch & Lomb informed the Examiner that the reexamination of the '297 patent had been favorably concluded. (BAUSCH0001336). Bausch & Lomb further argued (1) that "AREDS I proved that the recited combination of *vitamins plus zinc/copper* has a surprising medical benefit over the use of placebo, vitamins alone or zinc/copper alone at exactly

15

the same daily dosage" (BAUSCH0001339), (2) that "[g]iven the state of the art with respect to each of these vitamins and zinc, one of ordinary skill could not reasonably predict that their combination into a high daily dosage form would prevent the progression of AMD," (BAUSCH0001340), and (3) that "[a]s explained in the Chew Declaration before the results of the AREDS study were known, no combination of vitamins with zinc/copper at any concentration had demonstrated any clinical benefit to AMD patients." (BAUSCH0001341).

49.   The PTO rejected the claims on January 18, 2013, based on the AREDS publication, the Prevention Healing publication, the Howard reference, and Riley, arguing that all claimed concentration ranges overlapped. (BAUSCH0001347-54).

50.   Subsequently, Bausch & Lomb submitted the Reexamination Certificate for the '297 patent. (BAUSCH0001378-80).

51.   In the Statement of Reasons for Allowance, the Examiner stated that arguments submitted in connection with the '297 patent reexamination were persuasive for overcoming all pending rejections of the '522 patent. (BAUSCH0001382).

## VII.   REPLY OPINIONS

### A.   Dr. Kaser's "Reasonably Close" Arguments Are Flawed

52.   Dr. Kaser offers three distinct and different assertions on how a person of ordinary skill would understand the court's interpretation of "approximately" as meaning "reasonably close to" in the context of the '297 and '522 patents. (Kaser Report ¶¶ 63-65). I disagree with each of his conclusions.

53.   First, Dr. Kaser asserts that "reasonably close" refers to "90 mg above 500 mg" that, according to Dr. Kaser, "is to account for degradation." (Kaser Report ¶ 63; *see also* ¶¶ 28-31). As an initial matter, the portion of the specification that Dr. Kaser relies on for this

assertion makes clear that these are "preferred" amounts of vitamin C. (*See* '297 patent, col. 5, ll. 13-33). Moreover, Dr. Kaser mistakenly attributes the "approximately" 90 mg overage discussed in the specification to a 500 mg daily dosage, rather than the 450 mg daily dosage that it is clearly referring. Indeed, under Dr. Kaser's approach, applying the "approximately twenty percent overage" for vitamin C to the upper bound of "approximately . . . 10 times the RDA of vitamin C" or "approximately 600 mg vitamin C" would allow up to 720 mg of vitamin C within the literal scope of the claims.

54.    Second, Dr. Kaser asserts that "reasonably close" means "not more than ½ integer higher" based on the patentee statements during the reexamination. (Kaser Report ¶ 65). However, the statement Dr. Kaser relies upon from the reexamination clearly states "that the term be construed to extend the recited range *to at least* the next half integer." (BAUSCH0002595) (emphasis added). Regardless, as explained in this report, the Examiner disagreed with that position as "too narrow" an interpretation.

55.    Finally, Dr. Kaser asserts that "reasonably close to" in the context of the patents would be understood "to be limited to no more than 10 mg either way" based on "convention" when formulating a vitamin product. (Kaser Report ¶ 64). I note that Dr. Kaser relies on no documents to support this conclusion, but simply states this is based on his "experience as a biochemist." (*Id.*). In my opinion, industry standards and guidelines within the dietary supplement industry refute that position. The United States Pharmacopeia ("USP"), which is an authoritative source of information for the industry, states that the acceptance criteria of vitamin C in the form of ascorbic acid is 90%-150% of the labeled amount. (USP 24 NF 19 at 2333-38). In other words, if a manufacturer wants to make a label claim that its product contains 500 mg of vitamin C in the form of ascorbic acid, it would comply with USP specifications as long as it

17

contained from 450 mg up to 750 mg of ascorbic acid as measured using analytical methods

prescribed by the USP.  Applying this industry standard to the upper limit of "approximately . . .

10 times the RDA of vitamin C" or "approximately 600 mg vitamin C," a person of ordinary

skill in the art would understand that 600 mg of vitamin C in the form of ascorbic acid could

contain up to 900 mg of vitamin C in the form of ascorbic acid.  Thus, under Dr. Kaser's industry

"convention" approach, SBH's level of vitamin C would literally fall within the levels claimed in

the Patents-in-Suit and, at a minimum, further demonstrate that a person of ordinary skill in the

art would understand that SBH's Accused Products are insubstantially different from the claimed

amounts of vitamin C.

### B.    Dr. Kaser Relies on Misleading Studies to Support His Doctrine of Equivalents Opinion on Vitamin C

56.    For the reasons explained in my February 20, 2024 Infringement Report, one of

ordinary skill in the art would understand that SBH's Accused Products containing 750 mg of

vitamin C infringe the claim elements specifying "approximately 7 to 10 times the RDA of

vitamin C" and "not less than approximately 420 mg and not more than approximately 600 mg

vitamin C" under the doctrine of equivalents.  (*See* my February 20, 2024 Infringement Report

¶¶ 61-78, Exhibits 3-5).  In his Rebuttal Report, Dr. Kaser relies on several studies that,

according to him, contradict my conclusions.  (*See* Kaser Report ¶¶ 77-90.)  For at least the

reasons explained below, in my opinion, Dr. Kaser's reliance on these studies is misplaced and

does not affect my opinion that the formulations of SBH's accused products containing 750 mg

vitamin C infringe the '297 and '522 patents under the doctrine of equivalents.

57.    In support of his opinion that substantial differences exist between the 750 mg of

Vitamin C utilized in SBH's accused products and the literally claimed range, Dr. Kaser opines

that the Roche European American Cataract Trial ("REACT 2002") study taught a person of

18

ordinary skill in the art "that more Vitamin C is beneficial for eye disorders" and that "750 mg

Vitamin C as an appropriate daily dose would be better than lesser amounts to treat eye disorders

and conditions." (Kaser Report ¶¶ 78-79). I disagree.

58. REACT 2002 compared a daily dosage of beta-carotene (18 mg), vitamin C (750

mg) and vitamin E (600 mg) against a placebo to determine if the micronutrient combination

would modify progression of Age-Related Cataracts. Because REACT 2002 only tested vitamin

C at an oral dose of 750 mg, Dr. Kaser's conclusion "that more Vitamin C is beneficial for eye

disorders" and 750 mg vitamin C "would be better than lesser amounts" is completely

unsupported and baseless as the study does not make any comparison to any lesser daily dosage

amount, much less a daily dosage of 500 mg. Moreover, Dr. Kaser's statement that the REACT

2002 formula "produced a small deceleration in progression of Age-Related Cataract" is

irrelevant (*see* Kaser Report ¶ 78); the Patents-in-Suit are directed to formulations and methods

for using such formulations that reduce the risk of developing late stage or advanced AMD. I

also disagree with Dr. Kaser's assertion that it would have been foreseeable based on the

REACT 2002 results that 750 mg vitamin C is an appropriate daily dose for reducing the risk of

developing late stage of advanced AMD, because REACT 2002 is unrelated to that outcome.

(*See* Kaser Report ¶ 75).

59. Another study Dr. Kaser relies on, Iqbal 1999, studied oral administration of

vitamin C on human aqueous humor ascorbate concentration. Iqbal 1999 is irrelevant here for

several reasons. (*See* Kaser Report ¶¶ 80-87).

60. First, the study design of Iqbal is unreliable. The study does not mention any

baseline measurements of the diet, plasma, or serum of the patients, so it is unclear whether there

are any baseline differences. Although Table 1 of Iqbal merely mentions that the concentration

of vitamin C is measured as "x ± s", there is no indication of whether this is standard error or standard deviation.[4]  Standard error and standard deviation provide different indications of variability.   Although all doses show significant differences from the control, the study does not indicate that there are differences among the interventions with vitamin C.  Further, the study is merely designed to be cross-sectional, meaning the results do not reflect the effects of aqueous humor vitamin C levels over an extended period of time.  In fact, the patients were administered doses of vitamin C two times only, once at night before cataract surgery and once in the morning of the day of operation.[5]  There is no mention of whether the doses were administered at the same time or standardized throughout the patients tested.  This lack of standardizing dose administrations could be a factor in the varied data in the results, as explained below.

61.    Second, the Iqbal study is irrelevant because it does not compare the effect of vitamin C at an oral dosage of 500 mg with 750 mg.  Rather, the study observed the oral administration of vitamin C at 1, 2, 3, and 5 g per day and according to Dr. Kaser, the aqueous humor vitamin C levels "rose and did not plateau until between the 3 and 5 g oral dose (see Table 2)."  (*See* Kaser Report ¶ 80).  Dr. Kaser redrew Table 2 from Iqbal 1999 stating it was a "dose value per their text rather than from (implausible) column heading," (*see* Kaser Report ¶ 80) but the information represented by Dr. Kaser is misleading.  Dr. Kaser's "redrawn" Table 2 omits the data in Table 1 in Iqbal 1999 (below) showing that the aqueous humor level at Vc of 1.5 g (526 ± 125 mg per liter) was similar to the aqueous humor level at Vc of 5 g (571 ± 88 mg per liter).[6]  Therefore, it is inaccurate for Dr. Kaser to opine that Iqbal 1999 teaches that "plasma

---

[4] Iqbal 1999 at 881.

[5] Iqbal 1999 at 880.

[6] Iqbal 1999 at 881.

levels of vitamin C are increasing with increased amounts of vitamin C ingested (doses between 1 g and 5 g)." (*See* Kaser Report ¶ 85).

Tab 1. Concentration of Vc $(mg \cdot L^{-1})$ in human aqueous humour, plasma, and serum after *po* Vc. $\bar{x} \pm s$. [a]$P > 0.05$, [b]$P < 0.05$ vs control.

| Vc/ mg·kg⁻¹ | Patients | Aqueous humour | Plasma | Serum |
|---|---|---|---|---|
| 0 (Control) | 10 | $254 \pm 119$ | $4.5 \pm 1.1$ | $4.4 \pm 1.4$ |
| 1.0 | 10 | $270 \pm 62$[a] | $9.1 \pm 1.0$[b] | $6.0 \pm 1.6$[b] |
| 1.5 | 7 | $526 \pm 125$[b] | | |
| 2.0 | 19 | $713 \pm 93$[b] | $13.1 \pm 2.0$[b] | $7.4 \pm 1.7$[b] |
| 3.0 | 8 | $799 \pm 94$[b] | $27 \pm 5$[b] | $15 \pm 4$[b] |
| 5.0 | 4 | $571 \pm 88$[b] | $72 \pm 18$[b] | |

62.    Contrary to Dr. Kaser's assertion, my opinion based on Levine 2001 in my February 20, 2024 Infringement Report that plasma saturation occurs between 200 mg and 400 mg daily is not contradicted by the teachings of Iqbal, because in Levine 2001, the study was measuring steady-state concentrations of vitamin C doses. (*See* February 20, 2024 Infringement Report ¶¶ 70-72). Iqbal 1999 was an acute study, and the results were based on only two doses of vitamin C administered to cataract surgery patients at unknown times without a standardized procedure. Iqbal 1999 cannot be relied upon given the variability of when the doses of vitamin C were administered.

63.    Dr. Kaser further argues that "the inventors have disclaimed any plasma levels of vitamin C above 5 mg/l." (Kaser Report ¶¶ 81-82). I disagree. Nowhere do the claims of the Patents-in-Suit reference any plasma levels of vitamin C, thus there is no limitation that could have been disclaimed. Moreover, Dr. Kaser provides no explanation what amount of vitamin C within a "range of 0 and 1 g dose of vitamin C" was purportedly disclaimed.

64.    Finally, Dr. Kaser relies on Hah 2017, which measured vitamin C in the aqueous humor both in control (0 g) and test (2 g).  (*See* Kaser Report ¶¶ 88-90).  Dr. Kaser alleges that the testing resulted in "saturation of vitamin C in aqueous humor," relying on Fig. 2, but his assertion is incorrect.  (*See id.* ¶ 88).  Fig. 2 shows ascorbic acid concentrations in the aqueous humor of the control, oral vitamin C and intravenous vitamin C groups.[7]  The intravenous dose of vitamin C was 20 g/day and the intravenous dose results display that levels of vitamin C in the aqueous humor can be achieved beyond that of the oral dose of 2 g/day.[8]  Therefore, based on Fig. 2 of Hah 2017, one cannot conclude that saturation of vitamin C in the aqueous humor was achieved with an oral dose of 2 g/day.  (*See id.* ¶ 88).

65.    Similar to Iqbal 1999, Hah 2017 does not specify the timing of when the vitamin C dosing was administered; it merely mentions that participants were administered vitamin C on the day before cataract surgery.[9]  Indeed, the study acknowledged this design flaw, that there is "no standardization of ascorbic intake of the individual patients, so, it can affect ascorbic acid level in the aqueous humor."[10]  Hah 2017 further does not compare the effect of vitamin C at an oral dosage of 500 mg with 750 mg.

66.    Dr. Kaser asserts without any support that the Levine 2001 study from my February 20, 2024 Infringement Report is not a correct representation of what levels of vitamin C are carried in the blood.  (*See* Kaser Report ¶ 90).  Levine 2001 is a more accurate representation of the concentration of vitamin C in the blood, because unlike the Iqbal 1999 and Hah 2017 studies, it measured vitamin C plasma steady-state concentrations for each dose, rather

---

[7] Hah 2017 at 4.

[8] Hah 2017 at 4.

[9] Hah 2017 at 2.

[10] Hah 2017 at 4.

than acutely measuring vitamin C levels. Acute doses of vitamin C result in a peak plasma or serum level that rapidly decreases[11], whereas daily dosing results in steady state levels over a range of intakes.[12]  The Patents-in-Suit cover retinal health supplements that are taken as a daily dose, not one acute dose.

67.    In sum, the studies Dr. Kaser cites to are unreliable and have no relevance to whether SBH's accused products containing 750 mg vitamin C infringe the '297 and '522 patents under the doctrine of equivalents.  Therefore, they do not change my opinion that 750 mg of vitamin C is equivalent to the claimed amount of vitamin C.

### C.    Dr. Kaser Fails to Rebut the Opinions in My Infringement Report

68.    In my February 20, 2024 Infringement Report, I discussed literature supporting my opinion that the formulations of SBH's accused products containing 750 mg vitamin C perform substantially the same function in substantially the same way to achieve substantially the same result as the element of "approximately 7 to 10 times the RDA of vitamin C" and "not less than approximately 420 mg and not more than approximately 600 mg vitamin C." (*See, e.g.*, February 20, 2024 Infringement Report ¶¶ 69-74)  In response, Dr. Kaser alleges that "every person has a different way of metabolizing vitamin C," but provides no publications or literature to support this proposition.  (*See* Kaser Report ¶ 124)  Dr. Kaser further asserts that I relied on "questionable literature," yet does not explain what specifically was unreliable about the literature I referenced.  (*See id.* ¶ 124)

69.    Dr. Kaser further asserts that the Padayatty 2004 study found that "oral doses of 1.25 g/day ascorbic acid produce mean peak plasma vitamin C concentrations of 135

---

[11] *See* Padayatty 2004 at Fig. 1.

[12] *See* Levine 1996 and Levine 2001.

micromol/L." (*See* Kaser Report ¶ 130).  However, this finding is irrelevant because the study results are reporting the *mean peak plasma* of vitamin C concentrations, which is not relevant, because after the administration of an acute dose, there is a peak that rapidly falls.  The peak increases with increase in dose, but so will the urinary excretion.[13]  With daily dosing administration, a range of doses results in steady-state.[14]

70.    The Padayatty 2004 study found that "peak plasma vitamin C concentrations seemed to plateau with increasing oral doses" and concluded that the data showed that "vitamin C plasma concentrations are tightly controlled when the vitamin is taken orally, even at the highest tolerated amounts."[15]  This supports my opinion and the Blanchard 1997, Levine 2001, and Levine 1996 studies' findings that as the oral dose of vitamin C is increased, the concentration of vitamin C in the plasma does not increase proportionally, but rather approaches an upper limit.  (*See, e.g.*, February 20, 2024 Infringement Report ¶¶ 69-74).  Dr. Kaser's criticism that the Levine 2001 is limited to young women (Kaser Report ¶ 131), ignores the fact that Levine 1996 (also cited in my February 20, 2024 Infringement Report) similarly studied the relationship between vitamin C dose and steady-state plasma concentrations in young men with similar results to Levine 2001.  (*See, e.g.*, February 20, 2024 Infringement Report ¶¶ 73-74).

71.    Dr. Kaser's discussion of the natural biochemical function of vitamin C fails to change my opinion and is irrelevant to the doctrine of equivalents inquiry because it provides no explanation for why a 500 mg dose of vitamin C would function differently than a 750 mg dose of vitamin C.  (*See* Kaser Report ¶¶ 134-135).  Importantly, Dr. Kaser does not deny that vitamin

---

[13] *See* Levine 1996 at Fig. 4, 3707 ("The 500 and 1250-mg doses were entirely excreted in urine.")

[14] *See* Levine 1996, Fig. 1 and Levine 2001, Fig. 1.

[15] Padayatty 2004 at 534.

C functions as an antioxidant, and in fact, recognizes that "Vitamin C is essential to the eye in order to remove oxygen." (*See id.* ¶¶ 134, 139). Dr. Kaser concludes that "787.5 mg vitamin C is a good deal better for a person than 500 or 600 mg vitamin C" but provides no publications or evidence to show that the function of vitamin C is improved at a higher dose. (*See* Kaser Report ¶ 140).

72.    As such, Dr. Kaser fails to rebut my opinion that the 750 mg vitamin C in the formulations of SBH's accused products perform substantially the same function in substantially the same way to achieve substantially the same result as the element of "approximately 7 to 10 times the RDA of vitamin C" and "not less than approximately 420 mg and not more than approximately 600 mg vitamin C."

### D.    Prosecution History Estoppel

73.    I disagree with Dr. Kaser's argument that the Patent Owner's statements during the reexamination regarding claim construction of the term "approximately" "created a file or patent prosecution history estoppel" to prevent application of infringement under the doctrine of equivalents in this case (Kaser Report ¶¶ 41, 68). I note that Dr. Kaser relies primarily on the February 19, 2008 Patent Owner's Response to the Pending Rejections under the heading "Claim Construction" to make this argument (Kaser Report ¶¶ 37-40). The Court previously rejected this argument during the claim construction proceeding (D.I. 108 at 10-11):

> Nor does the Court agree with Defendant that "approximately" must be
> construed to limit any deviation from the claimed ranges to "a half integer
> variation in stated RDA multiples"—in light of the patentee's statements
> during the '297 patent reexamination proceedings. (D.I. 79 at 25-26).
> Importantly, in the reexamination, the Examiner rejected the argument that
> the patentee was making with those statements. Instead, the Examiner
> concluded that the term "approximately" should be interpreted more
> broadly than the patentee suggested, in line with the term's ordinary and
> customary meaning: "comes near" or "nearly exact." (D.I. 54, ex. E1 at 8-
> 10). Courts have refused to find prosecution history disclaimer where the

alleged disclaimer was not accepted by the PTO. . . . Indeed, in another case involving the same patents-in-suit that Plaintiffs filed against a third party, the United States District Court for the Western District of New York (the "*Vitamin Health* Court") was presented with this same argument (i.e., that the patentee narrowed the meaning of "approximately" during the reexamination proceedings by asserting that it would not extend to the next adjacent whole integer, and the term should instead be construed to extend the recited range to at least the next half integer). The *Vitamin Health* Court likewise concluded that "because Bausch and Lomb's purported disclaimer was not accepted, and indeed was rejected by the patent office, there can be no finding that the disclaimer was made for purpose of obtaining the '297 patent." *Bausch & Lomb Inc. v. Vitamin Health, Inc.*, 13-CV-6498T, 2015 WL 13574354, at *7 (W.D.N.Y. Jan 15, 2015) (citing cases).

74.     Similarly, there was no surrender of equivalents to the literal claim scope, as the Patent Office rejected the applicants' proposal.

75.     Also misplaced is Dr. Kaser's reliance on the Patent Owner's November 13, 2009 Response in the reexamination. (Kaser Report ¶ 45). The cited portion of the Response only discussed the construction of the term "approximately" in relation to the claim term "approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene" (*See* BAUSCH0002886-87). It is unclear how Dr. Kaser can argue that this statement—wholly unrelated to the amount of vitamin C—supports the argument that Bausch & Lomb disclaimed any amount of vitamin C.

76.     I also disagree with Dr. Kaser's conclusion that the statements during prosecution of the '297 patent support a finding that prosecution history estoppel prevents application of the doctrine of equivalents. In support of this argument, Dr. Kaser misleadingly and incompletely points only to statements made in an October 15, 2002 Amendment discussing the Gorsek and LaHaye references. (Kaser Report ¶¶ 69-71). As to Gorsek, while Dr. Kaser correctly states that the inventors noted that the claimed invention "differs significantly from the teachings or [sic: of] *Gorsek*," he then crops the response to make it seem as if the inventors' argument to

distinguish Gorsek was focused on vitamin C and its amount: "teaches a formulation comprising as **essential ingredients** vitamins A, C, and E, etc." and "that *Gorsek* **teaches away from the subject claimed invention** ….. **16.7** times the %DV of vitamin C." (Kaser Report ¶ 69). The full response, however, shows that the patent applicant did not limit its distinction to the vitamin C amounts; rather, the applicant argued that Gorsek disclosed a very different formulation from the claimed invention and taught a host of vitamins and minerals as "essential" ingredients. The applicant pointed out that, taken in its entirety, "Gorsek, '756 teaches away from the subject claimed formulation" (BAUSCH0001968-69):

> Gorsek, '756 teaches a formulation for treating macular degeneration comprising as **essential ingredients** vitamin C, vitamin E, vitamin A, magnesium, L-taurine, selenium, bilberry extract, a natural fruit with standardized anthocyanosides, lutein extract, lycopene, alpha lipoic acid, quercetin, rutin and citrus bioflavonoids, in addition to other non-essential ingredients.
>
> $$*\qquad\qquad *\qquad\qquad *$$
>
> **Gorsek, '756 teaches away from the subject claimed formulation.** Gorsek, '756 teaches a formulation comprising among other essential ingredients, **3.5** times the %DV of Vitamin A, **16.7** times the %DV of vitamin C, **17** times the %DV of vitamin E, and among other non-essential ingredients, **1.6** times the %DV of zinc and **0.5** times the %DV of copper. Accordingly, the subjection [sic: subject] formulation as compared to the Gorsek, '756 formulation comprises approximately a 2 to 3 times **greater** amount of vitamin A, approximately **half** the amount of vitamin C, approximately within the **same** range of vitamin E, approximately 2 to 3 times **greater** amount of zinc and approximately **double** the amount of copper. Gorsek, '756 teaches away from the importance of the subject five ingredients and the essential formulation amounts disclosed and claimed in the subject application. The subject unique formulation as described and claimed is not made obvious in light of the teachings of Gorsek, '756. . . . Accordingly, the unique formulation of the present invention as disclosed and claimed in the subject application differs significantly from the teachings of Gorsek, '756 and D.A Newsome et al. whether considered individually or in combination.

77.     Similarly misleading and incomplete is Dr. Kaser's discussion of the LaHaye reference. (Kaser Report ¶ 71). According to Dr. Kaser, the patent applicant countered the

Examiner's rejection based on LaHaye "by stating that LaHaye et al. '**teaches away from the subject claimed formulation**', that is a formulation **33.3** times the RDA of vitamin C (their emphasis)." (*Id.*). However, the full response clearly shows that the patent applicant based its distinction of LaHaye on the host of differences between LaHaye and the claimed inventions (BAUSCH0001971):

> **LaHaye et al., '116 teaches away from the subject claimed formulation.** LaHaye et al., '116 teaches a formulation comprising among other essential ingredients **33.3** times the RDA of vitamin C, **2** times the RDA of Vitamin E, **6.7** times the RDA of zinc and **2** times the RDA of copper with no teaching regarding vitamin A. Accordingly, the subject formulation as compared to the LaHaye et al., '116 formulation comprises approximately **3 to 5 times less** vitamin C, approximately **6 to 9 times more** vitamin E, approximately within the **same** range of zinc and approximately **half** the amount of copper. LaHaye et al., '116 teach away the importance of the subject five ingredients and the essential formulation amounts disclosed and claimed in the subject application. The subject unique formulation as described and claimed is not made obvious in light of the teachings of LaHaye et al., '116. . . . The unique formulation of the present invention as disclosed and claimed in the subject application differs significantly from the teachings of LaHaye et al., '116, Gorsek, '756 and D.A Newsome et al. whether considered individually or in combination.

78.    In sum, the prosecution history demonstrates that Bausch & Lomb distinguished its claimed formulation from the Gorsek and LaHaye references based on the combination of several factors. Bausch & Lomb never attempted to differentiate its claimed formulations from Gorsek and LaHaye based solely, or even in large part, on a difference in vitamin C levels. Bausch & Lomb did not clearly and unmistakably disavow coverage over formulations that meet all of the elements of the claims of the Patents-in-Suit but substitute 750 mg of vitamin C for the claimed ranges of vitamin C.

79.    My opinion that the statements during prosecution of the '297 patent do not support establishment of prosecution history estoppel to prevent application of the doctrine of

equivalents is consistent with the Examiner's position during reexamination who disagreed with

a similar argument by Rexall and concluded:

> The Patent Owner has not provided a disclaimer or disavowal in the
> prosecution history regarding the claim term of "approximately." In
> addition, the Patent Owner (Applicant during the original prosecution) has
> not clearly and unambiguously disclaimed or disavowaled any
> interpretation of the term "approximately" in order to distinguish the
> recited ranges of the claimed components from the ranges by the prior art.
> Accordingly, [Rexall]'s argument that Patent Owner should be estopped
> from taking a different position regarding the term "approximately," is not
> found persuasive. Thus, the term "approximately" is interpreted as
> meaning *comes near* or *nearly exact*, which are the ordinary and
> customary meanings of this term.

(BAUSCH0002738).

**E.      Opinions on Infringing Alternative Products, Settlement Agreements, and SBH's Products**





████████████    ██████████████████████████████████

████████████████

### F.    <u>Validity</u>

83.    As previously stated, I understand SBH has the burden of proof on validity by clear and convincing evidence (*see* April 5, 2024 Rebuttal Report ¶ 8), and that the parties with the burden of proof were to provide their expert reports on those issues on February 20, 2024. Dr. Kaser did not provide any report on invalidity on that date but appears to argue the issues of enablement and indefiniteness.  (*See, e.g.*, Kaser Report ¶¶ 91-104, 107-114).

84.    I reiterate and incorporate my opinions rebutting SBH's invalidity arguments as stated in my April 5, 2024 Rebuttal Report.  (*See* April 5, 2024 Rebuttal Report, ¶¶ 14-38). Regarding whether the claims of the '297 and '522 patent are definite, it is my opinion that the term "approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof" in claim 19 of the '297 patent and claim 11 of the '522 patent is not indefinite.

85.    Regarding enablement of the claims of the '297 and '522 patents, it is my opinion that a person of ordinary skill in the art provided with the '297 or '522 patent could make or use the compositions of claim 19 of the '297 patent and the method of claim 11 of the '522 patent containing "approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof" without engaging in undue experimentation.

---

[22] BAUSCH0122124-54.

86.     To the extent Dr. Kaser is allowed to also testify on these subjects, I reserve the right to further offer additional rebuttal testimony to any evidence or argument advanced by Dr. Kaser on these validity subjects and supplement this report as appropriate.

Dated:  April 25, 2024

Elizabeth J. Johnson, Ph.D.

Reply Expert Report of Elizabeth J. Johnson, Ph.D.

Exhibit 1

## Exhibit 1- Materials Considered

Age-Related Eye Disease Study Research Group, *The Age-Related Eye Disease Study (AREDS): Design Implications*, 20 Control Clin Trials. 573-600 (1999) (AREDS Report No. 1) (BAUSCH0064137-164)

Age-Related Eye Disease Study Research Group, *The Age-Related Eye Disease Study: A Clinical Trial of Zinc and Antioxidants – Age-Related Eye Disease Study Report No. 2*, J. Nutr. Sci. (Vol. 130): 1516S-9S (May 2000) (AREDS Report No. 2 (2000)) (BAUSCH0099769-72)

Age-Related Eye Disease Study Research Group, *A Randomized, Placebo-Controlled Clinical Trial of High-Dose Supplementation with Vitamins C and E, Beta-Carotene, and Zinc for Age-Related Macular Degeneration and Vision Loss*, 119 ARCH OPHTHALMOL. 1417-1436 (2001) (AREDS Report No. 8) (BAUSCH0008466-85)

Blanchard, J. et al., *Pharmacokinetic Perspectives on Megadoses of Ascorbic Acid*, Am. J. Clin. Nutr., Vol. 66: 1165-71 (1997) ("Blanchard") (BAUSCH0122163-0122169)

Chew et al., *Lutein + Zeaxanthin and Omega-3 Fatty Acids for Age-Related Macular Degeneration, AREDS2 Randomized Clinical Trial*, 309(19) JAMA 2005-2015 (2013) ("AREDS2 paper") (BAUSCH0011259-69)

Dietary Reference Intakes for Vitamin C, Vitamin E, Selenium, and Carotenoids, FOOD AND NUTRITION BOARD, Dietary reference intakes, National Academies Press (2000) (BAUSCH0122170-0122268)

Dr. Emily Chew ARVO Presentation (BAUSCH0061950-62028)

Johnson, E.J., Vishwanathan, R., Rasmussen, H.M., Lang, J.C., *Bioavailability of AREDS1 Micronutrients from Softgel Capsules and Tablets: A Pilot Study*, 20 MOLECULAR VISION 1228-42 (2014))

Levine, M. et al., *A New Recommended Dietary Allowance of Vitamin C for Healthy Young Women*, Proc. Natl. Acad. Sci. USA, Vol. 98, No. 17: 9842-46 (2001) ("Levine 2001") (BAUSCH0122269-0122273)

Levine, M. et al, *Vitamin C Pharmacokinetics in Healthy Volunteers: Evidence for a Recommended Dietary Allowance*, Proc. Natl. Acad. Sci. USA Vol. 93: 3704-09 (1996) ("Levine 1996") (BAUSCH0122155-0122160)

Meyers K.J., Mares J.A., Igo, R.P., Truitt B., Liu Z., Millen A.E., Klein M., Johnson E.J., et al., *Genetic Evidence for Role of Carotenoids in Age-Related Macular Degeneration in the Carotenoids in Age-Related Eye Disease Study (CAREDS)*, 55 IOVS 587 (2014)

Vishwanathan, R., Chung, M., and Johnson, E.J., *A Systematic Review on Zinc for the Prevention and Treatment of Age-Related Macular Degeneration*, 54 IOVS 3985 (2013)

Vitamin E Fact Sheet For Health Professionals, National Institutes of Health, available at https://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional/ (BAUSCH0122295-0122311)

Yin, J. et al., *Modulation of Oxidative Stress Responses in the Human Retinal Pigment Epithelium Following Treatment with Vitamin C*, J. Cellular Physiology, Vol. 226: 2025-32 at 2026 (2010) (BAUSCH0122274-0122281)

U.S. Patent 6,660,297 and File History (BAUSCH0001765-2334)

U.S. Patent 6,660,297 Reexamination Certificate and File History (BAUSCH0002335-3808)

U.S. Patent 8,603,522 and File History (BAUSCH0000013-1764)

U.S. Patent Application No. 10/641,668 File History (BAUSCH0121389-0121655)

SBH's Answer to Plaintiffs' Requests for Admission

SBH's Disclosure/Opinion of Unretained Expert Witness Zac Denning

SBH's Supplemented Final Invalidity Contentions Regarding Bausch & Lomb's Patents

SBH00008-8a
SBH00009-9a
SBH00010-10a
SBH00011-11a
SBH00012
SBH00013
SBH00014
SBH00015
SBH00016
SBH00017
SBH00018
SBH00019
SBH00020-20a
SBH00021-21a
SBH00022-22a
SBH00023-23a
SBH00051-51a
SBH00061
SBH00088
SBH00093-93a
SBH00095
SBH00096
SBH00106a-d
SBH00108
SBH00111
SBH00117
BAUSCH0003856-67
BAUSCH0003888-97
BAUSCH0004708-19
BAUSCH0011914-23
BAUSCH0018801
BAUSCH0028053
BAUSCH0031971
BAUSCH0099738-42
BAUSCH0099743-49
BAUSCH0105800
BAUSCH0105911
BAUSCH0121038-45
BAUSCH0121475-79
BAUSCH0121644-49
BAUSCH0121656
BAUSCH0122124-54
BAUSCH0122161-0122162
BAUSCH0122288-0122289
BAUSCH0122290-0122291

BAUSCH0122292-0122294
BAUSCH0122312-0122319
Deposition Transcript of SBH (30(b)(6) by Alain Magro), November 29, 2023
Deposition Transcript of Alain Magro, November 30, 2023 and Exhibits 2-5
Deposition Transcript of Zac Denning, November 30, 2023 and Exhibits 51, 52, 54, 55
Deposition Transcript of Zac Denning, December 1, 2023
D.I. 79, Joint Claim Construction Brief
D.I. 80, Joint Appendix to Joint Claim Construction Brief, Exhibit A (Declaration of Dr. Susan
B. Bressler)
D.I. 84, Amended Joint Claim Construction Chart
D.I. 108, Report and Recommendation on Claim Construction

# EXHIBIT 2



1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3                     ---oOo---

4   BAUSCH & LOMB INCORPORATED & PF  :
    CONSUMER HEALTHCARE 1 LLC,       :
5                                    :
                    Plaintiffs,      :
6                                    :
              vs.                    :  No. 20-1463(GBW)(CJB)
7                                    :
    SBH HOLDINGS LLC,                :
8                                    :
                    Defendant.       :
9   _____:

10

11

12              HIGHLY CONFIDENTIAL

13      VIDEO-RECORDED DEPOSITION OF ZAC DENNING

14                  Volume II

15              December 1, 2023

16

17

18

19

20

21

22  Job No. J10539023

23  Stenographically reported by:
    LAURA AXELSEN, CSR NO. 6173
24      RMR, CCRR, CRR, CRC

25



1    IN THE UNITED STATES DISTRICT COURT FOR

2              THE DISTRICT OF DELAWARE

3                   ---oOo---

4    BAUSCH & LOMB INCORPORATED & PF  :
     CONSUMER HEALTHCARE 1 LLC,       :
5                                     :
              Plaintiffs,             :
6                                     :
         vs.                          :  No. 20-1463(GBW)(CJB)
7                                     :
     SBH HOLDINGS LLC,                :
8                                     :
              Defendant.              :
9    _____ :

10

11        BE IT REMEMBERED THAT, pursuant to Notice and

12   on Friday, December 1,  2023, at 9:30 a.m. thereof,

13   with all participants being present or via Zoom

14   videoconference, before me, LAURA AXELSEN, a

15   Certified Shorthand Reporter, appeared

16                   ZAC DENNING

17   called as a witness by the Plaintiffs.

18

19                   ---oOo---

20

21

22

23

24

25



ZAC DENNING Vol. II Highly Conf.                    December 01, 2023
BAUSCH & LOMB vs SBH HOLDINGS LLC

```
 1                    APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4

 5        VENABLE LLP

 6        BY:  STEVEN C. KLINE, ESQ.

 7             DANIEL KALTMAN, ESQ.

 8             SCOTT K. REED, ESQ.

 9        151 West 42nd Street, 49th Floor

10        New York, New York 10036

11

12   FOR DEFENDANTS:

13        FREAR STEPHEN SHMID

14        ATTORNEY AT LAW

15        7585 Valley Ford Road

16        Petaluma, California 94952

17

18        There also being present and Kevin McMahon,

19   videographer.

20

21                    ---oOo---

22

23

24

25
```



```
 1                       INDEX

 2

 3                                          PAGE

 4   EXAMINATION BY MR. KLINE                146

 5   FURTHER EXAMINATION BY MR. KLINE        197

 6

 7                    ---oOo---

 8

 9              INDEX OF EXHIBITS

10

11   EXHIBIT       DESCRIPTION              PAGE

12

13   Exhibit 50   A Randomized,              146

14                Placebo-Controlled, Clinical

15                Trial of High-Dose

16                Supplementation With Vitamins C

17                and E, Beta Carotene, and Zinc

18                for Age-Related Macular

19                Degeneration and Vision Loss

20   Exhibit 51   ScienceBased Health Launches  149

21                First-of-its-kind Nutritional

22                Supplement Based on National Eye

23                Institute's New ARED Study

24                Findings

25   Exhibit 52   Detail Sheet for MaculaRX Plus  152
```



Case 1:20-cv-01463-GBW-CJB    Document 217-1    Filed 10/24/24    Page 46 of 266
PageID #: 6440

ZAC DENNING Vol. II Highly Conf.                    December 01, 2023
BAUSCH & LOMB vs SBH HOLDINGS LLC

1              Capsules

2    Exhibit 53    Statement of Use Under 37 CFR        156

3              2.88, MacularProtect Plus

4    Exhibit 54    Statement of Use Under 37 CFR        162

5              2.88, MacularProtect Complete

6    Exhibit 55    MacularProtect Complete Capsules     168

7              patient brochure

8    Exhibit 56    Patent No.: US 6,660,297 B2          182

9    Exhibit 57    Patent No.:  US 8,603, 522 B2        187

10

11                    ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25





Page 152

```
1        MR. KLINE:  Get this one.  I'll mark as
2   Exhibit 52 a document titled, MaculaRx Plus
3   capsules.
4        (EXHIBIT 52 WAS MARKED FOR
5        IDENTIFICATION.)
6        MR. SCHMID:  51 and 52 don't have any
7   Bates numbers, I take it?
8        MR. KLINE:  That's correct.  You guys
9   didn't -- did not produce this, yes.
10       THE REPORTER:  (Clarification.)
11       MR. SCHMID:  There's no question.  Okay.
12       MR. KLINE:  Q.  And can you just look at
13  Exhibit 52 and let me know if you can identify that
14  for the record?
15       A.  It looks like a detail sheet, also
16  referred to as a monograph, that has detailed
17  information about the MaculaRx Plus product.
18       Q.  And are these monographs, are these things
19  that SBH would have provided to doctors at about
20  that time on the product?
21       A.  Correct.
22       Q.  Okay.  Mr. Denning, is Exhibit 52 a copy
23  of SBH's monograph for SBH's reformulated MaculaRx
24  Plus product that reflected the results of the AREDS
25  study?
```

Page 153

```
1        A.  Correct.
2        Q.  And on page two of the exhibit, does that
3   provide the ingredients and levels of the nutrients
4   in the reformulated MaculaRx Plus product?
5        A.  Yes.
6        Q.  So SBH's reformulated MaculaRx Plus,
7   reflecting the AREDS results, contain a daily dosage
8   of 500 milligrams of vitamin C, 400 IU vitamin E,
9   80 milligrams zinc, and 2 milligrams copper,
10  correct?
11       A.  Correct.
12       Q.  Okay.  And the amounts of vitamin C,
13  vitamin E, zinc, and copper were the same levels
14  recommended by the NEI based on the AREDS results,
15  right?
16       A.  Correct.
17       Q.  But instead of 15 milligrams beta-carotene
18  as recommended by the NEI following AREDS, SBH's
19  reformulated MaculaRx Plus product contained 5 IU
20  vitamin A, which was 50 percent beta-carotene and
21  supplemented with -- supplemented the vitamin A with
22  15 milligrams lutein and 750 micrograms zeaxanthin
23  daily, right?
24       A.  Correct.  Although, lutein and zeaxanthin
25  don't supplement vitamin A.
```

Page 154

```
1        Q.  Well, it was added to the formula, right?
2        A.  It was included in the formula, right.
```

(lines 3-23 redacted)

```
24       MR. KLINE:  Q.  The AREDS results -- the
25  AREDS study that we looked at bears a date of
```

Page 155

```
1   October 2001, right?
2        MR. SCHMID:  You got 50?
3        MR. KLINE:  Q.  It's Exhibit 50.
4        A.  Correct.
5        Q.  And when we looked at Exhibit 51, the
6   press release of launching this product was a month
7   later, right?
8        A.  Correct.
```

(lines 9-14 redacted)

```
15       MR. KLINE:  Q.  Okay.  Now, you mentioned,
16  I believe, and correct me if I'm wrong -- if I'm --
17  I'm not trying to mischaracterize, but you mentioned
18  yesterday that this MaculaRx Plus product was later
19  rebranded as the MacularProtect Plus, correct?
20       A.  Incorrect.
21       Q.  Okay.
22       A.  MacularProtect Plus -- yeah, it was --
23  this was -- I believe changed to MacularProtect, and
24  I'm not sure of the timeline, but there was also
25  MacularProtect Complete.
```





Page 164

1  MacularProtect Complete in Exhibit 54 contained
2  1,000 milligrams of vitamin C daily, correct?
3      A.  Correct.
4      Q.  And despite that difference, SBH marketed
5  this formulation of its MacularProtect Complete as
6  being an AREDS formula, correct?
7          MR. SCHMID:  Objection; argumentative.
8  You can answer.
9          THE WITNESS:  Uhm, I would say that it was
10 marketed as a formula based on AREDS.  It notes that
11 the blend of nutrients -- and I'm paraphrasing --
12 found to protect macular health in the AREDS trial,
13 et cetera, but it doesn't say it is an AREDS
14 formulation.
15         So yesterday we talked about amounts
16 versus ingredients.  This cites using the
17 ingredients tested in that trial.
18         MR. KLINE:  Q. So you believe that SBH
19 marketed as an AREDS-based formula --
20     A.  Correct.
21     Q.  -- despite that difference, correct?
22     A.  Correct.
23

Page 165

1

Page 166

1  important role in impacting oxidated stress in
2  particular, which is, you know, is a -- plays a
3  significant role in macular degeneration.
4      Q.  And do you -- can you provide me a little
5  bit more information on this dose-response study
6  you're referring to?
7      A.  I don't have a specific study ready for
8  you, but I could look.  That was my understanding.
9  Certainly, plasma levels rise readily in response to
10 intake, and I believe that I've encountered studies
11 that -- that show a similar sort of increase in
12 ocular fluids as well.
13
14
15
16     Q.  Do you believe the MacularProtect Complete
17 depicted in Exhibit 54 would have any difference in
18 safety relative to the recommended AREDS formula?
19         MR. SCHMID:  To the extent it calls for an
20 expert testimony, objected.
21         THE WITNESS:  No.
22         MR. KLINE:  Q. Okay.  And you see in
23 addition to the 15 milligrams of beta-carotene,
24 SBH's MacularProtect Complete depicted in Exhibit 54
25 supplemented the formulation with 6 milligrams

Page 167

1  lutein and 300 micrograms of zeaxanthin, correct?
2          MR. SCHMID:  Objection to the term
3  supplemented --
4          MR. KLINE:  Okay.
5          MR. SCHMID:  -- as conclusionary.
6          THE WITNESS:  Those levels were included
7  in this formula.
8          MR. KLINE:  Q. Okay.  So why were those
9  levels included in this AREDS-based formula?
10     A.  I can't say.
11     Q.  Why?
12     A.  I'm not aware.



Page 168

[text redacted]

7    MR. KLINE:  Okay.  I'll have the court
8  reporter mark as Exhibit 55 a copy of the
9  MacularProtect Complete capsules document.
10    (EXHIBIT 55 WAS MARKED FOR
11    IDENTIFICATION.)
12    THE WITNESS:  Thank you.
13    MR. KLINE:  Q.  And just -- can you
14  identify for the record what Exhibit 55 is?
15    A.  It is a patient brochure for
16  MacularProtect.
17    Q.  And if you look on the first page of
18  Exhibit 55, you see there's -- there are columns, so
19  to speak.  There's a middle that says MacularProtect
20  Complete, and then it has an arrow pointed --
21  things, and then at the bottom it says, ScienceBased
22  Health.  Do you see that?
23    A.  Yes.
24    Q.  And at the very bottom, I believe that it
25  says 10/22/07.  It's my understanding that that

Page 169

1  would refer to this being created around
2  October 22nd, 2007, is that --
3    A.  Correct.  Yeah.
4    Q.  -- your understanding?
5    MR. SCHMID:  Let him finish his question.
6    THE WITNESS:  Sorry.
7    MR. KLINE:  Q.  Is that correct?
8    A.  That's correct.
9    Q.  So would it be fair to say that Exhibit 55
10  would represent the MacularProtect Complete product
11  that was marketed around 2007 time frame?
12    A.  Correct.
13    Q.  Okay.  And if you look back at the
14  MacularProtect Complete, the 2003 version we just
15  looked at in Exhibit 54, and you can compare
16  everything, but I'm just going to focus on more of
17  the AREDS-related components.
18    A.  Okay.
19    Q.  The 2007 version still contained
20  15 milligrams of beta-carotene, correct?
21    A.  Uhm, correct.
22    Q.  And it still contained 1,000 milligrams of
23  vitamin C, correct?
24    A.  Correct.
25    Q.  And it still contain 400 IU of vitamin E,

Page 170

1  correct?
2    A.  Correct.
3    Q.  And it still contained 80 milligrams of
4  zinc, correct?
5    A.  Correct.
6    Q.  And it still contained 2 milligrams of
7  copper, correct?
8    A.  Correct.
9    Q.  But the amount of lutein was changed from
10  6 milligrams to 10 milligrams, correct?
11    A.  Correct.
12    Q.  And the amount of zeaxanthin was changed
13  from 300 micrograms to 1 milligram, correct?
14    A.  Correct.
15  [text redacted]

Page 171

[text redacted]

11    Q.  Okay.  As far as you're aware, there had
12  been no publication in 2007 of any AREDS-based
13  formulation containing lutein and zeaxanthin, right?
14    A.  No.  Or I should say, that's right.
15  [text redacted]

24    Q.  So if -- just to reorient yourself.  So if
25  you could turn back to Exhibit 13, just so we're not



Page 172

1  in the dark here. This is the MacularProtect
2  Complete capsule that we have looked at previously,
3  or I guess you didn't look at it. We looked at it
4  with Mr. Magro, right?
5      A.  Right.
6      Q.  But you're familiar with this --
7      A.  Correct.
8      Q.  -- sheet, right? So in the current
9  MacularProtect Complete capsule, there are
10  750 milligrams of vitamin C daily, right?
11      A.  Right.
12      Q.  Whereas in the 2007 version and the 2003
13  version we looked at, there were 1,000 milligrams of
14  vitamin C, right?
15      A.  Right.
16      Q.  Why did SBH decrease the amount of vitamin
17  C in its MacularProtect Complete by 250 milligrams?
18      A.  I don't know specifically.
19      Q.  Do you believe it would have resulted in a
20  decrease in efficacy of the formulation?
21          MR. SCHMID: To the extent it calls for
22  expert testimony, objected to. Go ahead and answer.
23          THE WITNESS: It might, but I note that
24  the -- the B vitamins have also been increased
25  during this time, which I believe would have

Page 173

1  increased the efficacy.
2          MR. KLINE:  Q. Have these B vitamins ever
3  been studied for reducing macular degeneration or
4  reducing the risk of developing macular degeneration
5  in the patients that the AREDS formula was shown to
6  benefit?
7      A.  You're asking --
8          MR. SCHMID: Hold on. Object as vague --
9  vague and ambiguous. That seems compound. You got
10  a lot of stuff in there, but go ahead if you
11  understand it.
12          THE WITNESS: Are you asking if the exact
13  same people who were involved as participants in the
14  AREDS study were -- were tested in another study and
15  only those individuals?
16          MR. KLINE:  Q. No, the same patient
17  group?
18      A.  What do you mean by patient group?
19      Q.  Patients who already had AMD, or
20  Categories 3 and 4, as you said?
21          MR. SCHMID: Okay --
22          MR. KLINE: Let me rephrase it.
23          MR. SCHMID: Yeah.
24          MR. KLINE:  Q. Was the B3 -- is it B3, is
25  that the way you want to refer to it?

Page 174

1      A.  No.
2      Q.  How --
3      A.  You could say three B vitamins.
4      Q.  The three B vitamins, were those studied
5  in a patient population that would have been
6  characterized as Categories 3 and 4 in the AREDS
7  study?
8      A.  Some of the participants during the WAFACS
9  study, I believe, would have fallen into Categories
10  3 and 4.
11      Q.  What percentage?
12      A.  But I don't --
13          MR. SCHMID: You cut in.
14          MR. KLINE: I'm sorry.
15          MR. SCHMID: That's okay. Did you finish
16  your answer? He asked a follow-up.
17          THE WITNESS: Uhm, I don't know what
18  percentage.
19          MR. SCHMID: Okay.
20          MR. KLINE:  Q. Do you believe it was a
21  very small percentage?
22      A.  I don't know.
23      Q.  And you -- are you aware of any studies
24  that look at the impact on efficacy of a nutrient
25  supplement formulation of decreasing an amount of

Page 175

1  vitamin C and increasing three B vitamins in that
2  formula?
3      A.  No.
4



# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3                          ---oOo---

 4   BAUSCH & LOMB INCORPORATED & PF  :
     CONSUMER HEALTHCARE 1 LLC,       :
 5                                     :
                     Plaintiffs,      :
 6                                     :
                  vs.                 : No. 20-1463 (GBW)
 7                                     :        (CJB)
                                       :
 8                                     :
     SBH HOLDINGS LLC,                 :
 9                                     :
                                       :
10                   Defendant.        :
     _____:
11

12

13                   HIGHLY CONFIDENTIAL

14        VIDEO-RECORDED DEPOSITION OF ALAIN MAGRO

15                      30(b)(6)

16                  November 29, 2023

17

18

19

20

21

22

23   Job No. J10539021

24   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
25        RMR, CCRR, CRR, CRC, RDR
```



ALAIN MAGRO  Highly Conf. 30b6                    November 29, 2023
BAUSCH & LOMB vs SBH HOLDINGS LLC

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3                        ---oOo---

4   BAUSCH & LOMB INCORPORATED & PF  :
    CONSUMER HEALTHCARE 1 LLC,       :
5                                    :
                 Plaintiffs,         :
6                                    :
                 vs.                 : No. 20-1463 (GBW)
7                                    :       (CJB)
                                     :
8                                    :
    SBH HOLDINGS LLC,                :
9                                    :
                                     :
10                Defendant.         :
    _____ :
11

12          BE IT REMEMBERED THAT, pursuant to Notice and

13   on Wednesday, November 29, 2023, at

14   9:37 a.m. thereof at 101 California Street, Suite

15   3800, San Francisco, California, before me, LAURA

16   AXELSEN, a Certified Shorthand Reporter, personally

17   appeared

18                        ALAIN MAGRO,

19   called as a witness by the Plaintiff.

20                        ---oOo---

21

22

23

24

25



ALAIN MAGRO  Highly Conf. 30b6                      November 29, 2023
BAUSCH & LOMB vs SBH HOLDINGS LLC

```
 1                        APPEARANCES

 2

 3    FOR THE PLAINTIFF:

 4          VENABLE LLP

 5          BY:   STEVEN KLINE, ESQ.

 6                DANIEL H. KALTMAN, ESQ.

 7                SCOTT K. REED, ESQ. (Remotely)

 8          151 West 42nd Street, 49th Floor

 9          New York, New York  10036

10

11    FOR THE DEFENDANT:

12          FREAR STEPHEN SCHMID

13          Attorney at Law

14          7585 Valley Ford Road

15          Petaluma, California 94952

16

17    FOR THE DEFENDANT:

18          THOMAS FREIBURGER

19          ATTORNEY AT LAW

20          55 Main Street, 2nd Floor

21          Tiburon, California  94920

22

23          There also being present Zac Denning and Dan

24    DeFrank, videographer.

25                      ---oOo---
```



ALAIN MAGRO  Highly Conf. 30b6                      November 29, 2023
BAUSCH & LOMB vs SBH HOLDINGS LLC

```
1                        INDEX

2

3                                              PAGE

4   EXAMINATION BY MR. KLINE                     8

5

6                    ---oOo---

7

8               INDEX OF EXHIBITS

9

10  EXHIBIT        DESCRIPTION               PAGE

11

12  Exhibit 1    Notice of Deposition          11

13  Exhibit 2    MacularProtect product label  19

14  Exhibit 3    Former version of the         21

15               MacularProtect product label

16  Exhibit 4    MacularProtect Complete product 36

17               label

18  Exhibit 5    Former MacularProtect product  36

19               label

20  Exhibit 6    MacularProtect Complete drink  42

21               mix product label

22  Exhibit 7    Former version of the         43

23               MacularProtect Complete drink

24               mix product label

25  Exhibit 8    Formulation Specification Sheet, 67
```



MacularProtect Complete #294120 ct

Exhibit 9    Manufacturing Flowchart    76
Exhibit 10   2017 MacularProtect Complete    78
             testing results
Exhibit 11   MacularProtect capsules    80
Exhibit 12   Older version of a    83
             MacularProtect brochure
Exhibit 13   MacularProtect Complete patient    94
             brochure
Exhibit 14   Older version of the    97
             MacularProtect Complete-S
             product label
Exhibit 15   Older version of the    97
             MacularProtect Complete-S
             capsules brochure
Exhibit 16   MacularProtect Capsules brochure    99
             for doctors



1     ███████████████████████████████

2 ███████████████████████████████

3     Exhibit 20    Slide entitled Target Audience    146

4 ████████████████████████████████████████████

5 ██████████████████████████████████████

6 ████████████████████

7     Exhibit 22    Responses to First Set of    152

8                 Interrogatories

9     Exhibit 23    Average Cost of manufacture,    160

10                 from 10/28/14 to 3/23/21

11 ████████████████████████████████████████████

12 ███████████████████████████

13     Exhibit 25    Us vs Them    168

14 ████████████████████████████████████████████

15 ██████████████████████████████████

16 ████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████████████████████████

19 ████████████████████████

20     Exhibit 28    Vitamin firm battles Bausch &    202

21                 Lomb over eye formular

22

23                 ---oOo---

24

25



Page 21

1  address?
2      THE REPORTER:  (Clarification.)
3      THE WITNESS:  No, I'm not aware of any
4  other changes given the version of this label.
5      MR. KLINE:  I'm going to have the court
6  reporter mark as Plaintiff's Exhibit 3 a document
7  bearing production number SBH 00015.
8      (EXHIBIT 3 WAS MARKED FOR
9          IDENTIFICATION.)
10     THE WITNESS:  Thank you.
11     MR. KLINE:  Q.  And could you identify
12  what this is for the record?
13     A.  This is a former version of the
14  MacularProtect product label.
15     Q.  Now, if you look at Exhibit 2 and compare
16  that to Exhibit 3, the formula for the product,
17  they're the same, correct?
18     A.  Correct.
19     Q.  Okay.  So the difference was the product
20  name?
21     A.  No, it's still called MacularProtect.  It
22  still has the same product name.  The only
23  difference is in how the amounts per servings were
24  identified, you know, based on how some of the
25  labeling regulations had changed, but everything is

Page 22

1  the same in regard to the ingredients and the amount
2  of the ingredients, I think.
3      Q.  And there were some other changes to the
4  label, obviously, coloring and the way it's
5  presented, right?
6      A.  Yeah, coloring, you know, sometimes some
7  of the non-active stuff, how they make the product,
8  and, you know -- and, uhm, as well as, obviously,
9  our address.
10     Q.  Okay.  And the purpose for this is just so
11  if during today's deposition I referred to the
12  MacularProtect product of SBH you will understand
13  that to mean both the product as set forth in the
14  labels in Exhibit 2 and 3, correct?
15     A.  It's the same product.
16     Q.  Right.
17     A.  It's just a different --
18     Q.  Okay.
19     A.  -- label, but, yes, this is exact same
20  product, yes.
21     Q.  Okay.  I just want to make sure I don't
22  need to refer to -- you know, if I'm referring to
23  MacularProtect, I'm talking about --
24     THE REPORTER:  (Clarification.)
25     MR. KLINE:  Q.  MacularProtect, you'll

Page 23

1  understand that could be either one of those same
2  formulas, right?
3      A.  That is correct.
4      MR. SCHMID:  He just wants to have agreed
5  terminology.
6      THE WITNESS:  Yeah, yeah.
7      MR. SCHMID:  Sorry, Steve.  I just --
8      MR. KLINE:  Q.  Right.  So just so I'm
9  clear, so the Exhibit 3 label I think you said was
10  the old label; is that correct?
11     A.  Yeah, that was an older version of the
12  label for MacularProtect.
13     Q.  Right.  Was the label with -- under
14  Exhibit 3 ever sold at the same time as the label
15  product with Exhibit 2, or was one just we ran out
16  of this and we replaced it with the other?
17     A.  It wasn't -- both products weren't -- it
18  wasn't like they were, you know, sold
19  simultaneously.  One transitioned to the other
20  because predominantly this was a change in the look
21  of the label from design here to this design.  So
22  that's what --
23     Q.  Okay.
24     A.  -- precipitated, you know, that change.
25     MR. SCHMID:  And just for the record, his

Page 24

1  reference in Exhibit 2 --
2      THE WITNESS:  In 3.
3      MR. SCHMID:  Yeah.
4      THE WITNESS:  Both of them, the former
5  MacularProtect label that I was provided and the
6  most -- and the current MacularProtect label I was
7  provided.
8





Page 25

7     Q.   Okay.  So is it your testimony on behalf
8   of SBH that it was selling a MacularProtect product
9   containing vitamin C, 750 milligrams; vitamin E,
10   268 milligrams; vitamin B6, 11.9 milligrams;
11   foliate -- folate, 333 micrograms DFE; vitamin B12,
12   100 micrograms; zinc, 80 milligrams; copper, 2
13   milligrams, lutein, 10 milligrams; and zeaxanthin,
14   2 milligrams before 2005?
15     A.   No, not the lutein and -- not the lutein
16   and zeaxanthin because that didn't -- that wasn't in
17   the product.  It was a -- these products were not
18   sold prior to 2005 with the lutein and zeaxanthin.
19

20

Page 26

Page 27

Page 28



Page 29

Page 31

9     MR. KLINE:   Q. Do you understand what
10   research and development costs are?
11     A.   Yeah, I do.
12     Q.   What do you understand it to mean?
13     A.   That, you know, there's research that
14   would be done to -- to -- well, I guess research and
15   development with respect to just formulating a
16   product or just, you know, in general research and
17   development.
18     Q.   Why don't you tell me your in general
19   definition and --
20   ███████████████████

Page 30

4     Q.   Okay.  I think we have the same
5    understanding of what research and development is.
6     A.   Yeah, okay.  Yeah.





Page 33

Page 35

Page 34

Page 36

| | |
|---|---|
| 1 | MR. KLINE:  Let's mark as Exhibit 4 -- |
| 2 | this is Tab 12. |
| 3 | (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.) |
| 4 | MR. KLINE:  Q. I'll mark as Exhibit 4 a |
| 5 | document bearing production number SBH 00016. |
| 6 | Just -- again, just for the record, Mr. Magro, can |
| 7 | you identify Exhibit 4? |
| 8 | A.  Yeah, it's our MacularProtect Complete |
| 9 | product label.  I guess latest version that was |
| 10 | submitted -- provided to -- to you prior to our |
| 11 | moving to our new location.  So there's -- the |
| 12 | address is not the most current. |
| 13 | Q.  Okay. |
| 14 | A.  But otherwise this looks to me like it's |
| 15 | our -- yeah, our most current label of that product. |
| 16 | MR. KLINE:  All right.  And then I'm going |
| 17 | to have the court reporter mark as Exhibit 5 a |
| 18 | document bearing production number SBH 0017. |
| 19 | (EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.) |
| 20 | MR. KLINE:  Q. Can you just identify for |
| 21 | the record what Exhibit 5 is? |
| 22 | A.  Yeah, Exhibit 5 is our MacularProtect |
| 23 | Complete label for -- that was -- don't know exactly |
| 24 | what date, but it was the same -- the same product. |
| 25 | It's a former version of that label, and I don't |



Page 37

1  know exactly what date that was -- that was from,
2  but it's before we changed all our product designs
3  to the -- to the cutter labels from the little eye
4  image similar to what we just talked about with
5  regard to MacularProtect.
6      Q.   Okay.  So on Exhibit 5, it says
7  MacularProtect Complete-S.  Why is it called dash S?
8      A.   Because there were two versions of a
9  MacularProtect Complete product, and one was a dash
10  S and one was a -- just didn't have a dash S and one
11  was a smoker's version, and the other one was -- was
12  not.
13      Q.   Okay.  So is Exhibit 5 -- this is a
14  smoker's version?
15      A.   Yes, this is the smoker's version.
16      Q.   And that's because it took out the
17  beta-carotene?
18      A.   Correct, took out the beta-carotene.
19      Q.   And replaced it with lutein and
20  zeaxanthin?
21      A.   Well, the old version -- this one was the
22  one without beta-carotene.  Okay.  So there was
23  another version that had beta-carotene in it and
24  that was just MacularProtect Complete.  And this was
25  all pre -- you know -- pre-AREDS 2 and so forth.  So

Page 38

1  the -- and then when AREDS 2 was finished, we
2  discontinued the MacularProtect Complete product and
3  had a single product called MacularProtect Complete,
4  but which was the -- the smoker's version, which
5  used to be the smokers' version without
6  beta-carotene.  Does that --
7      Q.   Yeah, so -- but this -- this had no
8  beta-carotene and had lutein and zeaxanthin in it?
9      MR. SCHMID:   And this is exhibit 5?
10      MR. KLINE:   Exhibit 5.
11      MR. SCHMID:   Thank you.
12      THE WITNESS:   This was -- yes, this had --
13  this had -- yeah, this had lutein and zeaxanthin in
14  it, correct.  Yes, this had -- the smokers' version
15  didn't have beta-carotene in it.  That is correct.
16  This one had lutein zeaxanthin in it.  So there was
17  this -- we had made that transition at that time
18  to -- what we had two different products, one a
19  smokers', and then we eliminated one of the products
20  because we didn't have beta-carotene in one.
21      MR. KLINE:   Q.  Okay.  And just a
22  housekeeping, as we did earlier, if I refer today to
23  the MacularProtect Complete product of SBH, will you
24  understand that to mean the formula that is set
25  forth in Exhibits 4 and 5, or do I need to separate

Page 39

1  them out as S versus non-S or something?
2      A.   Yeah, I guess if we refer to
3  MacularProtect Complete, then I will understand that
4  it's that product, but we don't need to -- we won't
5  need to differentiate between S and not S because we
6  only have one product that's called MacularProtect
7  since -- during the dates that we're really looking
8  at here prior to.
9      Q.   Right.  And just for the record, you said
10  MacularProtect, you mean MacularProtect Complete,
11  right?
12      A.   MacularProtect Complete.

Page 40





Page 41

1 ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓

▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓

13    Q.    Can you read it back?

14    A.    I lost my train of thought. I'm sorry.

15        MR. KLINE: Okay.

16 ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 43

1  current version of the label or reflect the current

2  version of the label?

3    A.    I believe so.

4    Q.    Okay.

5    A.    Yeah.

6        MR. KLINE: And let me have the court

7  reporter mark as Exhibit 7 SBH0019.

8        (EXHIBIT 7 WAS MARKED FOR IDENTIFICATION.)

9        MR. KLINE: Q. Can you identify Exhibit 7

10 for the record?

11    A.    Yeah, this is a former version of our

12 MacularProtect Complete drink mix label, but I don't

13 know exactly what date this was because we -- it's a

14 former version of that product, yeah.

15    Q.    And there are a couple of differences

16 between the MacularProtect Complete-S and the

17 MacularProtect Complete formulation, right?

18    A.    I guess I'd have to look at every --

19    Q.    Okay. Well, if you just look at the

20 zeaxanthin, the zeaxanthin in the current label,

21 Exhibit 6, says 2 milligrams whereas the S product

22 says one milligram.

23        Do you see that?

24    A.    Yes.

25    Q.    Do you know why that change was made?

Page 44

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓

18        MR. KLINE: Okay. SBH 7. I'll have the

19 court reporter mark as Exhibit 6 SBH00018.

20        (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)

21        MR. KLINE: Q. And, Mr. Magro, could you

22 just identify this for the record, please?

23    A.    Yeah, this is our MacularProtect Complete

24 drink mix label.

25    Q.    And other than the address, is this a

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓







Page 49



20    Q.   Okay.  So I want to go back to Exhibit 2,
21   which is the MacularProtect label.  And if you
22   read -- I'm reading at the top.  It says
23   MacularProtect is a scientific formulation designed
24   to support macular health.
25       Do you see that?

Page 50

1    A.   Yes.
2    Q.   And then it says this formula is based on
3   the AREDS and AREDS 2 clinical trials, right?
4    A.   Correct.
5    Q.   What type of macular health does the
6   MacularProtect product support?
7       MR. SCHMID:  Objection to the extent it
8   calls for a legal -- I mean a expert opinion, but go
9   ahead and answer.
10       THE WITNESS:  In terms of macular health
11   and what this product was intended to do is to -- is
12   reflected in the AREDS and AREDS 2 study is to --
13   provides nutritional support for decreasing and
14   minimizing risk of -- of AMD progressing in patients
15   that have AMD and so forth.  It's providing
16   nutritional support so that patients that have AMD
17   can support their -- their -- their macular health
18   and minimize the risks for people of -- you know,
19   for it to get worse and so forth.

Page 51

18    Q.   If you could turn to Exhibit 4, and,
19   again, just looking at the top of this, I'll just
20   read it.  It says, "MacularProtect Complete is a
21   scientifically advanced nutritional formulation that
22   provides powerful support for macular and whole body
23   health."
24       Do you see that?
25    A.   Uh-huh.

Page 52

1    Q.   Macular --
2    A.   Yes, I do.
3    Q.   Okay.  "MacularProtect Complete, based on
4   the AREDS and AREDS 2 clinical trials and other
5   advanced research, delivers a diverse array of
6   anti-oxidants such as 10 milligrams of FloraGLo,
7   lutein, and other key nutrients."
8       Do you see that?
9    A.   Yes, I do.
10    Q.   And similar to what you just testified
11   about the MacularProtect product, is it fair to say
12   that the reference on your label to the
13   MacularProtect Complete to the powerful support for
14   macular health is intended by SBH that it's
15   MacularProtect Complete product provides the benefit
16   of the AREDS and AREDS 2 formulas found to reduce
17   the risk of developing AMD?
18    A.   Yeah, the powerful support relates to --
19   yeah, for macular and whole body health because
20   MacularProtect Complete is -- contains -- is an
21   AREDS based product, but also incorporates a
22   multivitamin component to it.  So essentially it's
23   the MacularProtect product plus a lot of other
24   ingredients for whole body health and was meant for
25   people to take that also took a multivitamin along



# EXHIBIT 4

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | ) | |
| Stephen Paul Bartels et al. | ) | Examiner:  To be assigned |
| | ) | |
| Serial No.:  To be assigned | ) | Art Unit:  To be assigned |
| | ) | |
| Filed:  To be assigned | ) | Docket No.:  P02930-C1 |
| | ) | |
| Title:  NUTRITIONAL SUPPLEMENT TO | ) | |
| TREAT MACULAR DEGENERATION | ) | |

### PRELIMINARY AMENDMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Honorable Sir:

Applicants respectfully request entry of the following preliminary amendments to the specification and claims of the above-identified application.

Please cancel claims 1, 2 and 6 without prejudice before calculation of fees.

1

BAUSCH0121475

<u>AMENDMENTS TO THE SPECIFICATION:</u>

On page 1, after the title, please add the following paragraph.


-- This application is a continuation application of prior application Serial

No. 09/816,284 filed March 23, 2001.--

2

BAUSCH0121476

<u>AMENDMENTS TO THE CLAIMS:</u>

Claims 1-2  (Cancelled)

Claim 3  (Currently amended)      A nutritional or dietary supplement

composition to safely and effectively prevent, stabilize, ~~reverse~~

and/or treat visual acuity loss by reducing the risk of developing late

stage or advanced age-related macular degeneration in persons

with early age-related macular degeneration and by reducing the

risk of vision loss associated with the formation of cataracts and the

progression of age-related macular degeneration comprising <u>on a</u>

<u>daily dosage basis</u>:

> approximately 7 to 10 times the RDA of vitamin C;
>
> approximately 13 to 18 times the RDA of vitamin E;
>
> approximately 6 to 10 times the RDA of vitamin A in the form
>
> of beta-carotene;
>
> approximately 4 to 7 times the RDA of zinc; and
>
> ~~approximately the RDA of~~ <u>at least 1.6 mg</u> copper.

3

BAUSCH0121477

Claim 4  (Currently amended)        A method of safely and effectively

preventing, stabilizing, ~~reversing~~ and/or treating visual acuity loss

by reducing the risk of developing late stage or advanced age-

related macular degeneration in persons with early age-related

macular degeneration and by reducing the risk of vision loss

associated with the development of cataracts and the progression

of age-related macular degeneration comprising:

administering a daily dosage of not less than approximately

420 mg and not more than approximately 600 mg vitamin C,

not less than approximately 400 IU and not more than

approximately 540 IU vitamin E, not less than approximately

17.2 mg and not more than approximately 28 mg beta-

carotene, not less than approximately 60 mg and not more

than approximately 100 mg zinc and not less than

approximately 1.6 mg and not more than approximately 2.4

mg copper.

4

BAUSCH0121478

Claim 5  (Currently amended)      A method of manufacturing a nutritional

supplement composition that is safe and effective in preventing,

stabilizing, ~~reversing~~ and/or treating visual acuity loss by reducing

the risk of developing late stage or advanced age-related macular

degeneration in persons with early age-related macular

degeneration and by reducing the risk of vision loss associated with

the development of cataracts and  the progression of age-related

macular degeneration comprising:

blending not less than approximately 420 mg and not more

than approximately 600 mg vitamin C, not less than

approximately 400 IU and not more than approximately 540

IU vitamin E, not less than approximately 17.2 mg and not

more than approximately 28 mg beta-carotene, not less than

approximately 60 mg and not more than approximately 100

mg zinc and not less than  approximately 1.6 mg and not

more than approximately 2.4 mg copper into a suitable <u>daily</u>

dosage form.


Claim 6  (Cancelled)

5

BAUSCH0121479

# EXHIBIT 5

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/641,668 | 08/15/2003 | Stephen Paul Bartels | P02930-C1 | 2250 |

7590        07/14/2004

RITA D. VACCA
BAUSCH & LOMB, INC.
ONE BAUSCH & LOMB PLACE
ROCHESTER, NY 14604-2701

| EXAMINER |
|---|
| JOYNES, ROBERT M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1615 | |

DATE MAILED: 07/14/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

BAUSCH0121644

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/641,668 | BARTELS ET AL. |
| | Examiner | Art Unit |
| | Robert M. Joynes | 1615 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.

2a) ☐ This action is **FINAL**.      2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
   closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) *3-5 and 7-25* is/are pending in the application.

   4a) Of the above claim(s) *1,2 and 6* is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) *3-5 and 7-25* is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All   b) ☐ Some * c) ☐ None of:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____.

       3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage
          application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
   Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____.

BAUSCH0121645

Application/Control Number: 10/641,668                                          Page 2
Art Unit: 1615

## DETAILED ACTION

### Claim Rejections - 35 USC § 112

The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 3-5 and 7-25 are rejected under 35 U.S.C. 112, first paragraph, because the specification, while being enabling for treating or stabilizing macular dengeneration, does not reasonably provide enablement for preventing macular degeneration. The specification does not enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the invention commensurate in scope with these claims.

The instant specification fails to provide information that would allow the skilled artisan to practice the instant invention without undue experimentation. Attention is directed to *In re Wands*, 8 USPQ2d 1400 (CAFC 1988) at 1404 where the court set forth the eight factors to consider when assessing if a disclosure would have required undue experimentation. Citing *Ex parte Forman*, 230 USPQ 546 (BdApls 1986) at 547 the court recited eight factors:

1) the quantity of experimentation necessary,

2) the amount of direction or guidance provided,

3) the presence of absence of working examples,

4) the nature of the invention,

5) the state of the prior art,

BAUSCH0121646

Application/Control Number: 10/641,668                                              Page 3
Art Unit: 1615

     6) the relative skill of those in the art

     7) the predictability of the art, and

     8) the breadth of the claims.

     Applicant fails to set forth the criteria that defines the prevention of macular

dengeneration. Additionally, Applicant fails to provide information allowing the skilled

artisan to ascertain these methods without undue experimentation. In the instant case,

no examples or results are shown to indicate that the applicant prevents macular

degeneration by administering such a composition. The pharmaceutical art is

unpredictable, requiring each embodiment to be individually assessed for physiological

activity. The instant claims read on treating, stabilizing and preventing, necessitating an

exhaustive search for the embodiments suitable to practice the claimed invention.

Applicants fail to provide information sufficient to practice the claimed invention, absent

undue experimentation.

### *Double Patenting*

     The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees. See *In re Goodman*, 11

F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225

USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA

1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970);and, *In re Thorington,*

418 F.2d 528, 163 USPQ 644 (CCPA 1969).

BAUSCH0121647

Application/Control Number: 10/641,668                                       Page 4
Art Unit: 1615

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent is shown to be commonly owned with this application.  See 37 CFR 1.130(b).

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer.  A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

Claims 3, 5, 7-25 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-21 of U.S. Patent No. 6,660,297.  Although the conflicting claims are not identical, they are not patentably distinct from each other.  U.S. Patent No. 6,660,297 claims retinal compositions and methods of manufacturing retinal health compositions wherein the compositions comprise vitamin C, vitamin E, vitamin A, zinc and copper in amount above the RDA for each compound, except copper, which is approximately the RDA for that compound.  The instant claims now define that the compositions are intended to be used for treating macular degeneration.  It would be have obvious to one of ordinary skill in the art to use a retinal health composition to treat a retinal condition to achieve the same expected results of treating or stabilizing such a condition.

### Correspondence

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Robert M. Joynes whose telephone number is (571)

Application/Control Number: 10/641,668                                    Page 5
Art Unit: 1615

272-0597. The examiner can normally be reached on Mon.-Thurs. 8:30 - 6:00, alternate

Fri. 8:30-5:00.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Thurman K. Page can be reached on (571) 272-0602. The fax phone

number for the organization where this application or proceeding is assigned is 703-

872-9306.

    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

Robert M. Joynes
Patent Examiner
Art Unit 1615

THURMAN K. PAGE
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 1600

BAUSCH0121649

# EXHIBIT 6

We claim:

1.  A composition comprising:

    approximately 7 to 10 times the RDA of vitamin C;

    approximately 13 to 18 times the RDA of vitamin E;

    approximately 6 to 10 times the RDA of vitamin A in the

    form of beta-carotene;

    approximately 4 to 7 times the RDA of zinc; and

    approximately the RDA of copper.

2.  A retinal health strengthening composition comprising:

    approximately 7 to 10 times the RDA of vitamin C;

    approximately 13 to 18 times the RDA of vitamin E;

    approximately 6 to 10 times the RDA of vitamin A in the form

    of beta-carotene;

    approximately 4 to 7 times the RDA of zinc; and

    approximately the RDA of copper.

3.  A nutritional or dietary supplement composition to safely and

    effectively prevent, stabilize, reverse and/or treat visual acuity loss

    by reducing the risk of developing late stage or advanced age-

25

BAUSCH0000070

related macular degeneration in persons with early age-related macular degeneration and by reducing the risk of vision loss associated with the formation of cataracts and the progression of age-related macular degeneration comprising:

> approximately 7 to 10 times the RDA of vitamin C;
>
> approximately 13 to 18 times the RDA of vitamin E;
>
> approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene;
>
> approximately 4 to 7 times the RDA of zinc; and
>
> approximately the RDA of copper.

4.     A method of safely and effectively preventing, stabilizing, reversing and/or treating visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration and by reducing the risk of vision loss associated with the development of cataracts and the progression of age-related macular degeneration comprising:

> administering a daily dosage of not less than approximately 420 mg and not more than approximately 600 mg vitamin C,

26

BAUSCH0000071

not less than approximately 400 IU and not more than

approximately 540 IU vitamin E, not less than approximately

17.2 mg and not more than approximately 28 mg beta-

carotene, not less than approximately 60 mg and not more

than approximately 100 mg zinc and not less than

approximately 1.6 mg and not more than approximately 2.4

mg copper.

5.     A method of manufacturing a nutritional supplement composition

that is safe and effective in preventing, stabilizing, reversing and/or

treating visual acuity loss by reducing the risk of developing late

stage or advanced age-related macular degeneration in persons

with early age-related macular degeneration and by reducing the

risk of vision loss associated with the development of cataracts and

the progression of age-related macular degeneration comprising:

blending not less than approximately 420 mg and not more

than approximately 600 mg vitamin C, not less than

approximately 400 IU and not more than approximately 540

IU vitamin E, not less than approximately 17.2 mg and not

more than approximately 28 mg beta-carotene, not less than

27

BAUSCH0000072

approximately 60 mg and not more than approximately 100 mg zinc and not less than approximately 1.6 mg and not more than approximately 2.4 mg copper into a suitable dosage form.

6.    A method of manufacturing a composition comprising:

blending not less than approximately 420 mg and not more than approximately 600 mg vitamin C, not less than approximately 400 IU and not more than approximately 540 IU vitamin E, not less than approximately 17.2 mg and not more than approximately 28 mg beta-carotene, not less than approximately 60 mg and not more than approximately 100 mg zinc and not less than approximately 1.6 mg and not more than approximately 2.4 mg copper into a suitable dosage form.

7.    The composition of claim 1, 2 or 3 wherein said composition comprises not less than approximately 450 mg vitamin C, not less than approximately 400 IU vitamin E, not less than approximately 17.2 mg beta-carotene, not less than approximately 68 mg zinc and not less than approximately 1.6 mg copper.

28

BAUSCH0000073

8.    The composition of claim 1, 2 or 3 wherein said vitamin C is
provided in the form of ascorbic acid.

9.    The composition of claim 1, 2 or 3 wherein said vitamin E is
provided in the form of dl-alpha tocopheryl acetate.

10.   The composition of claim 1, 2 or 3 wherein said beta-carotene is
substituted or supplemented with lutein, zeaxanthine or a raw
material combination thereof.

11.   The composition of claim 1, 2 or 3 wherein said composition is
supplemented with alpha-lipoic acid, phenolic compounds,
anthocyanosides or a combination thereof.

12.   The composition of claim 1, 2 or 3 wherein said zinc is provided in
the form of zinc oxide, zinc gluconate or a combination thereof.

13.   The composition of claim 1, 2 or 3 wherein said copper is provided
in the form of cupric oxide, copper gluconate or a combination
thereof.

29

BAUSCH0000074

14.    The method of claim 5 or 6 wherein said blend provides not less

than approximately 450 mg vitamin C, not less than approximately

400 IU vitamin E, not less than approximately 17.2 mg beta-

carotene, not less than approximately 68 mg zinc, and not less than

approximately 1.6 mg copper, up until an expiration date of said

dosage form produced from said blend.

15.    The method of claim 4, 5 or 6 wherein said vitamin C is provided in

the form of ascorbic acid.

16.    The method of claim 4, 5 or 6 wherein said vitamin E is provided in

the form of dl-alpha tocopheryl acetate.

17.    The method of claim 4, 5 or 6 wherein said beta-carotene is

substituted or supplemented with lutein, zeaxanthine, or a raw

material combination thereof.

18.    The method of claim 4, 5 or 6 wherein said composition is

supplemented with alpha-lipoic acid, phenolic compounds,

anthocyanosides or a combination thereof.

30

BAUSCH0000075

19.    The method of claim 4, 5 or 6 wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof.

20.    The method of claim 4, 5 or 6 wherein said copper is provided in the form of copper oxide, copper gluconate or a combination thereof.

21.    The composition of claim 1, 2 or 3 wherein said composition is formed into one or more tablets for daily oral ingestion by a human or other mammal.

22.    The composition of claim 1, 2 or 3 wherein said composition is formed into four tablets for oral ingestion by a patient of two tablets twice daily.

23.    The method of claim 4 wherein said daily dosage is administered orally in the form of one or more tablets taken daily.

24.    The method of claim 4 wherein said daily dosage is administered orally in the form of two tablets taken twice daily.

31

BAUSCH0000076

25.    The method of claim 5 or 6 wherein said composition is
compressed in the form of two tablets taken twice daily.

BAUSCH0000077

# Exhibit 7



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/034,656 | 01/13/2005 | Stephen Paul Bartels | P02930-C2 | 9989 |

23702        7590        12/11/2008
Bausch & Lomb Incorporated
One Bausch & Lomb Place
Rochester, NY 14604-2701

| EXAMINER |
|---|
| AHMED, HASAN SYED |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1615 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/11/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

BAUSCH0000275

| *Office Action Summary* | Application No. | Applicant(s) |
| --- | --- | --- |
| | 11/034,656 | BARTELS ET AL. |
| | Examiner | Art Unit | |
| | HASAN S. AHMED | 1615 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _1_ MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.
2a) ☐ This action is **FINAL**.        2b) ☒ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) _1-25_ is/are pending in the application.
  4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☐ Claim(s) _____ is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☒ Claim(s) _1-25_ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  a) ☐ All   b) ☐ Some * c) ☐ None of:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
  * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 08-06)                    Office Action Summary                    Part of Paper No./Mail Date 20081201

BAUSCH0000276

Application/Control Number: 11/034,656                                      Page 2
Art Unit: 1615

## DETAILED ACTION

### *Election/Restrictions*

Restriction to one of the following inventions is required under 35 U.S.C. 121:

I.    Claims 1-3, 7-13, 21, and 22, drawn to a composition, classified in class
      424, subclass 489.

II.   Claims 4, 15-20, 28, and 29 drawn to a method of preventing visual acuity
      loss, classified in class 424, subclass 489.

III.  Claims 5, 6, 14-20, and 25, drawn to a method of manufacturing a
      nutritional supplement composition, classified in class 424, subclass 489.

* * * * *

The inventions are distinct, each from the other for the following reasons:

### *Groups I-III*

Inventions I and II are related as product and process of use.  The inventions can
be shown to be distinct if either or both of the following can be shown: (1) the process
for using the product as claimed can be practiced with another materially different
product or (2) the product as claimed can be used in a materially different process of
using that product. See MPEP § 806.05(h).  In the instant case the product as claimed
can be used in a materially different process of using that product, such as reduction of
free-radicals.

Inventions I and III are related as process of making and product made.  The
inventions are distinct if either or both of the following can be shown: (1) that the
process as claimed can be used to make another and materially different product or (2)

BAUSCH0000277

Application/Control Number: 11/034,656                                    Page 3
Art Unit: 1615

that the product as claimed can be made by another and materially different process

(MPEP § 806.05(f)).  In the instant case the product as claimed can be made by another

and materially different process, such as granulation.

### *Groups II and III*

Inventions II and III are unrelated.  Inventions are unrelated if it can be shown

that they are not disclosed as capable of use together and they have different designs,

modes of operation, and effects (MPEP § 802.01 and § 806.06).  In the instant case,

Group II is drawn to a method of preventing visual acuity loss while Group III is drawn to

a method of manufacturing a nutritional supplement composition.

* * * * *

The examiner has required restriction between product and process claims.
Where applicant elects claims directed to the product, and the product claims are
subsequently found allowable, withdrawn process claims that depend from or otherwise
require all the limitations of the allowable product claim will be considered for rejoinder.
All claims directed a nonelected process invention  must require all the limitations of an
allowable product claim for that process invention to be rejoined.
In the event of rejoinder, the requirement for restriction between the product
claims and the rejoined process claims will be withdrawn, and the rejoined process
claims will be fully examined for patentability in accordance with 37 CFR 1.104. Thus, to
be allowable, the rejoined claims must meet all criteria for patentability including the
requirements of 35 U.S.C. 101, 102, 103 and 112. Until all claims to the elected product
are found allowable, an otherwise proper restriction requirement between product
claims and process claims may be maintained. Withdrawn process claims that are not
commensurate in scope with an allowable product claim will not be rejoined. See MPEP
§ 821.04(b). Additionally, in order to retain the right to rejoinder in accordance with the
above policy, applicant is advised that the process claims should be amended during
prosecution to require the limitations of the product claims. **Failure to do so may result
in a loss of the right to rejoinder**. Further, note that the prohibition against double
patenting rejections of 35 U.S.C. 121 does not apply where the restriction requirement
is withdrawn by the examiner before the patent issues. See MPEP § 804.01.

* * * * *

BAUSCH0000278

Application/Control Number: 11/034,656                               Page 4
Art Unit: 1615

This application contains claims directed to the following patentably distinct species:

If <u>Group I</u> is elected:

- Election of a supplement.  Please elect one of the following (a or b):

    a.    the supplements of claim 10; or

    b.    the supplements of claim 11.

If <u>Group II</u> is elected:

- Election of a supplement.  Please elect one of the following (a or b):

    a.    the supplements of claim 17; or

    b.    the supplements of claim 18.

If <u>Group III</u> is elected:

- Election of a supplement.  Please elect one of the following (a or b):

    a.    the supplements of claim 17; or

    b.    the supplements of claim 18.

* * * * *

Restriction for examination purposes as indicated is proper because all these inventions listed in this action are independent or distinct for the reasons given above <u>and</u> there would be a serious search and examination burden if restriction were not required because one or more of the following reasons apply:

(a) the inventions have acquired a separate status in the art in view of their different classification;

BAUSCH0000279

Application/Control Number: 11/034,656                                    Page 5
Art Unit: 1615

> (b) the inventions have acquired a separate status in the art due to their recognized divergent subject matter;
>
> (c) the inventions require a different field of search (for example, searching different classes/subclasses or electronic resources, or employing different search queries);
>
> (d) the prior art applicable to one invention would not likely be applicable to another invention;
>
> (e) the inventions are likely to raise different non-prior art issues under 35 U.S.C. 101 and/or 35 U.S.C. 112, first paragraph.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a invention to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected invention**.

The election of an invention may be made with or without traverse. To reserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the restriction requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable on the elected invention.

BAUSCH0000280

Application/Control Number: 11/034,656                                    Page 6
Art Unit: 1615

    If claims are added after the election, applicant must indicate which of these
claims are readable upon the elected invention.

    Should applicant traverse on the ground that the inventions are not patentably
distinct, applicant should submit evidence or identify such evidence now of record
showing the inventions to be obvious variants or clearly admit on the record that this is
the case. In either instance, if the examiner finds one of the inventions unpatentable
over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C.
103(a) of the other invention.

* * * * *

*

*Correspondence*

    Any inquiry concerning this communication or earlier communications from the
examiner should be directed to HASAN S. AHMED whose telephone number is
(571)272-4792. The examiner can normally be reached on 9am - 5:30pm.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Michael P. Woodward can be reached on (571)272-8373. The fax phone
number for the organization where this application or proceeding is assigned is 571-
273-8300.

BAUSCH0000281

Application/Control Number: 11/034,656                                        Page 7
Art Unit: 1615

     Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.    Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/H. S. A./
Examiner, Art Unit 1615

                          /Humera  N. Sheikh/
                          Primary Examiner, Art Unit 1615

BAUSCH0000282

# EXHIBIT 8

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant | : | Bartels et al. |
| Application No. | : | 11/034656 |
| Filed | : | January 13, 2005 |
| Title | : | Nutritional Supplement to Treat Macular Degeneration |
| Group/Art Unit | : | 1614 |
| Examiner | : | |
| Conf. No. | : | 9989 |
| Docket No. | : | P02930C2 |

**RESPONSE TO RESTRICTION AND SECOND PRELIMINARY AMENDMENT**

Commissioner for Patents
P. O. Box 1450
Alexandria, Virginia 22313-1450

Dear Sir:

In response to the Request for Restriction under 35 USC §121, Applicants elect the invention of Group II (i.e., claims 4, 15-20, 23 and 24) for reconsideration and examination.

Claims 6, 9, 10, 13, 16, 17 and 20 are canceled. Claims 1-3, 5, 7, 8, 11, 12, 21, 22 and 25 are withdrawn as being directed to a non-elected invention.

In response to a Request for Election of Species, Applicants elect the invention of claim 17. Applicants even have taken the next step to cancel claim 17 and incorporate its language into amended claim 4. Also, the language of canceled claim 20 is incorporated into amended claim 19. Support for the claim amendments is provided by original claim 17 and page 20, paragraph [0028] of the application.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

Respectfully submitted,

Joseph Barrera
Attorney for Applicant
Registration No. 44522

Bausch & Lomb Incorporated
One Bausch & Lomb Place
Rochester, New York 14604
Telephone: 585 338 8180
Dated:    January 21, 2009

**Amendments to the Claims**:

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims**:

1. (withdrawn)  A daily dosage composition comprising:

approximately 7 to 10 times the RDA of vitamin C;

approximately 13 to 18 times the RDA of vitamin E;

approximately ~~6 to 10 times the RDA of~~ 0.04 to 40 mg of lutein-zeaxanthine combination as a substitute for vitamin A in the form of beta-carotene;

approximately 4 to 7 times the RDA of zinc; and

approximately ~~the RDA~~ 1.6 to 2.4 mg of copper.

2. (withdrawn)  A retinal health strengthening, daily dosage composition comprising:

approximately 7 to 10 times the RDA of vitamin C;

approximately 13 to 18 times the RDA of vitamin E;

approximately ~~6 to 10 times the RDA of~~ 0.04 to 40 mg of lutein-zeaxanthine combination as a substitute for vitamin A in the form of beta-carotene;

approximately 4 to 7 times the RDA of zinc; and

approximately ~~the RDA~~ 1.6 to 2.4 mg of copper.

3. (withdrawn)  A nutritional or dietary supplement composition to safely and effectively prevent, stabilize, reverse and/or treat visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration and by reducing the risk of vision loss associated with the formation of cataracts and the progression of age-related macular degeneration comprising:

approximately 7 to 10 times the RDA of vitamin C;

approximately 13 to 18 times the RDA of vitamin E;

approximately ~~6 to 10 times the RDA of~~ 0.04 to 40 mg of lutein-zeaxanthine combination as a substitute for vitamin A in the form of beta-carotene;

approximately 4 to 7 times the RDA of zinc; and

approximately ~~the RDA~~ 1.6 to 2.4 mg of copper.

2

BAUSCH0000287

4. (currently amended)  A method of safely and effectively preventing, stabilizing, reversing and/or treating visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration and by reducing the risk of vision loss associated with the development of cataracts and the progression of age-related macular degeneration comprising:

administering a daily dosage of not less than approximately 420 mg and not more than approximately 600 mg vitamin C, not less than approximately 400 IU and not more than approximately 540 IU vitamin E, not less than approximately [[17.2]] 0.04 mg and not more than approximately [[28]] 40 mg lutein-zeaxanthine combination as a substitute for beta-carotene, not less than approximately 60 mg and not more approximately 100 mg zinc and not less than approximately 1.6 mg and not more than approximately 2.4 mg copper.

5. (withdrawn)  A method of manufacturing a nutritional supplement composition that is safe and effective in preventing, stabilizing, reversing and/or treating visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration and by reducing the risk of vision loss associated with the development of cataracts and  the progression of age-related macular degeneration comprising:

blending not less than approximately 420 mg and not more than approximately 600 mg vitamin C, not less than approximately 400 IU and not more than approximately 540 IU vitamin E, not less than approximately [[17.2]] 0.04 mg and not more than approximately [[28]] 40 mg lutein-zeaxanthine combination as a substitute for beta-carotene, not less than approximately 60 mg and not more than approximately 100 mg zinc and not less than approximately 1.6 mg and not more than approximately 2.4 mg copper into a suitable dosage form.

6.      Canceled

7. (withdrawn)  The composition of claim [[1, 2 or]] 3 wherein said composition comprises not less than approximately 450 mg vitamin C, not less than approximately 400 IU vitamin E, not less than approximately 0.04 mg lutein-zeaxanthine combination as a substitute

3

BAUSCH0000288

for beta-carotene,, not less than approximately 68 mg zinc and not less than approximately 1.6 mg copper.

8. (withdrawn)  The composition of claim 1 [[, 2]] or 3 wherein said vitamin C is provided in the form of ascorbic acid, and said vitamin E is provided in the form of dl-alpha tocopheryl acetate.

Claims  9. – 10. Canceled

11. (withdrawn)  The composition of claim 1 [[, 2 or 3]] wherein said composition is supplemented with alpha-lipoic acid, phenolic compounds, anthocyanosides or a combination thereof.

12. (withdrawn)  The composition of claim 1 [[, 2]] or 3 wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, and said copper is provided in the form of cupric oxide, copper gluconate or a combination thereof.

13.    Canceled

14. (currently amended)  The method of claim [[5 or 6]] 4 wherein said blend provides not less than approximately 450 mg vitamin C, not less than approximately 400 IU vitamin E, not less than approximately 0.04 mg lutein-zeaxanthine combination as a substitute for beta-carotene, not less than approximately 68 mg zinc, and not less than approximately 1.6 mg copper, up until an expiration date of said dosage form produced from said blend.

15. (currently amended)  The method of claim 4[[, 5 or 6]] wherein said vitamin C is provided in the form of ascorbic acid, and said vitamin E is provided in the form of dl-alpha tocopheryl acetate.

Claims 16. – 17.    Canceled

18. (currently amended)  The method of claim 4 [[, 5 or 6]] wherein said composition is supplemented with alpha-lipoic acid, phenolic compounds, anthocyanosides or a combination thereof.

4

BAUSCH0000289

19. (currently amended)  The method of claim 4 [[, 5 or 6]] wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof.

20.    Canceled.

21. (withdrawn)  The composition of claim 1 [[, 2 or]] 3 wherein said composition is formed into one or more tablets for daily oral ingestion by a human or other mammal.

22. (withdrawn)  The composition of claim 1 [[, 2 or]] 3 wherein said composition is formed into four tablets for oral ingestion by a patient of two tablets twice daily.

23. (currently amended)  The method of claim 4 wherein said daily dosage is administered orally in the form of one or more tablets taken daily.

24. (currently amended)  The method of claim 4 wherein said daily dosage is administered orally in the form of two tablets taken twice daily.

25. (withdrawn)  The method of claim 5 [[or 6]] wherein said composition is compressed in the form of two tablets taken twice daily.

5

BAUSCH0000290

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAUSCH & LOMB INCORPORATED & PF CONSUMER HEALTHCARE 1 LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-1463 (GBW) (CJB) |
| SBH HOLDINGS LLC, | ) ) | **HIGHLY CONFIDENTIAL** |
| Defendant. | ) ) | |

## BAUSCH & LOMB'S FINAL INFRINGEMENT CONTENTIONS AGAINST SBH HOLDINGS LLC

Pursuant to the Court's Scheduling Order (D.I. 28) and the Court's Default Standard for Discovery, Including Discovery of Electronically Stored Information Paragraph 4(c), Plaintiffs Bausch & Lomb, Inc. ("Bausch and Lomb") and PF Consumer Healthcare 1 LLC ("PF Consumer Healthcare 1") (collectively, "Plaintiffs") hereby provide the following Final Infringement Contentions ("Contentions") concerning Defendant SBH Holdings LLC's ("SBH") infringement of U.S. Patent No. 6,660,297 ("the '297 patent") and U.S. Patent No. 8,603,522 ("the '522 patent").

These Contentions are based on the information presently and reasonably known to Plaintiffs. The Court has not yet construed any of the asserted claims of the '297 and '522 patents and Plaintiffs' investigation into SBH's infringement of the '297 and '522 patents continues. Plaintiffs reserve the right to rely on further production by SBH, testing of SBH's products, expert discovery and/or testimony to support SBH's infringement of the '297 and '522 patents. Plaintiffs provide these Contentions without prejudice to their right to modify, amend, or otherwise supplement them as appropriate as discovery in this case continues and/or in light of this Court's claim construction decision, as provided in the Federal Rules of Civil Procedure, the Court's

Scheduling Order, and the Local Rules of the United States District Court for the District of Delaware.

Plaintiffs state that SBH is and will be liable for direct and/or indirect infringement of claims 19, 24, 31, and 32 of the '297 patent, and claims 1, 4, 5, 6, 8, 11, 15, 16, and 20 of the '522 patent either literally or under the doctrine of equivalents, for its commercial manufacture, use, sale, or offer for sale of the following SBH products: (1) MacularProtect® Capsules (*see, e.g.*, SBH 00008-8a, 14, 20-20a; FAQs about MacularProtect® Capsules, available at https://www.sciencebasedhealth.com/MacularProtect-P45.aspx (BAUSCH0121662)); (2) MacularProtect® AREDS 2 Capsules (*see, e.g.*, SBH 00009-9a, 15, 21-21a); (3) MacularProtect Complete® Capsules (*see, e.g.*, SBH 00010-10a, 16, 22-22a; FAQs about MacularProtect Complete® Capsules at https://www.sciencebasedhealth.com/MacularProtect-Complete--P46.aspx (BAUSCH0121675)); (4) MacularProtect Complete®-S AREDS 2 Capsules (*see, e.g.*, SBH 00011-11a, 17, 23-23a); (5) MacularProtect Complete® Drink Mix (*see, e.g.*, SBH 00012, 18; FAQs about MacularProtect Complete® Drink Mix, available at https://www.sciencebasedhealth.com/MacularProtect-Completebr-font-size3iDrink-Mixifont-P76.aspx (BAUSCH0121668)); and (6) MacularProtect Complete®-S Drink Mix (*see, e.g.*, SBH 00013, 19) (collectively, "the Accused Products").

SBH has directly infringed and/or continues to directly infringe claims 19, 24, 31, and 32 of the '297 patent, and claims 1, 4, 5, 6, 8, 11, 15, 16, and 20 of the '522 patent, by its commercial manufacture, use, sale, and/or offer for sale of its Accused Products. Additionally, to the extent claims 19, 24, 31, and 32 of the '297 patent, and claims 1, 4, 5, 6, 8, 11, 15, 16, and 20 of the '522 patent are directly infringed by the actions of an end-user or consumer of the Accused Products: (1) SBH was aware of the '297 and '522 patents no later than June 30, 2020 when Plaintiffs filed

the Western District of New York complaint asserting SBH's infringement of the '297 and '522 patents (*see Bausch & Lomb Inc. et al. v. SBH Holdings LLC, C.A. No. 6-20-cv-06451 (W.D.N.Y).*), SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's products in a manner that infringes the '297 and '522 patents, and SBH has continued infringing those claims under 35 U.S.C. § 271(b) because SBH has sold, and is selling, products containing vitamin and minerals with instructions for use that cause and induce the end-user or consumer to carry out one or more claims of the '297 and '522 patents; and/or (2) SBH infringes those claims under 35 U.S.C. § 271(c) because SBH has made, and has sold, and is selling such products containing vitamins and minerals that are especially made or adapted for use in practicing one or more claims of the '297 and '522 patents, and not a staple article suitable for substantial noninfringing use. SBH is doing so with knowledge of the '297 and '522 patents and with specific intent that its customers will infringe the '297 and '522 patents.

Attached as Exhibit A is a chart identifying specifically where each limitation of each asserted claim of the '297 patent is found within each Accused Product, including whether each limitation of each asserted claim of the '297 patent is literally present in the Accused Product(s) or is present under the doctrine of equivalents. Attached as Exhibit B is a chart identifying specifically where each limitation of each asserted claim of the '522 patent is found within each Accused Product, including whether each limitation of each asserted claim of the '522 patent is literally present in the Accused Product(s) or is present under the doctrine of equivalents.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Daniel H. Kaltman
Monica Chou
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY  10036
(212) 307-5500

*Attorneys for Plaintiff Bausch & Lomb
Incorporated*

November 1, 2023

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com

*Attorneys for Plaintiffs Bausch & Lomb
Incorporated and PF Consumer Healthcare 1
LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2023, copies of the foregoing were caused to be served

upon the following in the manner indicated:

Glenn A. Brown, Esquire                          *VIA ELECTRONIC MAIL*
REAL WORLD LAW, P.C.
727 North Market Street, Suite 4
Wilmington, DE  19801
*Attorneys for Defendant*

Frear Stephen Schmid, Esquire                    *VIA ELECTRONIC MAIL*
7585 Valley Ford Road
Petaluma, CA  94952
*Attorneys for Defendant*

Thomas Freiburger, Esquire                       *VIA ELECTRONIC MAIL*
55 Main Street, 2nd Floor
Tiburon, CA  94920
*Attorneys for Defendant*

/s/ *Derek J. Fahnestock*
_____
Derek J. Fahnestock (#4705)

**HIGHLY CONFIDENTIAL**

# EXHIBIT A

# CHART IDENTIFYING SPECIFICALLY WHERE EACH CLAIM LIMITATION IS FOUND IN EACH ACCUSED PRODUCT

Bausch & Lomb's Final Infringement Contentions
Against SBH Holdings LLC

**Regarding U.S. Patent No. 6,660,297**

**HIGHLY CONFIDENTIAL**

| CLAIM LIMITATION | INFRINGEMENT CONTENTION | LITERALLY PRESENT? | PRESENT UNDER DOE? |
|---|---|---|---|
| **U.S. Patent No. 6,660,297 – Claim 19** <br> **Products: MacularProtect® Capsules,[1] MacularProtect® AREDS 2 Capsules,[2] MacularProtect Complete® Capsules,[3] MacularProtect Complete®-S AREDS 2 Capsules,[4] MacularProtect Complete® Drink Mix,[5] MacularProtect Complete®-S Drink Mix[6]** | | | |
| A composition comprising on a daily dosage basis: | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00014); <br><br> MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00015); <br><br> MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00016); <br><br> MacularProtect Complete®-S AREDS 2 Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00017); | Yes | |

---

[1]    As used herein, MacularProtect® Capsules refers to the product at SBH 00008-8a, 20-20a and with the label at SBH 00014.  *See also* FAQs about MacularProtect® Capsules, available at https://www.sciencebasedhealth.com/MacularProtect-P45.aspx (*see* BAUSCH0121662) ("MacularProtect® Capsules FAQs").

[2]    As used herein, MacularProtect® AREDS 2 Capsules refers to the product at SBH 00009-9a, 21-21a and with the label at SBH 00015.

[3]    As used herein, MacularProtect Complete® Capsules refers to the product at SBH 00010-10a, 22-22a and with the label at SBH 00016.  *See also* FAQs about MacularProtect Complete® Capsules at https://www.sciencebasedhealth.com/MacularProtect-Complete--P46.aspx (*see* BAUSCH0121675) ("MacularProtect Complete® Capsules FAQs").

[4]    As used herein, MacularProtect Complete®-S AREDS 2 Capsules refers to the product at SBH 00011-11a, 23-23a and with the label at SBH 00017.

[5]    As used herein, MacularProtect Complete® Drink Mix refers to the product at SBH 00012 and with the label at SBH 00018.  *See also* FAQs about MacularProtect Complete® Drink Mix, available at https://www.sciencebasedhealth.com/MacularProtect-Completebr-font-size3iDrink-Mixifont-P76.aspx (*see* BAUSCH0121668) ("MacularProtect Complete® Drink Mix FAQs").

[6]    As used herein, MacularProtect Complete®-S Drink Mix refers to the product at SBH 00013 and with the label at SBH 00019.

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Drink Mix product label recommends two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00019). | | |
| approximately 7 to 10 times the RDA of vitamin C;[7] | MacularProtect® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00019).<br><br>To the extent SBH asserts that the limitation "approximately 7 to 10 times the RDA of vitamin C" is not literally met, the limitation is met under the doctrine of equivalents. A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are interchangeable with the claimed formulations containing "approximately 7 to 10 times the | Yes | Yes, if not literal |

---

[7] As stated in the '297 patent, the RDA of vitamin C in the form of ascorbic acid is 60 mg ('297 patent, col. 5, ll. 8-9).

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | RDA of vitamin C." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "approximately 7 to 10 times the RDA of vitamin C." Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C. Thus, SBH will directly infringe this part of the claim, if not literally then under the doctrine of equivalents ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ | | |
| approximately 13 to 18 times the RDA of vitamin E;[8] | MacularProtect® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00014); MacularProtect® AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00015); MacularProtect Complete® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00016); | Yes | |

[8] As stated in the '297 patent, the RDA of vitamin E in the form of dl-alpha tocopheryl acetate is 30 IU ('297 patent, col. 5, ll. 48-49).

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00019). | | |
| approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene,[9] substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof; | MacularProtect® Capsules product contains 10 mg of lutein and 2 mg of zeaxanthin per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein and 1 mg zeaxanthin per day (*see, e.g.*, SBH 00019). | Yes | |

---

[9] As stated in the '297 patent, the RDA of vitamin A is 5,000 IU ('297 patent, col. 6, ll. 13-14).

5

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| approximately 4 to 7 times the RDA of zinc;[10] | MacularProtect® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00019). | Yes | |
| and at least 1.6 mg and not more than approximately 2.4 mg copper | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00018); | Yes | |

---

[10] As stated in the '297 patent, the RDA of zinc is approximately 15 mg ('297 patent, col. 6, l. 49).

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00019). | | |
| into a suitable dosage form. | MacularProtect® Capsules product is a capsule (*see, e.g.*, SBH 00014) which is a suitable dosage form (*see e.g.*, '297 patent, col 3, ll. 46-53); | Yes | |
| | MacularProtect® AREDS 2 Capsules product is a capsule (*see, e.g.*, SBH 00015) which is a suitable dosage form (*see e.g.*, '297 patent, col 3, ll. 46-53); | | |
| | MacularProtect Complete® Capsules product is a capsule (*see, e.g.*, SBH 00016) which is a suitable dosage form (*see e.g.*, '297 patent, col 3, ll. 46-53); | | |
| | MacularProtect Complete®-S AREDS 2 Capsules product is a capsule (*see, e.g.*, SBH 00017) which is a suitable dosage form (*see e.g.*, '297 patent, col 3, ll. 46-53); | | |
| | MacularProtect Complete® Drink Mix product is a powder (*see, e.g.*, SBH 00018) which is a suitable dosage form (*see e.g.*, '297 patent, col. 4, ll. 51-56); | | |
| | MacularProtect Complete®-S Drink Mix product is a powder (*see, e.g.*, SBH 00019) which is a suitable dosage form (*see e.g.*, '297 patent, col. 4, ll. 51-56). | | |
| **U.S. Patent No. 6,660,297 – Claim 24**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | | |
| The composition of claim 19 | See claim 19. | | |
| wherein the zinc is provided as zinc oxide | MacularProtect® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00014); | Yes | |
| | MacularProtect® AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00015); | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00017). | | |
| and the copper as copper oxide. | MacularProtect® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00017). | Yes | |
| **U.S. Patent No. 6,660,297 – Claim 31**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules, MacularProtect Complete® Drink Mix, MacularProtect Complete®-S Drink Mix** | | | |
| A retina stabilizing composition comprising on a daily dosage basis: | The preamble term "retina stabilizing" is a non-limiting statement of the purpose or intended use of the composition and thus not a claim limitation requiring proof of infringement. To the extent SBH asserts that the "retina stabilizing" term must be met to prove infringement, SBH's accused products meet this term for the reasons explained below.<br><br>SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, | Yes | |

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| | and the label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, and the label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, and the label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, and the label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, and the label recommends | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on delivering the levels of ingredients found in the AREDS and AREDS2 clinical studies to provide a significantly better chance of preserving vision resulting in the decrease or stabilization of visual acuity loss, and the label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00013, 19). | | |
| approximately 7 to 10 times the RDA of vitamin C; | MacularProtect® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00019).<br><br>To the extent SBH asserts that the limitation "approximately 7 to 10 times the RDA of vitamin C" is not literally met, the limitation is met under the doctrine of equivalents.  A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are | Yes | Yes, if not literal |

10

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | interchangeable with the claimed formulations containing "approximately 7 to 10 times the RDA of vitamin C." ██████████████████████████████████████████████████████████████████████████████████████     The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "approximately 7 to 10 times the RDA of vitamin C."  Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C.  Thus, SBH will directly infringe this part of the claim, if not literally then under the doctrine of equivalents ██████████ ████████████ | | |
| approximately 13 to 18 times the RDA of vitamin E; | MacularProtect® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00016); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00019). | | |
| approximately 1 mg to 40 mg of lutein; | MacularProtect® Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein per day (*see, e.g.*, SBH 00019). | Yes | |
| approximately 0.04 mg to 40 mg of zeaxanthine; | MacularProtect® Capsules product contains 2 mg of zeaxanthin per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00015); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 1 mg zeaxanthin per day (*see, e.g.*, SBH 00019). | | |
| approximately 4 to 7 times the RDA of zinc; | MacularProtect® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00019). | Yes | |
| and not less than 1.6 mg and not more than 2.4 mg copper | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00015); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00017);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00018);<br><br>MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00019). | | |
| as a suitable dosage form for the stabilization of visual acuity loss in persons with early age-related macular degeneration. | The term "for the stabilization of visual acuity loss in persons with early age-related macular degeneration" is a non-limiting statement of the purpose or intended use of the composition and thus not a claim limitation requiring proof of infringement. To the extent SBH asserts that the "for the stabilization of visual acuity loss in persons with early age-related macular degeneration" term must be met to prove infringement, SBH's accused products meet this term for the reasons explained below.<br><br>SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular health", "a dietary supplement for those concerned about preserving macular health," and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss, and is a capsule (*see, e.g.*, SBH 00008-8a, 20-20a; MacularProtect® Capsules FAQs; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36);<br><br>SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | AREDS 2 clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss, and is a capsule (*see, e.g.*, SBH 00009-9a, 21-21a; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36);<br><br>SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight", which results in the decrease or stabilization of visual acuity loss, and is a capsule (*see, e.g.*, SBH 00010-10a, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36);<br><br>SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight", which results in the decrease or stabilization of visual acuity loss, and is a capsule (*see, e.g.*, SBH 00011-11a, 23-23a; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36);<br><br>SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | visual acuity loss, and is a powder (*see, e.g.*, SBH 00012; MacularProtect Complete® Drink Mix FAQs; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36); | | |
| | SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss, and is a powder (*see, e.g.*, SBH 00013; '297 patent at Abstract, col. 1, ll. 17-22, col. 2, ll. 32-36). | | |
| | SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a). | | |
| | ■■■■■■■■■■■■■■■■■■■■■■■■■ | | |

| **U.S. Patent No. 6,660,297 – Claim 32** | | | |
|---|---|---|---|
| **Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | | |
| The composition of claim 31 | See claim 31. | | |
| wherein the zinc is provided as zinc oxide | MacularProtect® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00014); <br><br> MacularProtect® AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00015); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00017). | | |
| and the copper as copper oxide. | MacularProtect® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00014);<br><br>MacularProtect® AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00015);<br><br>MacularProtect Complete® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00016);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00017). | Yes | |

17

**HIGHLY CONFIDENTIAL**

# EXHIBIT B

# CHART IDENTIFYING SPECIFICALLY WHERE EACH CLAIM LIMITATION IS FOUND IN EACH ACCUSED PRODUCT

Bausch & Lomb's Final Infringement Contentions
Against SBH Holdings LLC

**Regarding U.S. Patent No. 8,603,522**

**HIGHLY CONFIDENTIAL**

| CLAIM LIMITATION | INFRINGEMENT CONTENTION | LITERALLY PRESENT? | PRESENT UNDER DOE? |
|---|---|---|---|
| | **U.S. Patent No. 8,603,522 – Claim 1** <br> **Products: MacularProtect® Capsules,[1] MacularProtect® AREDS 2 Capsules,[2] MacularProtect Complete® Capsules,[3] MacularProtect Complete®-S AREDS 2 Capsules,[4] MacularProtect Complete® Drink Mix,[5] MacularProtect Complete®-S Drink Mix[6]** | | |
| A method for stabilizing visual acuity loss in persons with early age-related macular degeneration comprising: | SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); <br><br> SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular | Yes | |

---

[1]    As used herein, MacularProtect® Capsules refers to the product at SBH 00008-8a, 20-20a and with the label at SBH 00014. *See also* FAQs about MacularProtect® Capsules, available at https://www.sciencebasedhealth.com/MacularProtect-P45.aspx (*see* BAUSCH0121662) ("MacularProtect® Capsules FAQs").

[2]    As used herein, MacularProtect® AREDS 2 Capsules refers to the product at SBH 00009-9a, 21-21a and with the label at SBH 00015.

[3]    As used herein, MacularProtect Complete® Capsules refers to the product at SBH 00010-10a, 22-22a and with the label at SBH 00016. *See also* FAQs about MacularProtect Complete® Capsules at https://www.sciencebasedhealth.com/MacularProtect-Complete--P46.aspx (*see* BAUSCH0121675) ("MacularProtect Complete® Capsules FAQs").

[4]    As used herein, MacularProtect Complete®-S AREDS 2 Capsules refers to the product at SBH 00011-11a, 23-23a and with the label at SBH 00017.

[5]    As used herein, MacularProtect Complete® Drink Mix refers to the product at SBH 00012 and with the label at SBH 00018. *See also* FAQs about MacularProtect Complete® Drink Mix, available at https://www.sciencebasedhealth.com/MacularProtect-Completebr-font-size3iDrink-Mixifont-P76.aspx (*see* BAUSCH0121668) ("MacularProtect Complete® Drink Mix FAQs").

[6]    As used herein, MacularProtect Complete®-S Drink Mix refers to the product at SBH 00013 and with the label at SBH 00019.

health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00009-9a, 15, 21-21a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00010-10a, 16, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00011-11a, 17, 23-23a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on the AREDS and AREDS 2 clinical trials and as

**HIGHLY CONFIDENTIAL**

"powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00013, 19; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a);

[REDACTED]

Thus, the Accused Products labels and/or SBH's marketing actively encourage end-users to take the

[REDACTED]

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | Accused Products for the purpose of stabilizing visual acuity loss in persons with early age-related macular degeneration, and the Accused Products will stabilize visual acuity loss in persons with early age-related macular degeneration when taken as instructed.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's Accused Products in a manner that, as discussed above, infringes claim 1 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's Accused Products, with the knowledge that SBH's Accused Products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| administering a daily dosage | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product label recommends two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00013, 19); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | <br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of the Accused Products in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of the Accused Products in a way that directly infringes. | | |
| of not less than approximately 420 mg and not more than approximately 600 mg vitamin C, | MacularProtect® Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); | Yes | Yes, if not literal |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S Drink Mix product contains 750 mg of vitamin C per day (*see, e.g.,* SBH 00013, 19);<br><br>To the extent SBH asserts that the limitation "not less than approximately 420 mg and not more than approximately 600 mg vitamin C" is not literally met, the limitation is met under the doctrine of equivalents.  A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are interchangeable with the claimed formulations containing "not less than approximately 420 mg and not more than approximately 600 mg vitamin C."<br><br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████ The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "not less than approximately 420 mg and not more than approximately 600 mg vitamin C."  Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C.<br><br>██████████████████████<br>██████████████████████ | | |
| not less than approximately 400 IU and not more | MacularProtect® Capsules product contains 268 mg of vitamin E per day (*see, e.g.,* SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| than approximately 540 IU vitamin E, | MacularProtect® AREDS 2 Capsules product contains 400 IU of vitamin E per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | | |
| | MacularProtect Complete® Capsules product contains 268 mg of vitamin E per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | | |
| | MacularProtect Complete®-S AREDS 2 Capsules product contains 400 IU of vitamin E per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a); | | |
| | MacularProtect Complete® Drink Mix product contains 268 mg of vitamin E per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); | | |
| | MacularProtect Complete®-S Drink Mix product contains 400 IU of vitamin E per day (*see, e.g.*, SBH 00013, 19); | | |
| | Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of not less than approximately 400 IU and not more than approximately 540 IU vitamin E in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of not less than approximately 400 IU and not more than approximately 540 IU vitamin E in a way that directly infringes. | | |
| approximately 0.04 mg to 40 mg lutein-zeaxanthine combination, | MacularProtect® Capsules product contains 10 mg of lutein and 2 mg of zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); | Yes | |
| | MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein and 1 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 0.04 mg to 40 mg lutein-zeaxanthine combination in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 0.04 mg to 40 mg lutein-zeaxanthine combination in a way that directly infringes. | | |
| not less than approximately 60 mg and not more than approximately 100 mg zinc | MacularProtect® Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | Yes | |

9

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 80 mg of zinc per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 80 mg of zinc per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of not less than approximately 60 mg and not more than approximately 100 mg zinc in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of not less than approximately 60 mg and not more than approximately 100 mg zinc in a way that directly infringes. | | |
| and at least 1.6 mg and not more than approximately 2.4 mg copper. | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in a way that directly infringes. | | |
| **U.S. Patent No. 8,603,522 – Claim 4**<br>**Products: MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | | |
| The method of claim 1 | See claim 1.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's MacularProtect Complete® Capsules and MacularProtect Complete®-S AREDS 2 Capsules products in a manner that infringes claim 4 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's MacularProtect Complete® Capsules and MacularProtect Complete®-S AREDS 2 Capsules products, with the knowledge that SBH's products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| wherein said composition is supplemented with alpha-lipoic acid, | MacularProtect Complete® Capsules product is supplemented with alpha-lipoic acid (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | Yes | |

11

| | | | |
|---|---|---|---|
| phenolic compounds, anthocyanosides or a combination thereof. | MacularProtect Complete®-S AREDS 2 Capsules product is supplemented with alpha-lipoic acid (*see, e.g.*, SBH 00011-11a, 17, 23-23a).<br><br>Thus, end-users of the MacularProtect Complete® Capsules and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering a composition that is supplemented with alpha-lipoic acid, phenolic compounds, anthocyanosides or a combination thereof in accordance with the instructions on those product labels and/or on SBH's marketing.  The MacularProtect Complete® Capsules and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer a composition that is supplemented with alpha-lipoic acid, phenolic compounds, anthocyanosides or a combination thereof in a way that directly infringes. | | |
| **U.S. Patent No. 8,603,522 – Claim 5**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | | |
| The method of claim 1 | See claim 1.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products in a manner that infringes claim 5 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products, with the knowledge that SBH's products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, | MacularProtect® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a).<br><br>Thus, end-users of the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in accordance with the instructions on those products labels and/or on SBH's marketing.  The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in a way that directly infringes. | Yes | |
| and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof. | MacularProtect® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains copper provided in the form of copper | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>Thus, end-users of SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering copper provided in the form of copper oxide, copper gluconate or a combination thereof in accordance with the instructions on the products' labels and/or on SBH's marketing.  The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer copper provided in the form of copper oxide, copper gluconate or a combination thereof in a way that directly infringes. | | |

| | | |
|---|---|---|
| **U.S. Patent No. 8,603,522 – Claim 6**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | |

| | | | |
|---|---|---|---|
| The method of claim 1 | See claim 1.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products in a manner that infringes claim 6 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules, with the knowledge that SBH's products are made and/or adapted especially for use in said method and | | |

**HIGHLY CONFIDENTIAL**

| | are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
|---|---|---|---|
| wherein said daily dosage is administered orally | MacularProtect® Capsules product is a capsule (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product is a capsule (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product is a capsule (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product is a capsule (*see, e.g.*, SBH 00011-11a, 17, 23-23a).<br><br>Thus, end-users of MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules will directly infringe by administering those products in accordance with the instructions on those products labels and/or on SBH's marketing. The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of those products orally in a way that directly infringes. | Yes | |
| in the form of one or more tablets taken daily. | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S AREDS 2 Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a).<br><br>Thus, end-users of MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules will directly infringe by administering one or more tablets daily of those products in accordance with the instructions on those products labels and/or on SBH's marketing. The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer one or more tablets daily of those products in a way that directly infringes. | | |
| **U.S. Patent No. 8,603,522 – Claim 8**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules, MacularProtect Complete® Drink Mix, MacularProtect Complete®-S Drink Mix** | | | |
| A method of treating age-related macular degeneration | The preamble term "[a] method of treating age-related macular degeneration" does not recite any additional claim limitation and thus does not require proof of infringement. To the extent SBH asserts that the term must be met to prove infringement, SBH's Accused Products meet this term for the reasons explained below.<br><br>SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula" (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 | Yes | |

16

**HIGHLY CONFIDENTIAL**

clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula" (*see, e.g.*, SBH 00009-9a, 15, 21-21a);

SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight" (*see, e.g.*, SBH 00010-10a, 16, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs);

SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight" (*see, e.g.*, SBH 00011-11a, 17, 23-23a);

SBH markets its MacularProtect Complete® Drink Mix product as "powerful protection for macular and whole body health" and supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);

SBH markets its MacularProtect Complete®-S Drink Mix product as "powerful protection for macular and whole body health" and protecting macular health based on the AREDS and AREDS 2 clinical trials (*see, e.g.*, SBH 00013, 19);

SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a);

**HIGHLY CONFIDENTIAL**



Thus, the Accused Products labels and/or SBH's marketing actively encourage end-users to take the Accused Products for the purpose of treating age-related macular degeneration, and the Accused Products will treat age-related macular degeneration when taken as instructed.

SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's Accused Products in a manner that, as discussed above, infringes claim 8 of the '522 patent.

SBH sells, offers for sale, and/or imports into the United States SBH's Accused Products, with the knowledge that SBH's Accused Products are made and/or adapted especially for use in said method and

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| consisting essentially of administering a daily dosage | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product label recommends two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00013, 19);<br><br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████████████ | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of the Accused Products in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of the Accused Products in a way that directly infringes. | | |
| of not less than approximately 420 mg and not more than approximately 600 mg vitamin C, | MacularProtect® Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 750 mg of vitamin C per day (*see, e.g.*, SBH 00013, 19).<br><br>To the extent SBH asserts that the limitation "not less than approximately 420 mg and not more than approximately 600 mg vitamin C" is not literally met, the limitation is met under the doctrine of equivalents. A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are interchangeable with the claimed formulations containing "not less than approximately 420 mg and not more than approximately 600 mg vitamin C."<br><br>██████████████████████████ | Yes | Yes, if not literal |

20

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | █████████████████████ The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "not less than approximately 420 mg and not more than approximately 600 mg vitamin C." Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C. ██████████████████ | | |
| not less than approximately 400 IU and not more than approximately 540 IU vitamin E, | MacularProtect® Capsules product contains 268 mg of vitamin E per day (*see, e.g.,* SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 400 IU of vitamin E per day (*see, e.g.,* SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 268 mg of vitamin E per day (*see, e.g.,* SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 400 IU of vitamin E per day (*see, e.g.,* SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 268 mg of vitamin E per day (*see, e.g.,* | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 400 IU of vitamin E per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of not less than approximately 400 IU and not more than approximately 540 IU vitamin E in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of not less than approximately 400 IU and not more than approximately 540 IU vitamin E in a way that directly infringes. | | |
| approximately 0.04 mg to 40 mg lutein-zeaxanthine combination, | MacularProtect® Capsules product contains 10 mg of lutein and 2 mg of zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein and 2 mg zeaxanthin per | Yes | |

| | | | |
|---|---|---|---|
| | day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein and 1 mg zeaxanthin per day, including Lutein FloraGLO® containing lutein and zeaxanthin combination (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 0.04 mg to 40 mg lutein-zeaxanthine combination in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 0.04 mg to 40 mg lutein-zeaxanthine combination in a way that directly infringes. | | |
| not less than approximately 60 mg and not more than approximately 100 mg zinc | MacularProtect® Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 80 mg of zinc per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 80 mg of zinc per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 80 mg of zinc per day (*see, e.g.*, SBH 00013, 19). | Yes | |

23

**HIGHLY CONFIDENTIAL**

|  |  |  |  |
|---|---|---|---|
|  | Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of not less than approximately 60 mg and not more than approximately 100 mg zinc in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of not less than approximately 60 mg and not more than approximately 100 mg zinc in a way that directly infringes. |  |  |
| and at least 1.6 mg and not more than approximately 2.4 mg copper, | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to | Yes |  |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | administer a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in a way that directly infringes. | | |
| wherein the daily dosage stabilizes visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration. | SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00009-9a, 15, 21-21a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00010-10a, 16, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and | Yes | |

**HIGHLY CONFIDENTIAL**

AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00011-11a, 17, 23-23a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00013, 19; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a).



26

**HIGHLY CONFIDENTIAL**



Thus, the Accused Products labels and/or SBH's marketing actively encourage end-users to take the Accused Products for the purpose of stabilizing visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration, and the Accused Products will stabilize visual acuity loss by reducing the risk of developing late stage or advanced age-related macular degeneration in persons with early age-related macular degeneration when taken as instructed.

| | | | |
|---|---|---|---|
| **U.S. Patent No. 8,603,522 – Claim 11**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules, MacularProtect Complete® Drink Mix, MacularProtect Complete®-S Drink Mix** | | | |
| A method for treating visual acuity loss in persons with early age-related macular degeneration, | SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00008-8a, 14, 20-20a; | Yes | |

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| MacularProtect® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);<br><br>SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00009-9a, 15, 21-21a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);<br><br>SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00010-10a, 16, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);<br><br>SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00011-11a, 17, 23-23a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);<br><br>SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and | | |

28

**HIGHLY CONFIDENTIAL**

whole body health" (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", (*see, e.g.*, SBH 00013, 19; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40).

SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a).



**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | ███████████████ | | |
| | Thus, the Accused Products labels and/or SBH's marketing actively encourage end-users to take the Accused Products for the purpose of treating visual acuity loss in persons with early age-related macular degeneration, and the Accused Products will treat visual acuity loss in persons with early age-related macular degeneration when taken as instructed.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's Accused Products in a manner that, as discussed above, infringes claim 11 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's Accused Products, with the knowledge that SBH's Accused Products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| the method comprising administering a daily dosage composition comprising: | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product label recommends two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S Drink Mix product label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00013, 19);<br><br>[REDACTED]<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of the Accused Products in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of the Accused Products in a way that directly infringes. | | |
| approximately 7 to 10 times the RDA of vitamin C;[8] | MacularProtect® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | Yes | Yes, if not literal |

---

[8] As stated in the '522 patent, the RDA of vitamin C in the form of ascorbic acid is 60 mg ('522 patent, col. 5, ll. 9-10).

**HIGHLY CONFIDENTIAL**

MacularProtect Complete®-S AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);

MacularProtect Complete® Drink Mix product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);

MacularProtect Complete®-S Drink Mix product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00013, 19).

To the extent SBH asserts that the limitation "approximately 7 to 10 times the RDA of vitamin C" is not literally met, the limitation is met under the doctrine of equivalents. A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are interchangeable with the claimed formulations containing "approximately 7 to 10 times the RDA of vitamin C." ███████████ ██████████████████████████████████ ███████████████████████████████ ██████████████████████████████ ████████████████████████████████ ███████████ In other words, there are no differences between the two. The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "approximately 7 to 10 times the RDA of vitamin C." Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C. ████████████████████████████████████

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | ████████████████████████ | | |
| approximately 13 to 18 times the RDA of vitamin E,[9] | MacularProtect® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); <br><br> MacularProtect® AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); <br><br> MacularProtect Complete® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); <br><br> MacularProtect Complete®-S AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a); <br><br> MacularProtect Complete® Drink Mix product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); <br><br> MacularProtect Complete®-S Drink Mix product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00013, 19). <br><br> Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 13 to 18 times the RDA of vitamin E in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 13 to 18 times the RDA of vitamin E in a way that directly infringes. | Yes | |
| approximately 6 to 10 times the RDA | MacularProtect® Capsules product contains 10 mg of lutein and 2 mg of zeaxanthin per day (*see, e.g.*, | Yes | |

---

[9] As stated in the '522 patent, the RDA of vitamin E in the form of dl-alpha tocopheryl acetate is 30 IU ('522 patent, col. 5, ll. 49-50).

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| of vitamin A in the form of beta-carotene,[10] substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof; | SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein and 2 mg zeaxanthin per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein and 1 mg zeaxanthin per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 6 to 10 times the RDA of vitamin A in the form of beta-carotene, substituted or supplemented with lutein, zeaxanthine or a raw material combination thereof in a way that directly infringes. | | |

---

[10] As stated in the '522 patent, the RDA of vitamin A is 5,000 IU ('522 patent, col. 6, l. 14).

34

**HIGHLY CONFIDENTIAL**

| approximately 4 to 7 times the RDA of zinc;[11] | MacularProtect® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); | Yes | |
|---|---|---|---|
| | MacularProtect® AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | | |
| | MacularProtect Complete® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | | |
| | MacularProtect Complete®-S AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a); | | |
| | MacularProtect Complete® Drink Mix product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); | | |
| | MacularProtect Complete®-S Drink Mix product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00013, 19). | | |
| | Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 4 to 7 times the RDA of zinc in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 4 to 7 times the RDA of zinc in a way that directly infringes. | | |
| and at least 1.6 mg and not more than approximately 2.4 mg copper. | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); | Yes | |
| | MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | | |

---

[11] As stated in the '522 patent, the RDA of zinc is approximately 15 mg ('522 patent, col. 6, l. 51).

| | | | |
|---|---|---|---|
| | MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of at least 1.6 mg and not more than approximately 2.4 mg copper in a way that directly infringes. | | |

| U.S. Patent No. 8,603,522 – Claim 15 |
|---|
| **Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** |

| | | | |
|---|---|---|---|
| The method of claim 11 | See claim 11.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products in a manner that infringes claim 15 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's MacularProtect® Capsules, | | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products, with the knowledge that SBH's products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, | MacularProtect® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a).<br><br>Thus, end-users of the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in accordance with the instructions on those products labels and/or on SBH's marketing. The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in a way that directly infringes. | Yes | |
| and said copper is provided in the form of copper | MacularProtect® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| oxide, copper gluconate or a combination thereof. | 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); <br><br> MacularProtect® AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a); <br><br> MacularProtect Complete® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); <br><br> MacularProtect Complete®-S AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a); <br><br> Thus, end-users of the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering copper provided in the form of copper oxide, copper gluconate or a combination thereof in accordance with the instructions on the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or on SBH's marketing. The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer copper provided in the form of copper oxide, copper gluconate or a combination thereof in a way that directly infringes. | | |
| **U.S. Patent No. 8,603,522 – Claim 16** <br> **Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules, MacularProtect Complete® Drink Mix, MacularProtect Complete®-S Drink Mix** | | | |
| A method for treating visual acuity loss in persons with early | SBH markets its MacularProtect® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help support macular | Yes | |

| age-related macular degeneration, | health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); | | |
| --- | --- | --- | --- |
| | SBH markets its MacularProtect® AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "[a] powerful formulation to help protect macular health", "a dietary supplement for those concerned about preserving macular health", and "designed to help maintain the health of the macula", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00009-9a, 15, 21-21a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); | | |
| | SBH markets its MacularProtect Complete® Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful support for macular and whole body health", "a simple solution to help protect vision", "powerful support for individuals concerned about preserving their eyesight", "powerful protection for macular & whole body health", and "powerful key ingredients that work together to preserve eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00010-10a, 16, 22-22a, 108a-c; MacularProtect Complete® Capsules FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); | | |
| | SBH markets its MacularProtect Complete®-S AREDS 2 Capsules product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", "a simple solution to help protect vision", and "powerful support for individuals concerned about preserving their eyesight", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00011-11a, 17, 23-23a; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40); | | |

**HIGHLY CONFIDENTIAL**

SBH markets its MacularProtect Complete® Drink Mix product as supporting or preserving macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect Complete®-S Drink Mix product as protecting macular health based on the AREDS and AREDS 2 clinical trials, and as "powerful protection for macular and whole body health", which results in the decrease or stabilization of visual acuity loss (*see, e.g.*, SBH 00013, 19; '522 Patent at Abstract, col. 1, ll. 17-21, col. 2, ll. 36-40);

SBH markets its MacularProtect® Capsules and MacularProtect Complete® Capsules products as "AMD Nutrition Support" (*see, e.g.*, SBH 00059, 59a, 60, 60a);

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | <br><br><br><br><br><br><br><br>Thus, the Accused Products labels and/or SBH's marketing actively encourage end-users to take the Accused Products for the purpose of treating visual acuity loss in persons with early age-related macular degeneration, and the Accused Products will treat visual acuity loss in persons with early age-related macular degeneration when taken as instructed.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's Accused Products in a manner that, as discussed above, infringes claim 16 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's Accused Products, with the knowledge that SBH's Accused Products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| the method comprising administering a daily dosage composition comprising: | MacularProtect® Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product label recommends two capsules daily (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | Yes | |

41

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | MacularProtect Complete®-S AREDS 2  Capsules product label recommends four capsules daily (*see, e.g.*, SBH 00011-11a, 17, 23-23a); | | |
| | MacularProtect Complete® Drink Mix product label recommends two scoops (7.9 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs); | | |
| | MacularProtect Complete®-S Drink Mix product label recommends two scoops (9.3 g) with one cup (8 fl. oz) of water daily (*see, e.g.*, SBH 00013, 19); | | |
| |  | | |
| | Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of the Accused Products in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of the Accused Products in a way that directly infringes. | | |
| approximately 7 to 10 times the RDA of vitamin C; | MacularProtect® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs); | Yes | Yes, if not literal |
| | MacularProtect® AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a); | | |

**HIGHLY CONFIDENTIAL**

MacularProtect Complete® Capsules product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);

MacularProtect Complete®-S AREDS 2 Capsules product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);

MacularProtect Complete® Drink Mix product contains 833% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);

MacularProtect Complete®-S Drink Mix product contains 1250% DV (750 mg) of vitamin C per day (*see, e.g.*, SBH 00013, 19).

To the extent SBH asserts that the limitation "approximately 7 to 10 times the RDA of vitamin C" is not literally met, the limitation is met under the doctrine of equivalents. A POSA would understand that SBH's Accused Products containing 750 mg vitamin C are interchangeable with the claimed formulations containing "approximately 7 to 10 times the RDA of vitamin C." ███████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ███████████ The 750 mg vitamin C in SBH's Accused Products is insubstantially different from the claimed amounts of vitamin C because the bioavailability of vitamin C is such that a person taking a 750 mg daily dose is not likely absorbing more than a person taking "approximately 7 to 10 times the RDA of vitamin C." Moreover, 750 mg of vitamin C performs substantially the same function – as one ingredient in a vitamin and mineral supplement to reduce the risk of developing late stage or advanced AMD, works in substantially the same way – through absorption in the body to

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | provide the protective effect, and provides substantially the same results – providing vitamin C (in combination with other ingredients) to reduce the risk of AMD, as the claimed amounts of vitamin C. ████████████████████████████████ | | |
| approximately 13 to 18 times the RDA of vitamin E, | MacularProtect® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 1787% DV (268 mg) of vitamin E per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 1333% DV (400 IU) of vitamin E per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 13 to 18 times the RDA of vitamin E in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or on SBH's marketing actively encourage end-users to administer a daily dosage of approximately 13 to 18 times the RDA of vitamin E in a way that directly infringes. | Yes | |

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| approximately 1 mg to 40 mg of lutein, | MacularProtect® Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 10 mg of lutein per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 10 mg of lutein per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 10 mg of lutein per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 1 mg to 40 mg of lutein in accordance with the instructions on the Accused Products labels and/or on SBH's marketing.  The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 1 mg to 40 mg of lutein in a way that directly infringes. | Yes | |
| approximately 0.04 mg to 40 mg zeaxanthine | MacularProtect® Capsules product contains 2 mg of zeaxanthin per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH | Yes | |

45

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg zeaxanthin per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 1 mg zeaxanthin per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 0.04 mg to 40 mg zeaxanthine in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 0.04 mg to 40 mg zeaxanthine in a way that directly infringes. | | |
| approximately 4 to 7 times the RDA of zinc; | MacularProtect® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 727% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 727% DV (80 mg) of zinc per day (*see,* | Yes | |

46

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | *e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 533% DV (80 mg) of zinc per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of approximately 4 to 7 times the RDA of zinc in accordance with the instructions on the Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of approximately 4 to 7 times the RDA of zinc in a way that directly infringes. | | |
| and not less than 1.6 mg and not more than 2.4 mg copper. | MacularProtect® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);<br><br>MacularProtect Complete®-S AREDS 2 Capsules product contains 2 mg of copper per day (*see, e.g.*, SBH 00011-11a, 17, 23-23a);<br><br>MacularProtect Complete® Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00012, 18; MacularProtect Complete® Drink Mix FAQs);<br><br>MacularProtect Complete®-S Drink Mix product contains 2 mg of copper per day (*see, e.g.*, SBH 00013, 19).<br><br>Thus, end-users of the Accused Products will directly infringe by administering a daily dosage of not less than 1.6 mg and not more than 2.4 mg copper in accordance with the instructions on the | Yes | |

| | | | |
|---|---|---|---|
| | Accused Products labels and/or on SBH's marketing. The Accused Products labels and/or SBH's marketing actively encourage end-users to administer a daily dosage of not less than 1.6 mg and not more than 2.4 mg copper in a way that directly infringes. | | |
| **U.S. Patent No. 8,603,522 – Claim 20**<br>**Products: MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, MacularProtect Complete®-S AREDS 2 Capsules** | | | |
| The method of claim 16 | See claim 16.<br><br>SBH has known and/or was willfully blind to the fact that its labeling and/or marketing activities instructs and/or directs the use of SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products in a manner that infringes claim 20 of the '522 patent.<br><br>SBH sells, offers for sale, and/or imports into the United States SBH's MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products, with the knowledge that SBH's products are made and/or adapted especially for use in said method and are not staple articles or commodities of commerce suitable for substantial noninfringing use. | | |
| wherein said zinc is provided in the form of zinc oxide, zinc gluconate or a combination thereof, | MacularProtect® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);<br><br>MacularProtect® AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a);<br><br>MacularProtect Complete® Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs); | Yes | |

**HIGHLY CONFIDENTIAL**

<table>
<tr>
<td></td>
<td>MacularProtect Complete®-S AREDS 2 Capsules product contains zinc provided in the form of zinc oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a).

Thus, end-users of the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in accordance with the instructions on those products labels and/or on SBH's marketing. The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer zinc provided in the form of zinc oxide, zinc gluconate or a combination thereof in a way that directly infringes.</td>
<td></td>
<td></td>
</tr>
<tr>
<td>and said copper is provided in the form of copper oxide, copper gluconate or a combination thereof.</td>
<td>MacularProtect® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00008-8a, 14, 20-20a; MacularProtect® Capsules FAQs);

MacularProtect® AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00009-9a, 15, 21-21a);

MacularProtect Complete® Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00010-10a, 16, 22-22a; MacularProtect Complete® Capsules FAQs);

MacularProtect Complete®-S AREDS 2 Capsules product contains copper provided in the form of copper oxide (*see, e.g.*, SBH 00011-11a, 17, 23-23a);

Thus, end-users of the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules products will directly infringe by administering copper provided in the form of copper oxide, copper</td>
<td>Yes</td>
<td></td>
</tr>
</table>

49

**HIGHLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | gluconate or a combination thereof in accordance with the instructions on the MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or on SBH's marketing.  The MacularProtect® Capsules, MacularProtect® AREDS 2 Capsules, MacularProtect Complete® Capsules, and MacularProtect Complete®-S AREDS 2 Capsules product labels and/or SBH's marketing actively encourage end-users to administer copper provided in the form of copper oxide, copper gluconate or a combination thereof in a way that directly infringes. | | |

# EXHIBIT 10

# 2000

## USP 24

# THE UNITED STATES PHARMACOPEIA

## NF 19

# THE NATIONAL FORMULARY

*By authority of the United States Pharmacopeial Convention, Inc., meeting at Washington, D.C., March 9–12, 1995. Prepared by the Committee of Revision and published by the Board of Trustees*

*Official from January 1, 2000*

UNITED STATES PHARMACOPEIAL CONVENTION, INC.
12601 Twinbrook Parkway, Rockville, MD   20852

BAUSCH0122312

## NOTICE AND WARNING

*Concerning U.S. Patent or Trademark Rights*

The inclusion in the Pharmacopeia or in the National Formulary of a monograph on any drug in respect to which patent or trademark rights may exist shall not be deemed, and is not intended as, a grant of, or authority to exercise, any right or privilege protected by such patent or trademark. All such rights and privileges are vested in the patent or trademark owner, and no other person may exercise the same without express permission, authority, or license secured from such patent or trademark owner.

*Concerning Use of USP or NF Text*

Attention is called to the fact that USP and NF text is fully copyrighted. Authors and others wishing to use portions of the text should request permission to do so from the Secretary of the USPC Board of Trustees.

© 1999    The United States Pharmacopeial Convention, Inc.
12601 Twinbrook Parkway, Rockville, MD  20852.
*All rights reserved*
ISSN 0195-7996
ISBN 1-889788-03-1

Printed by National Publishing, Philadelphia, PA

RS in the *Standard preparation*, and $r_U$ and $r_S$ are the peak responses of folic acid obtained from the *Assay preparation* and the *Standard preparation*, respectively.

**Assay for calcium pantothenate, Method 1**—Proceed as directed in the *Assay for calcium pantothenate, Method 1*, under *Water-Soluble Vitamins Tablets*.

**Assay for calcium pantothenate, Method 2**—Proceed as directed in the *Assay for calcium pantothenate, Method 2*, under *Water-Soluble Vitamins Tablets*.

**Assay for calcium pantothenate, Method 3**—Proceed as directed in the *Assay for calcium pantothenate, Method 3*, under *Oil- and Water-soluble Vitamins with Minerals Tablets*.


# Oil- and Water-Soluble Vitamins with Minerals Capsules

» Oil- and Water-Soluble Vitamins with Minerals Capsules contain one or more of the following oil-soluble vitamins: Vitamin A, Vitamin D as Ergocalciferol (Vitamin $D_2$) or Cholecalciferol (Vitamin $D_3$), Vitamin E, Phytonadione (Vitamin $K_1$), and Beta Carotene; one or more of the following water-soluble vitamins: Ascorbic Acid or its equivalent as Calcium Ascorbate or Sodium Ascorbate, Biotin, Cyanocobalamin, Folic Acid, Niacin or Niacinamide, Dexpanthenol or Panthenol, Pantothenic Acid (as Calcium Pantothenate or Racemic Calcium Pantothenate), Pyridoxine Hydrochloride, Riboflavin, and Thiamine Hydrochloride or Thiamine Mononitrate; and one mineral or more, furnishing one or more of the following elements in ionizable form: calcium, chromium, copper, fluorine, iodine, iron, magnesium, manganese, molybdenum, phosphorus, potassium, selenium, and zinc, derived from substances generally recognized as safe. Capsules contain not less than 90.0 percent and not more than 165.0 percent of the labeled amounts of vitamin A ($C_{20}H_{30}O$) as retinol or esters of retinol in the form of retinyl acetate ($C_{22}H_{32}O_2$) or retinyl palmitate ($C_{36}H_{60}O_2$), vitamin D as ergocalciferol ($C_{28}H_{44}O$) or cholecalciferol ($C_{27}H_{44}O$), vitamin E as alpha tocopherol ($C_{29}H_{50}O_2$) or alpha tocopheryl acetate ($C_{31}H_{52}O_3$) or alpha tocopheryl acid succinate ($C_{33}H_{54}O_5$), phytonadione ($C_{31}H_{46}O_2$), and beta carotene ($C_{40}H_{56}$); and not less than 90.0 percent and not more than 150.0 percent of the labeled amounts of ascorbic acid ($C_6H_8O_6$) or its salts as calcium ascorbate ($C_{12}H_{14}CaO_2$) or sodium ascorbate ($C_6H_7NaO_6$), biotin ($C_{10}H_{16}N_2O_3S$), cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$), folic acid ($C_{19}H_{19}N_7O_6$), niacin ($C_6H_5NO_2$) or niacinamide ($C_6H_6N_2O$), dexpanthenol ($C_9H_{19}NO_4$) or panthenol ($C_9H_{19}NO_4$), calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$), pyridoxine hydrochloride ($C_8H_{11}NO_3 \cdot HCl$), riboflavin ($C_{17}H_{20}N_4O_6$), and thiamine ($C_{12}H_{17}ClN_4OS$) as thiamine hydrochloride or thiamine mononitrate; and not less than 90.0 percent and not more than 125.0 percent of the labeled amount of calcium (Ca), copper (Cu), iron (Fe), magnesium (Mg), manganese (Mn), phosphorus (P), potassium (K), and zinc (Zn); and not less than 90.0 percent and not more than 200.0 percent of the labeled amounts of chromium (Cr), fluorine (F), iodine (I), molybdenum (Mo), and selenium (Se).

They may contain other labeled added substances that are generally recognized as safe, in amounts that are unobjectionable.

**Packaging and storage**—Preserve in tight, light-resistant containers.

**Labeling\***—The label states that the product is Oil- and Water-Soluble Vitamins with Minerals Capsules. The label states also the quantity of each vitamin and mineral per dosage unit and where necessary the chemical form in which a vitamin is present and states also the salt form of the mineral used as the source of each element. Where the product contains vitamin E, the label indicates whether it is the *d*- or *dl*- form. Where more than one *Assay* method is given for a particular vitamin or mineral, the labeling states with which *Assay* method the product complies only if *Method 1* is not used.

**USP Reference standards ⟨11⟩**—*USP Vitamin A RS. USP Ergocalciferol RS. USP Cholecalciferol RS. USP Alpha Tocopherol RS. USP Alpha Tocopheryl Acetate RS. USP Alpha Tocopheryl Acid Succinate RS. USP Phytonadione RS. USP Biotin RS. USP Cyanocobalamin RS. USP Folic Acid RS. USP Niacin RS. USP Niacinamide RS. USP Calcium Pantothenate RS. USP Pyridoxine Hydrochloride RS. USP Riboflavin RS. USP Thiamine Hydrochloride RS.*

**Microbial limits ⟨2021⟩**—The total bacterial count does not exceed 3000 per g, and the combined yeast and mold counts do not exceed 300 per g. Capsules meet also the requirements of the tests for absence of *Salmonella* species, *Escherichia coli*, and *Staphylococcus aureus*.

**Disintegration and dissolution ⟨2040⟩**: meet the requirements for *Dissolution.*

**Weight variation ⟨2091⟩**: meet the requirements.

NOTE—In the following assays, where more than one *Assay* method is given for an individual ingredient, compliance may be determined by following any one of the specified methods, the method used being stated in the labeling only if *Method 1* is not used.

**Assay for vitamin A, Method 1**—[NOTE—Where the use of a vitamin A ester (or either retinyl acetate or retinyl palmitate) is specified in the following procedure, use the chemical form present in the formulation. The USP Vitamin A RS is all-*trans* retinyl acetate. It is to be used where USP Vitamin A RS is specified. Use low-actinic glassware throughout this procedure.]

*Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin A, Method 1,* under *Oil- and Water-Soluble Vitamins with Minerals Capsules.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 1,* under *Oil-Soluble Vitamins Capsules,* retaining the solution for use in the assays for vitamin D, vitamin E, and phytonadione as specified therein.

*Procedure*— Proceed as directed for *Procedure* in the *Assay for vitamin A, Method 1,* under *Oil-Soluble Vitamins Capsules.*

**Assay for vitamin A, Method 2**—[NOTE—Where the use of a vitamin A ester (or either retinyl acetate or retinyl palmitate) is specified in the following procedure, use the chemical form present in the formulation. The USP Vitamin A RS is all-*trans* retinyl acetate. It is to be used where USP Vitamin A RS is specified. Use low-actinic glassware throughout this procedure.]

*3 N Methanolic sulfuric acid solution, Sodium ascorbate-pyrogallol solution, Lecithin solution, Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin A, Method 2* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—[NOTE—This preparation is suitable for the determination of vitamin A, vitamin D, and vitamin E, when present in the formulation.] Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a 100-mL beaker. Remove any contents adhering to the empty shells by washing with several portions of ether. Discard

---

\* For information on USP Units of activity for vitamins and labeling in terms of units, see the footnote to the *Labeling* section under *Oil-Soluble Vitamins Capsules.*

BAUSCH0122314

the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 30 µg of the ergocalciferol or cholecalciferol (vitamin D), to a container having a polytef-lined screw cap. If vitamin D is not present in the formulation, use a portion equivalent to about 90 mg of vitamin E. If vitamin E is not present in the formulation, use a portion equivalent to about 2.5 mg of vitamin A. Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, beginning with ''Add about 0.5 g of sodium bicarbonate.''

*Procedure*—Proceed as directed for *Procedure* in the *Assay for vitamin A, Method 2*, under *Oil- or Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of vitamin A as the retinol ($C_{20}H_{30}O$) equivalent in the portion of Capsules taken by the formula:

$$26.5ECD(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for vitamin A, Method 3**—

*Extraction solvent, Potassium hydroxide solution, Diluting solution, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin A, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a 100-mL beaker. Remove any contents adhering to the empty shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 1.5 mg of vitamin A acetate, to a stoppered 125-mL flask, and proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, beginning with ''Add 5 mL of water.''

*Procedure*—Proceed as directed for *Procedure* in the *Assay for vitamin A, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of vitamin A, as the retinol ($C_{20}H_{30}O$) equivalent, in the portion of Capsules taken by the formula:

$$EC(L/D)(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for cholecalciferol or ergocalciferol (vitamin D), Method 1**—[NOTE—Where vitamin D (ergocalciferol or cholecalciferol) is specified in the following procedure, use the chemical form present in the formulation and the relevant USP Reference Standard. Use low-actinic glassware throughout this procedure.]

*Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for cholecalciferol or ergocalciferol, Method 1*, under *Oil-Soluble Vitamins Capsules.*

*Assay preparation*—Transfer an accurately measured volume of the solution retained as specified in the directions for *Assay preparation* in the *Assay for vitamin A, Method 1*, to a suitable container, and evaporate. if necessary, in vacuum at room temperature to obtain a solution having a concentration of about 2 µg of cholecalciferol or ergocalciferol per mL.

*Procedure*—Proceed as directed for *Procedure* in the *Assay for cholecalciferol or ergocalciferol, Method 1*, under *Oil-Soluble Vitamins Capsules.*

**Assay for cholecalciferol or ergocalciferol (vitamin D), Method 2**—

*3 N Methanolic sulfuric acid solution, Sodium ascorbate-pyrogallol solution, Lecithin solution, Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin A, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—[NOTE—This preparation is suitable for the determination of vitamin A, vitamin D, and vitamin E, when present in the formulation.] Weigh accurately not less than 20 Capsules in

a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a 100-mL beaker. Remove any contents adhering to the empty shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 30 µg of ergocalciferol or cholecalciferol (vitamin D), to a container having a polytef-lined screw cap. If vitamin D is not present in the formulation, use a portion equivalent to about 90 mg of vitamin E. If vitamin E is not present in the formulation, use a portion equivalent to about 2.5 mg of vitamin A. Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, beginning with ''Add about 0.5 g of sodium bicarbonate.''

*Procedure*—Proceed as directed for *Procedure* in the *Assay for cholecalciferol or ergocalciferol (vitamin D), Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in µg, of ergocalciferol ($C_{28}H_{44}O$) or cholecalciferol ($C_{27}H_{44}O$) in the portion of Capsules taken by the formula:

$$26.5C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for cholecalciferol or ergocalciferol (vitamin D), Method 3**—

*Acetic acid solution, Phenolphthalein solution, Potassium hydroxide solution, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for cholecalciferol or ergocalciferol (vitamin D), Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 3*, through ''Calculate the net weight of the Capsule contents.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 10 µg of ergocalciferol or cholecalciferol, to a stoppered 125-mL flask, and proceed as directed for *Assay preparation* in the *Assay for cholecalciferol or ergocalciferol (vitamin D), Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for cholecalciferol or ergocalciferol (vitamin D), Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in µg, of ergocalciferol ($C_{28}H_{44}O$) or cholecalciferol ($C_{27}H_{44}O$) in the portion of Capsules taken by the formula:

$$1.09(2C)(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for vitamin E, Method 1**—[NOTE—Where Vitamin E (as alpha tocopherol, alpha tocopherol acetate or alpha tocopheryl acid succinate) is specified in the following procedure, use the chemical form present in the formulation and the relevant USP Reference Standard. Use low-actinic glassware throughout this procedure.]

*Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin E, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for vitamin E, Method 1*, under *Oil-Soluble Vitamins Capsules.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for vitamin E, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of alpha tocopherol ($C_{29}H_{50}O_2$), alpha tocopheryl acetate ($C_{31}H_{52}O_3$), or alpha tocopheryl acid succinate ($C_{33}H_{54}O_5$) in the Capsules taken by the formula given therein. where *L* is the labeled amount, in mg, of vitamin E in the Capsules.

**Assay for vitamin E, Method 2**—[NOTE—Where vitamin E (as alpha tocopherol, alpha tocopheryl acetate, or alpha tocopheryl acid succinate) is specified in the following procedure, use the chemical form present in the formulation and the relevant USP Reference Standard. Use low-actinic glassware throughout this procedure.]

*Mobile phase, Standard preparation, System suitability preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for vitamin E, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 2*, through ''Calculate the net weight of the Capsule contents.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 55 mg of vitamin E, to a container having a polytef-lined screw cap, and proceed as directed for *Assay preparation* in the *Assay for vitamin E, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for vitamin E, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of alpha tocopherol ($C_{29}H_{50}O$), alpha tocopheryl acetate ($C_{31}H_{52}O_3$), or alpha tocopheryl acid succinate ($C_{33}H_{54}O_5$) in the portion of capsules taken by the formula:

$$26.5CD(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for vitamin E, *Method 3***—

*Diluting solution*, *Mobile phase*, *Standard preparation*, and *Chromatographic system*—Proceed as directed in the *Assay for vitamin E, Method 3*, under *Oil- and Water-Soluble Vitamins with Mineral Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for vitamin A, Method 3*, through ''Calculate the net weight of the Capsule contents.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 8.0 mg of alpha tocopherol, to a glass-stoppered conical flask, and proceed as directed for *Assay preparation* in the *Assay for vitamin E, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for vitamin E, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of alpha tocopherol ($C_{29}H_{50}O_2$) in the portion of Capsules taken by the formula:

$$5C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for phytonadione**—[NOTE—Use low-actinic glassware throughout this procedure.]

*Mobile phase*, *Standard stock solution*, *Standard preparation*, *System suitability preparation*, and *Chromatographic system*—Proceed as directed in the *Assay for phytonadione* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for phytonadione* under *Oil-Soluble Vitamins Capsules.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for phytonadione* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in μg, of phytonadione ($C_{31}H_{46}O_2$) in the Capsules taken by the formula given therein, where *L* is the labeled quantity, in μg, of phytonadione in the Capsules.

**Assay for beta carotene**—[NOTE—Use low-actinic glassware throughout this procedure.]

*Assay preparation 1* (for preparations containing beta carotene in oil solutions)—Proceed as directed in the *Assay for vitamin A*, except to use cyclohexane instead of *n*-hexane as the extraction solvent and to dilute the filtered extracts quantitatively, and stepwise if necessary, with cyclohexane to obtain a solution having a concentration of about 2 μg of beta carotene per mL.

*Potassium hydroxide solution*—Dissolve 58.8 g of potassium hydroxide in 50 mL of water.

*Iodine solution*—Transfer about 10 mg of iodine to a 100-mL volumetric flask. Dissolve in and dilute with cyclohexane to volume, and mix. Dilute 10 mL of this solution with cyclohexane to 100 mL, and mix. Prepare this solution fresh daily.

*Assay preparation 2* (for preparations containing beta carotene in dry powder)—Weigh accurately not less than 20 Capsules, cut open the Capsules. using a sharp blade if necessary, and combine the contents in a suitable container. Transfer an accurately weighed quantity of the Capsule contents, equivalent to about 2 mg of beta carotene, to a 500-mL saponification flask, and proceed as directed for *Assay preparation* in the *Assay for beta carotene* under *Oil- and water-Soluble Vitamins with Minerals Tablets*, beginning with ''Add 100 mL of alcohol, 6 mL of *Potassium hydroxide solution*, and a magnetic stirring bar.''

*Procedure*—Proceed as directed for *Procedure* in the *Assay for beta carotene* under *Oil- and Water-Soluble Vitamins with Minerals*

*Tablets.* Calculate the quantity, in μg, of beta carotene ($C_{40}H_{56}$) in the Capsules taken by the formula:

$$(L/D)(A_U/223),$$

in which the terms are as defined therein, substituting Capsules for Tablets.

**Assay for ascorbic acid, *Method 1***—Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully cut open the Capsules, without the loss of shell material, and transfer the contents to a 100-mL beaker. Remove any contents adhering to the empty shells by washing if necessary with several portions of ether. Discard the washings, and dry the Capsule shells with the aid of a current of dry air until the odor of ether is no longer perceptible. Weigh the empty Capsule shells in the tared weighing bottle, and calculate the average net weight per Capsule. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 100 mg of ascorbic acid, to a 200-mL volumetric flask, and proceed as directed in the *Assay for ascorbic acid, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

**Assay for ascorbic acid, *Method 2***—Proceed as directed in the *Assay for Ascorbic Acid* under *Automated Methods of Analysis* ⟨16⟩.

**Assay for calcium ascorbate, *Method 1***—Proceed as directed in the *Assay for ascorbic acid, Method 1.*

**Assay for calcium ascorbate, *Method 2***—Proceed as directed in the *Assay for Ascorbic Acid* under *Automated Methods of Analysis* ⟨16⟩.

**Assay for sodium ascorbate, *Method 1***—Proceed as directed in the *Assay for ascorbic acid, Method 1.*

**Assay for sodium ascorbate, *Method 2***—Proceed as directed in the *Assay for Ascorbic Acid* under *Automated Methods of Analysis* ⟨16⟩.

**Assay for biotin, *Method 1***—[NOTE—Use low-actinic glassware throughout this procedure.]

*Mobile phase*, *Standard preparation*, and *Chromatographic system*—Proceed as directed in the *Assay for biotin, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for ascorbic acid, Method 1*, through ''calculate the average net weight per Capsule.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 1 mg of biotin, to a 200-mL volumetric flask. Add 3 mL of dimethyl sulfoxide, and swirl to wet the contents. Place the flask in a water bath at 60° to 70° for 5 minutes. Sonicate for 5 minutes, dilute with water to volume, mix, and filter.

*Procedure*—Proceed as directed for *Procedure* in the *Assay for biotin, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in μg, of biotin ($C_{10}H_{16}N_2O_3S$) in the portion of Capsules taken by the formula defined therein, substituting Capsules for Tablets.

**Assay for biotin, *Method 2***—Proceed as directed in the *Assay for biotin, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets* except to use the following *Assay preparation.*

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*. through ''calculate the average net weight per Capsule.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 100 μg of biotin, to a 200-mL volumetric flask, add 3 mL of 50 percent alcohol, and swirl to wet the contents. Heat the flask in a water bath at 60° to 70° for 5 minutes. Sonicate for 5 minutes, dilute with diluted alcohol to volume, mix, and filter. Dilute an accurately measured volume of the filtrate quantitatively, and stepwise if necessary, with water to obtain a solution having a concentration of about 0.1 ng per mL.

**Assay for cyanocobalamin, *Method 1***—[NOTE—Use low-actinic glassware throughout this procedure.]

*Mobile phase*, *Standard preparation*, and *Chromatographic system*—Proceed as directed in the *Assay for cyanocobalamin, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through ''calculate the average net weight per Capsule.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 100 μg of cyanocobalamin. to a 250-mL flask. Quantitatively add 100.0 mL of water. and hand extract for 2 minutes. Filter about 10 mL of the extract. and use the clear solution as the *Assay preparation.*

BAUSCH0122316

*Procedure*—Proceed as directed for *Procedure* in the *Assay for cyanocobalamin, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in μg, of cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$) in the portion of Capsules taken by the formula defined therein, substituting Capsules for Tablets.

**Assay for cyanocobalamin, Method 2**—[NOTE—Use low-actinic glassware throughout this procedure.] Proceed as directed in the *Assay for cyanocobalamin, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, except to use the following *Assay preparation*.

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through "calculate the average net weight per Capsule." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 1.0 μg of cyanocobalamin, to an appropriate vessel containing, for each g of Capsule contents taken, 25 mL of an aqueous extracting solution prepared just prior to use to contain, in each 100 mL, 1.29 g of dibasic sodium phosphate, 1.1 g of anhydrous citric acid, and 1.0 g of sodium metabisulfite. Autoclave the mixture at 121° for 10 minutes. Allow any undissolved particles of the extract to settle, and filter or centrifuge, if necessary. Dilute an aliquot of the clear solution with water to obtain a final solution containing vitamin $B_{12}$ activity approximately equivalent to that of the *Standard preparation*.

**Assay for folic acid, Method 1**—[NOTE—Use low-actinic glassware throughout this procedure.]

*Reagent A, Reagent B, Mobile phase, Internal standard preparation, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for folic acid, Method 1* under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through "calculate the average net weight per Capsule." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 0.4 mg of folic acid, to a 50-mL centrifuge tube. Add 25.0 mL of *Internal standard preparation*, insert a stopper, shake by mechanical means for 10 minutes, and centrifuge. Filter a portion of the clear supernatant liquid, and use the filtered portion as the *Assay preparation*.

*Procedure*—Proceed as directed in the *Assay for folic acid, Method 1* under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of folic acid ($C_{19}H_{19}N_7O_6$) in the portion of Capsules taken by the formula defined therein, substituting Capsules for Tablets.

**Assay for folic acid, Method 2**—[NOTE—Use low-actinic glassware throughout this procedure.]

*Reagent, Diluting solution, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for folic acid, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a 100-mL beaker. Remove any contents adhering to the empty shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 0.3 mg of folic acid, to a stoppered 125-mL flask. Add 10.0 mL of a mixture of methanol and 35.0 mL of *Reagent*, insert the stopper, shake for 15 minutes in a water bath maintained at 60°, and cool. Filter, discarding the first few mL of the filtrate.

*Procedure*—Proceed as directed for *Procedure* in the *Assay for folic acid, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of folic acid ($C_{19}H_{19}N_7O_6$) in the portion of Capsules taken by the formula:

$$45C(r_U/r_S).$$

in which the terms are as defined therein.

**Assay for dexpanthenol or panthenol**—Proceed as directed in the *Assay for dexpanthenol or panthenol* under *Water-Soluble Vitamins Capsules*.

**Assay for calcium pantothenate, Method 1**—

*Mobile phase, Internal standard preparation, Standard preparation,* and *Chromatographic system*— Proceed as directed in the *Assay for calcium pantothenate, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through "calculate the average net weight per Capsule." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 15 mg of calcium pantothenate, to a centrifuge tube. Transfer 25.0 mL of the *Internal standard preparation* to the centrifuge tube, and shake vigorously for 10 minutes. Centrifuge, and filter, using the clear filtrate as the *Assay preparation*.

*Procedure*—Proceed as directed in the *Assay for calcium pantothenate, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$) in the portion of Capsules taken by the formula defined therein.

**Assay for calcium pantothenate, Method 2**—Proceed as directed in the *Assay for calcium pantothenate, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, except to use the following *Assay preparation*.

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through "calculate the average net weight per Capsule." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 50 mg of calcium pantothenate, to a 1000-mL volumetric flask containing 500 mL of water. Add 10 mL of 0.2 N acetic acid and 100 mL of sodium acetate solution (1 in 60), dilute with water to volume, and filter. Dilute an accurately measured volume of this solution quantitatively, and stepwise if necessary, to obtain a solution having approximately the same concentration as that of the *Standard preparation*.

**Assay for calcium pantothenate, Method 3**—

*Buffer solution, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for calcium pantothenate, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for calcium pantothenate, Method 2*, through "Calculate the net weight of the Capsule contents." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 10 mg of calcium pantothenate, to a 250-mL volumetric flask, add 10 mL of methanol, and swirl the flask to disperse the Capsules contents. Dilute with water to volume, mix, and filter.

*Procedure*—Proceed as directed in the *Assay for calcium pantothenate, Method 3*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantity, in mg, of calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$) in the portion of Capsules taken by the formula:

$$250C(r_U/r_S)$$

in which the terms are as defined therein.

**Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine, Method 1**—[NOTE—Use low-actinic glassware throughout this procedure.]

*Diluting solution, Mobile phase, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

*Assay preparation*—Proceed as directed in the *Assay for ascorbic acid, Method 1*, through "calculate the average net weight per Capsule." Transfer an accurately weighed portion of the Capsule contents, equivalent to about 10 mg of niacinamide and 2.5 mg each of pyridoxine hydrochloride, riboflavin, and thiamine hydrochloride. to a 50-mL centrifuge tube. Add 25.0 mL of *Diluting solution*, and mix, using a vortex mixer, for 30 seconds to completely suspend the powder. Immerse the centrifuge tube in a hot water bath maintained at 65° to 70°, heat for 5 minutes, and mix, using a vortex mixer, for 30 seconds. Return the tube to the hot water bath, heat for another 5 minutes, and mix, using a vortex mixer, for 30 seconds. Filter a portion of the solution, cool to room temperature, and use the clear filtrate as the *Assay preparation*. [NOTE—Use the filtrate within 3 hours after filtration.]

*Procedure*—Proceed as directed in the *Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine, Method 1*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*. Calculate the quantities, in mg, of niacinamide ($C_6H_6N_2O$), pyridoxine hydrochloride ($C_8H_{11}NO_3 \cdot HCl$). riboflavin ($C_{17}H_{20}N_4O_6$),

BAUSCH0122317

and thiamine $(C_{12}H_{17}ClN_4OS)$ in the portion of Capsules taken by the formula defined therein, substituting Capsules for Tablets.

**Assay for niacin,** *Method 2*—

*Extraction solvent, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for niacin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—[NOTE—This preparation is suitable for the determination of niacin or niacinamide, pyridoxine hydrochloride, and riboflavin, when present in the formulation.] Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a beaker. Remove any contents adhering to the shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 2 mg of riboflavin, to a 250-mL volumetric flask. If riboflavin is not present in the formulation, use a portion equivalent to 2 mg of pyridoxine. If pyridoxine is not present in the formulation, use a portion equivalent to 20 mg of niacin or niacinamide. Add 100.0 mL of *Extraction solvent,* and mix for 20 minutes, using a wrist-action shaker. Immerse the flask in a water bath maintained at 70° to 75°, and heat for 20 minutes. Mix on a vortex mixer for 30 seconds, cool to room temperature, and filter. Use the clear filtrate as the *Assay preparation.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for niacin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of niacin $(C_6H_5NO_2)$ in the portion of Capsules taken by the formula:

$$100C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for niacinamide,** *Method 2*—

*Extraction solvent* and *Mobile phase*—Proceed as directed in the *Assay for niacin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for niacinamide, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Prepare as directed for *Assay preparation* in the *Assay for niacin, Method 2.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for niacinamide, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of niacinamide $(C_6H_6N_2O)$ in the portion of Capsules taken by the formula:

$$100C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for pyridoxine hydrochloride,** *Method 2*—

*Extraction solvent* and *Mobile phase*—Proceed as directed in the *Assay for niacin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for pyridoxine hydrochloride, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Prepare as directed for the *Assay preparation* in the *Assay for niacin, Method 2.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for pyridoxine hydrochloride, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of pyridoxine hydrochloride $(C_8H_{11}NO_3 \cdot HCl)$ in the portion of Capsules taken by the formula:

$$100C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for riboflavin,** *Method 2*—

*Extraction solvent, 0.05 M Buffer solution, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for riboflavin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Prepare as directed for *Assay preparation* in the *Assay for niacin, Method 2.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for riboflavin, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of riboflavin $(C_{17}H_{20}N_4O_6)$ in the portion of Capsules taken by the formula:

$$100C(r_U/r_S),$$

in which the terms are as defined therein.

**Assay for thiamine,** *Method 2*—

*Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for thiamine, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.*

*Assay preparation*—Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a beaker. Remove any contents adhering to the shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsule shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the contents, equivalent to about 2 mg of thiamine, to a 250-mL volumetric flask. Add 100.0 mL of 0.2 *N* hydrochloric acid, shake for 15 minutes with a wrist-action shaker, and heat to boiling for 30 minutes. Cool to room temperature, and filter. Use the clear filtrate as the *Assay preparation.*

*Procedure*—Proceed as directed for *Procedure* in the *Assay for thiamine, Method 2,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of thiamine $(C_{12}H_{17}ClN_4OS)$ in the portion of Capsules taken by the formula given for the chemical form of thiamine present in the preparation, in which the terms are as defined.

**Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine,** *Method 3*— [NOTE—Use low-actinic glassware throughout this procedure.]

*Reagent, Mobile phase, Standard stock solution, Standard preparation,* and *Chromatographic system*—Proceed as directed in the *Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine, Method 3,* under *Oil- and Water-Soluble Vitamins Tablets.*

*Assay preparation*—Proceed as directed for *Assay preparation* in the *Assay for folic acid, Method 2,* through ''Calculate the net weight of the Capsule contents.'' Transfer an accurately weighed portion of the Capsule contents, equivalent to about 7.5 mg of niacin or niacinamide, 1.2 mg of pyridoxine hydrochloride, 0.4 mg of riboflavin, and 1.2 mg of thiamine hydrochloride, to a stoppered 125-mL flask. Add 10.0 mL of a mixture of methanol and glacial acetic acid (9:1) and 30.0 mL of a mixture of methanol and ethylene glycol (1:1). Insert the stopper, shake for 15 minutes in a water bath maintained at 60°, and cool. Filter, discarding the first few mL of the filtrate.

*Procedure*—Proceed as directed for *Procedure* in the *Assay for niacin or niacinamide, pyridoxine hydrochloride, riboflavin, and thiamine, Method 3,* under *Oil- and Water-Soluble Vitamins with Minerals Tablets.* Calculate the quantity, in mg, of niacin $(C_6H_5NO_2)$ or niacinamide $(C_6H_6N_2O)$, pyridoxine hydrochloride $(C_8H_{11}NO_3 \cdot HCl)$, and riboflavin $(C_{17}H_{20}N_4O_6)$ in the portion of Capsules taken by the formula:

$$40C(r_U/r_S),$$

in which the terms are as defined therein. For products containing thiamine hydrochloride, calculate the quantity, in mg, of thiamine $(C_{12}H_{17}ClN_4OS)$ in the portion of Capsules taken by the same formula. For products containing thiamine mononitrate, calculate the quantity, in mg, of thiamine in the portion of Capsules taken by the formula:

$$(327.37/337.27)40C(r_U/r_S),$$

in which 327.37 and 337.27 are the molecular weights of thiamine mononitrate and thiamine hydrochloride, respectively, and the other terms are as previously defined.

NOTE—Commercially available atomic absorption standard solutions for the minerals, where applicable, may be used where preparation of a *Standard stock solution* is described in the following

*Assays.* Use deionized water where water is specified. Where atomic absorption spectrophotometry is specified in the *Assay*, the *Standard preparations* and the *Assay preparation* may be diluted quantitatively with the solvent specified, if necessary, to yield solutions of suitable concentrations adaptable to the linear or working range of the instrument.

**Assay for calcium**—Proceed as directed in the *Assay for calcium* under *Minerals Capsules*, and calculate the quantity, in mg, of calcium (Ca) in the portion of Capsules taken by the formula defined therein.

**Assay for chromium**—Proceed as directed in the *Assay for chromium* under *Minerals Capsules*, and calculate the quantity, in μg, of chromium (Cr) in the portion of Capsules taken by the formula defined therein.

**Assay for copper**—Proceed as directed in the *Assay for copper* under *Minerals Capsules*, and calculate the quantity, in mg, of copper (Cu) in the portion of Capsules taken by the formula defined therein.

**Assay for fluoride, *Method 1***—[NOTE—Store all solutions in plastic containers.] Proceed as directed in the *Assay for fluoride, Method 1* under *Minerals Capsules*, and calculate the quantity, in mg, of fluorine (F) in the portion of Capsules taken by the formula defined therein.

**Assay for fluoride, *Method 2***—Proceed as directed in the *Assay for fluoride, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*, except to use the following *Assay preparation*.

*Assay preparation*—Weigh accurately not less than 20 Capsules in a tared weighing bottle. Using a sharp blade if necessary, carefully open the Capsules, without loss of shell material, and transfer the contents to a 100-mL container. If necessary, remove any contents adhering to the empty shells by washing with several portions of ether. Discard the washings, and dry the capsule shells with the aid of a current of dry air. Weigh the empty capsules shells in the tared weighing bottle, and calculate the net weight of the Capsule contents. Transfer an accurately weighed portion of the Capsule contents, equivalent to about 1 mg of fluoride, to a 100-mL volumetric flask. Proceed as directed for *Assay preparation* in the *Assay for fluoride, Method 2*, under *Oil- and Water-Soluble Vitamins with Minerals Tablets*.

**Assay for iodide, *Method 1***—Proceed as directed in the *Assay for iodide, Method 1*, under *Minerals Capsules*, and calculate the quantity, in μg, of iodine (I) in the portion of Capsules taken by the formula defined therein.

**Assay for iodide, *Method 2***—Proceed as directed in the *Assay for Iodide* under *Automated Methods of Analysis* ⟨16⟩.

**Assay for iron**—Proceed as directed in the *Assay for iron* under *Minerals Capsules*, and calculate the quantity, in mg, of iron (Fe) in the portion of Capsules taken by the formula defined therein.

**Assay for magnesium**—Proceed as directed in the *Assay for magnesium* under *Minerals Capsules*, and calculate the quantity, in mg, of magnesium (Mg) in the portion of Capsules taken by the formula defined therein.

**Assay for manganese**—Proceed as directed in the *Assay for manganese* under *Minerals Capsules*, and calculate the quantity, in mg, of manganese (Mn) in the portion of Capsules taken by the formula defined therein.

**Assay for molybdenum, *Method 1***—Proceed as directed in the *Assay for molybdenum, Method 1*, under *Minerals Capsules*, and calculate the quantity, in mg, of molybdenum (Mo) in the portion of Capsules taken by the formula defined therein.

**Assay for molybdenum, *Method 2***—Proceed as directed in the *Assay for molybdenum, Method 2*, under *Minerals Capsules*, and calculate the quantity, in μg, of molybdenum (Mo) in the portion of Capsules taken by the formula defined therein.

**Assay for phosphorus**—Proceed as directed in the *Assay for phosphorus* under *Minerals Capsules*, and calculate the quantity, in mg, of phosphorus (P) in the portion of Capsules taken by the formula defined therein.

**Assay for potassium**—Proceed as directed in the *Assay for potassium* under *Minerals Capsules*, and calculate the quantity, in mg, of potassium (K) in the portion of Capsules taken by the formula defined therein.

**Assay for selenium, *Method 1***—Proceed as directed in the *Assay for selenium, Method 1*, under *Minerals Capsules*, and calculate the quantity, in μg, of selenium (Se) in the portion of Capsules taken by the formula defined therein.

**Assay for selenium, *Method 2***—Proceed as directed in the *Assay for selenium, Method 2*, under *Minerals Capsules*, and calculate the quantity, in μg, of selenium (Se) in the portion of Capsules taken by the formula defined therein.

**Assay for selenium, *Method 3***—[NOTE—Follow this method for preparations containing low levels of selenium.] Proceed as directed in the *Assay for selenium, Method 1*, under *Minerals Capsules*, and calculate the quantity, in μg, of selenium (Se) in the portion of Capsules taken by the formula defined therein.

**Assay for zinc**—Proceed as directed in the *Assay for zinc* under *Minerals Capsules*, and calculate the quantity, in mg, of zinc (Zn) in the portion of Capsules taken by the formula defined therein.

# Oil- and Water-Soluble Vitamins with Minerals Oral Solution

» Oil- and Water-Soluble Vitamins with Minerals Oral Solution contains one or more of the following oil-soluble vitamins: Vitamin A, Vitamin D as Ergocalciferol (Vitamin $D_2$) or Cholecalciferol (Vitamin $D_3$), and Vitamin E; one or more of the following water-soluble vitamins: Ascorbic Acid or its equivalent as Calcium Ascorbate or Sodium Ascorbate, Biotin, Cyanocobalamin, Niacin or Niacinamide, Dexpanthenol or Panthenol, Pantothenic Acid (as Calcium Pantothenate or Racemic Calcium Pantothenate), Pyridoxine Hydrochloride, Riboflavin or Riboflavin-5′-Phosphate Sodium, and Thiamine Hydrochloride or Thiamine Mononitrate; and one or more minerals derived from substances generally recognized as safe, furnishing one or more of the following elements in ionizable form: chromium, fluorine, iodine, iron, magnesium, manganese, molybdenum, and zinc. It contains not less than 90.0 percent and not more than 200.0 percent of the labeled amounts of vitamin A ($C_{20}H_{30}O$) as retinol or esters of retinol in the form of retinyl acetate ($C_{22}H_{32}O_2$) or retinyl palmitate ($C_{36}H_{60}O_2$), vitamin D as ergocalciferol ($C_{28}H_{44}O$) or cholecalciferol ($C_{27}H_{44}O$), vitamin E as alpha tocopherol ($C_{29}H_{50}O_2$) or alpha tocopheryl acetate ($C_{31}H_{52}O_3$) or alpha tocopheryl acid succinate ($C_{33}H_{54}O_5$), ascorbic acid ($C_6H_8O_6$) or its salts as calcium ascorbate ($C_{12}H_{14}CaO_2$) or sodium ascorbate ($C_6H_7NaO_6$), and thiamine ($C_{12}H_{17}ClN_4OS$) as thiamine hydrochloride or thiamine mononitrate; not less than 90.0 percent and not more than 150.0 percent of the labeled amounts of biotin ($C_{10}H_{16}N_2O_3S$), niacin ($C_6H_5NO_2$) or niacinamide ($C_6H_6N_2O$), dexpanthenol ($C_9H_{19}NO_4$) or panthenol ($C_9H_{19}NO_4$), calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$), pyridoxine hydrochloride ($C_8H_{11}NO_3 \cdot HCl$), riboflavin ($C_{17}H_{20}N_4O_6$) or riboflavin-5′-phosphate sodium ($C_{17}H_{20}N_4NaO_9P$); not less than 90.0 percent and not more than 450.0 percent of the labeled amount of cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$); and not less than 90.0 percent and not more than 125.0 percent of the labeled amounts of chromium (Cr), fluorine (F), iodine (I), iron (Fe), magnesium (Mg), manganese (Mn), molybdenum (Mo), and zinc (Zn).

# EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**BAUSCH & LOMB INCORPORATED AND
PF CONSUMER HEALTHCARE 1 LLC,**

        **Plaintiffs,**

    **v.**

**SBH HOLDINGS LLC,**

        **Defendant.**

CIVIL ACTION NO: 1:20-cv-01463

## EXPERT REPORT OF MICHAEL E. TATE

## February 20, 2024

**Highly Confidential Information**

**Table of Contents**

1   PROFESSIONAL AND EDUCATIONAL BACKGROUND ................................. 1
2   INFORMATION RELIED UPON ................................................ 2
3   SUMMARY OF CONCLUSIONS .............................................. 2
4   BACKGROUND ............................................................. 3
    4.1   B+L – PreserVision® ............................................ 3
    4.2   SBH – Accused Products ......................................... 4
    4.3   Patents-in-Suit ................................................ 5
    4.4   Market for Products Covered by the Patents-in-Suit ............. 6
5   ANALYSIS ............................................................... 9
    5.1   Damages Period ................................................. 9
    5.2   Lost Profits ................................................... 10
    5.3   Reasonable Royalty ............................................. 16
6   CONCLUSION ............................................................. 34
7   PREJUDGMENT INTEREST .................................................. 34

**Highly Confidential Information**

1.      My name is Michael E. Tate.  I have been retained as the damages expert in this case by counsel for Bausch & Lomb Incorporated ("B+L").

2.      The following report sets forth my opinions as to the amount of financial harm B+L suffered because of SBH Holdings LLC's ("SBH") infringement of B+L's U.S. Patent Nos. 6,660,297 ("the '297 Patent") and 8,603,522 ("the '522 Patent") (collectively, the "Patents-in-Suit").

# 1    PROFESSIONAL AND EDUCATIONAL BACKGROUND

3.      I am a Vice President of Charles River Associates ("CRA") in its Chicago office.  CRA is an international business consulting firm focusing on, among other things, intellectual property matters in the context of strategy, licensing, valuation and litigation consulting.  CRA is a leading provider of expert damage analysis and testimony for complex intellectual property litigation matters.

4.      I obtained a Bachelor of Business Administration degree, with a concentration in finance, from the University of Houston in Houston, Texas.  Thereafter, I obtained a Master of Science degree in Industrial Administration from Purdue University in West Lafayette, Indiana.

5.      I have served as a consultant to a wide variety of business and industrial clients on matters involving financial analysis and modeling for the purpose of interpreting and projecting data and evaluating the economic impact of business decisions, transactions and economic events.  I have served as an expert witness or consultant in a wide range of litigation matters, including patent, copyright, trademark and trade secret cases.  My work on patent infringement litigation matters has involved the quantification of economic damages and evaluation of commercial success.  I have also advised clients on strategic and valuation issues relating to intellectual property and license negotiations.

6.      My curriculum vitae is attached hereto at Tab 1.  A list of the cases in which I have testified at trial or by deposition within the last four years is attached hereto at Tab 2.

7.      CRA is being compensated on a rate-times-hours basis for the work my staff and I perform.  My current rate is $890 per hour.  CRA's compensation does not depend in any way on the outcome of this litigation.

**HIGHLY CONFIDENTIAL INFORMATION**

## 2    INFORMATION RELIED UPON

8.      I have relied upon publicly available information, deposition testimony, and various documents produced by the parties in this matter in developing the opinions and analyses reflected herein.  I have had a discussion with one of B+L's experts, Dr. Susan Bressler and with B+L personnel, including Barbara Teresaki (Senior Director Corporate FP&A), Anamika Singhal (Senior Director of Marketing), Paul Ulloa (Head of Consumer Data Science) and John Ferris (Executive Vice President, Consumer).  In addition, I have relied on the Opening Expert Report of Elizabeth J. Johnson, Ph.D. ("Johnson Report") and the Opening Expert Report of Susan B. Bressler, M.D. ("Bressler Report").  A list of the information I have reviewed and/or relied upon is attached hereto at Tab 3 or referenced in the text, footnotes and attached schedules of this report.

9.      I reserve the right to supplement and/or amend my report to reflect information made available to me after the submittal date of this report.

## 3    SUMMARY OF CONCLUSIONS

10.     I was asked to assume that SBH's MacularProtect ("MP"), MacularProtect Complete ("MPC") and MacularProtect Complete Drink Mix ("MPC Drink Mix") products (collectively, the "Accused Products") will be found to infringe the Patents-in-Suit and that the Patents-in-Suit will not be found invalid.  B+L would be entitled to damages adequate to compensate for that infringement, but in no event less than a reasonable royalty under these assumptions.

███  █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL INFORMATION**

████████████ ██ ██████████ ████ ██████████████████████
████████████████████████████ ████████ ████████████████
█████████████████████

## 4   BACKGROUND

### 4.1   B+L – PreserVision®

12.     B+L is a global eye health company that focuses primarily on the development, manufacture and marketing of eye health products.[5]  B+L was founded in 1853.[6]  In 2013, B+L was acquired by Valeant Pharmaceuticals International, Inc. ("Valeant").[7]  In May 2022, B+L completed an initial public offering relating to its eye health business.[8]  B+L offers a broad portfolio of eye health products including PreserVision® Eye Vitamins.[9]

13.     The PreserVision® AREDS and AREDS 2 formulas are based on the formulas recommended by the National Eye Institute ("NEI") in its 2001 AREDS and 2013 AREDS 2 studies for people with moderate to advanced age-related macular degeneration ("AMD").[10]  The



[5] Valeant 12/31/2013 Form 10-K, p. 29; B+L 12/31/2022 Form 10-K, p. 1.
[6] www.bausch.com/about-bausch-lomb/history-heritage/.
[7] Valeant 12/31/2016 Form 10-K, p. 42.
[8] B+L 12/31/2022 Form 10-K, p. 1.
[9] Valeant 12/31/2016 Form 10-K, p. 3; B+L 12/31/2022 Form 10-K, p. 2.
[10] www.preservision.com; www.preservision.com/Why-PreserVision/The-AREDS-Story/;
www.bausch.com/about-bausch-lomb/history-heritage/; B+L 12/31/2022 Form 10-K, p. 2.

HIGHLY CONFIDENTIAL INFORMATION

PreserVision® AREDS product was launched by B+L in 2001.[11]  B+L introduced its
PreserVision® AREDS 2 formula eye vitamin and mineral supplement product in 2013.[12]

14.    PreserVision® can be purchased by patients online (through the PreserVision® store at
Amazon.com, drugstore.com, walgreens.com, cvs.com, kroger.com, riteaid.com, target.com, and
samsclub.com, among others[13]), in a retail store (including Walmart, Rite Aid, Costco, Target,
Sam's Club, CVS, Kroger and Walgreens) and through direct purchase at the B+L
PreserVision® store (order through a toll-free telephone number or online[14]).[15]

15.    I understand that PreserVision® AREDS and AREDS 2 Eye Vitamins are covered by the
'297 and '522 patents.[16]

### 4.2    SBH – Accused Products

16.    SBH was founded in 1997.[17]  They market and sell products for eye health including the
MacularProtect® Capsules and MacularProtect® AREDS 2 Capsules (collectively,
"MacularProtect® Products"); the MacularProtect Complete® Capsules and MacularProtect
Complete®-S AREDS 2 Capsules (collectively, "MacularProtect Complete® Products"); and the
MacularProtect Complete® Drink Mix and MacularProtect Complete®-S Drink Mix (collectively,
"MacularProtect Complete® Drink Mix Products") (collectively for all products, "SBH's
Accused Products").[18]

---

[11] Bausch & Lomb 12/29/2001 Form 10-K, Exhibit 13, p. A10; www.bausch.com/about-bausch-lomb/history-heritage/.
[12] www.bausch.com/about-bausch-lomb/history-heritage/.
[13] Based on discussions with John Ferris, B+L launched the PreserVision® brand store at Amazon in June 2014 and the product is available as a shopper subscription service.  Currently, 10% to 15% of B+L's PreserVision® sales are made through the Amazon store.  In addition, PreserVision® was available online through drugstore.com, walgreens.com and cvs.com, among others since at least 2011.
[14] Based on discussions with John Ferris, PreserVision® direct 1-800 number has been operational since April 2013.  In October 2020, the 1-800 number was transitioned to www.shop.preservision.com.  E-commerce purchases represent greater than 10% of B+L's Vision Care segment revenues (B+L 12/31/2022 Form 10-K, p. 62).
[15] www.preservision.com; www.amazon.com/preservision; discussion with John Ferris.
[16] Johnson Report, ¶ 48.
[17] www.sciencebasedhealth.com; www.sciencebasedhealth.com/AboutUs.aspx?index=1.
[18] www.sciencebasedhealth.com; Johnson Report, ¶ 50.
**HIGHLY CONFIDENTIAL INFORMATION**

17.     I understand that the formulations of SBH's Accused Products are covered by the '297 and '522 patents, and that the formulations from the AREDS and AREDS 2 studies are covered by those patents.[19]

18.     All SBH Accused Products are offered in a single package size and are sold individually (not bundled together).  The products are manufactured in the U.S. by a third-party contract manufacturer.[20]  SBH distributes its products through recommending ophthalmologists and optometrists.[21]  Their products are available through eyecare professionals or directly through SBH.[22]  The Accused Products are generally shipped directly from the contract manufacturer to SBH's warehouse and are then shipped directly to doctors or consumers, to Amazon for resale or to a very limited number of small distributors that largely sell to doctors.[23]

### 4.3     Patents-in-Suit[24]

19.     I understand that the patents-in-suit generally relate to a nutritional supplement intended to promote retinal health.  I understand that B+L's PreserVision® Eye Vitamins and SBH's Accused Products make use of the technology taught by the Patents-in-Suit.  Generally, the Patents-in-Suit claim the following inventions:

20.     The '297 patent issued on December 9, 2003 and relates to a "Nutritional Supplement to Treat Macular Degeneration."[25]  The '297 patent was reexamined by the patent office between 2007 and 2013, and a reexamination certificate was issued on April 30, 2013.[26]  The '297 patent discloses and claims nutritional dietary supplement compositions that strengthen retinal health. The '297 patent claims formulations containing amounts of vitamin A in the form of beta-carotene (substituted or supplemented with lutein, zeaxanthin or a combination thereof), vitamin

---

[19] Johnson Report, ¶ 51.
[20] Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, Response to Interrogatory Nos. 1 and 3.
[21] www.sciencebasedhealth.com; www.sciencebasedhealth.com/AboutUs.aspx?index=1.
[22] www.sciencebasedhealth.com; www.sciencebasedhealth.com/AboutUs.aspx?index=1.
[23] Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, Response to Interrogatory No. 1; A. Magro 11/29/2023 deposition, pp. 109-110, 114; A. Magro 11/30/2023 deposition, pp. 28-32; A. Magro 11/30/2023 deposition, Ex. 30.
[24] Unless otherwise noted, the discussion in this section is based on the Johnson Report, ¶¶ 42-47.
[25] U.S. Patent No. 6,660,297; Google Patents (https://patents.google.com/patent/US6660297/).
[26] U.S. Patent No. 6,660,297; Google Patents (https://patents.google.com/patent/US6660297/).

HIGHLY CONFIDENTIAL INFORMATION

C and vitamin E, as well as zinc and copper. I understand that B+L asserts that SBH infringes the following claims of the '297 Patent: 19, 24 and 31-32.[27]

21. The '522 patent issued on December 10, 2013 and is also titled "Nutritional Supplement to Treat Macular Degeneration."[28] The '522 patent is related to the '297 patent and arose from the same patent application.[29] The '522 patent discloses and claims various methods of addressing AMD, including methods "for stabilizing visual acuity loss in persons with early age-related macular degeneration," "for treating visual acuity loss," and for "treating age-related macular degeneration." The '522 patent is a "method" or "process" patent. The invention of the '522 patent provides methods of using a formulation of vitamin A in the form of beta-carotene (substituted or supplemented with lutein, zeaxanthin or a combination thereof), vitamin C and vitamin E, as well as zinc and copper. I understand that B+L asserts that SBH infringes the following claims of the '522 Patent: 1, 4-6, 8, 11, 15-16 and 20.[30]

22. The Patents-in-Suit cover the AREDS and AREDS 2 formula, and formulations that fall outside of the claims of the Patents-in-Suit would not be associated with the AREDS and AREDS 2 studies.[31]

23. I discuss the advantages and benefits of using the Patents-in-Suit in greater detail below.

## 4.4    Market for Products Covered by the Patents-in-Suit

24. AMD is a common eye condition and a leading cause of vision loss among people aged 60 and older.[32] It causes damage to the macula, a small spot near the center of the retina and the part of the eye needed for sharp, central vision, which lets a person see objects that are straight ahead. In some people, AMD advances slowly and vision loss does not occur for a long time. In others, the disease progresses faster and may lead to loss of vision in one or both eyes. While

---

[27] Bausch & Lomb's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-13), Response to Interrogatory No. 8; Johnson Report, ¶ 44.
[28] U.S. Patent No. 8,603,522; Google Patents (https://patents.google.com/patent/US8603522/).
[29] U.S. Patent No. 8,603,522; Google Patents (https://patents.google.com/patent/US8603522/).
[30] Bausch & Lomb's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-13), Response to Interrogatory No. 8; Johnson Report, ¶ 47; Bressler Report, ¶ 49.
[31] Johnson Report, ¶ 51.
[32] The information reflected in this paragraph is based on www.nei.nih.gov; www.mayoclinic.org; www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/what-to-know-about-age-related-macular-degeneration; www.preservision.com; www.preservision.com/Why-PreserVision/The-AREDS-Story/; Bressler Report at ¶17.

HIGHLY CONFIDENTIAL INFORMATION

there is no cure for AMD, there are now ways to lessen the risk of vision loss including by taking AREDS and AREDS 2 based eye vitamins.

25.     The NEI performed two studies (AREDS and AREDS 2), which found that taking a nutritional supplement based on the AREDS formula decreases the proportion of people who will progress to advanced AMD over a five-year period.  It reduces the risk of progressing to advanced AMD.[33]

26.     I understand that it is important in the marketplace for both B+L and SBH to be able to say that their respective AMD eye vitamin products are based on the formulas identified by the AREDS and AREDS 2 clinical trials.  According to the 30(b)(6) deposition testimony of SBH personnel, its Accused Products are intended to provide the benefit of the AREDS and AREDS 2 formulas found to reduce the risk of developing AMD.[34]  SBH further testified that if the patient sees the word AREDS, they understand the product is used to treat AMD.[35]  The importance of being able to highlight that the products are based on the AREDS and AREDS 2 clinical trials is also reflected in SBH's marketing materials.[36]

27.     The marketplace for the AREDS and AREDS 2 products is the eyecare professionals' office (optometrist's and ophthalmologist's).[37]  Both B+L and SBH promote their AREDS and AREDS 2 eye vitamin products to healthcare and eye care professionals.[38]  I understand that eyecare professionals recommend the AREDS and AREDS 2 products that their patients should

---

[33] www.mayoclinic.org; www.preservision.com; www.nei.nih.gov/research/clinical-trials/age-related-eye-disease-studies-aredsareds2/aredsareds2-frequently-asked-questions; Age-Related Eye Disease Study Research Group, *A Randomized, Placebo-Controlled, Clinical Trial of High-Dose Supplementation with Vitamins C and E, Beta Carotene, and Zinc for Age-Related Macular Degeneration and Vision Loss*, Arch Ophthalmol. (Vol. 119):1417-1436 (Oct. 2001) ("AREDS Report No. 8") (BAUSCH0008466-85); Chew et al., *Lutein + Zeaxanthin and Omega-3 Fatty Acids for Age-Related Macular Degeneration, AREDS2 Randomized Clinical Trial*, 309(19) JAMA 2005-2015 (2013) ("AREDS 2 paper") (BAUSCH0011259-69); Johnson Report, ¶¶ 31-39; Bressler Report, ¶¶ 29-39.

[34] A. Magro 11/29/2023 deposition, pp. 27, 29, 50-51, 53.

[35] A. Magro 11/29/2023 deposition, p. 174.

[36] *See* for example, SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.

[37] Discussion with John Ferris; Bressler Report, ¶ 55.

[38] Discussion with John Ferris; A. Magro 11/29/2023 deposition, p. 86; Z. Denning 11/30/2023 deposition, p. 109; Bressler Report, ¶ 55.

HIGHLY CONFIDENTIAL INFORMATION

take.[39]  A goal of the companies' marketing and promotion efforts is to educate doctors relating to the benefits of the AREDS and AREDS 2 products so that doctors can recommend them to their patients.[40]  I understand that this recommendation is made by doctors based on the proven safety and efficacy of those formulations, which contain the amounts of the ingredients claimed by the Patents-in-Suit.[41]

28.    Based on the doctor's recommendation the patient then makes a purchase decision.[42] Patients then source the recommended product through various channels.[43]  In the marketplace, whether the product is sold at retail, at the doctor's office or online is a very minor distinction.[44] The term "omni-channel" retail refers to the fact many consumers shop in different channels interchangeably.[45]

29.    The B+L PreserVision® and the SBH Accused Products are sold in the AREDS and AREDS 2 vitamins market.  In addition to B+L, Alcon and SBH, there are numerous other AREDS and AREDS 2-based products on the market.[48]

---

[39] Johnson Report, ¶ 84; Bressler Report, ¶ 55; discussion with Dr. Bressler; discussion with John Ferris; A. Magro 11/29/2023 deposition, pp. 86, 109-110.

[40] Johnson Report, ¶ 84; Bressler Report at ¶ 55; discussion with B+L personnel; A. Magro 11/29/2023 deposition, pp. 80-81, 83, 94; A. Magro 11/29/2023 deposition, Ex. Nos. 11-13; SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.

[41] Johnson Report, ¶¶ 48-51; Bressler Report, ¶ 55; discussion with Dr. Bressler.

[42] Discussion with B+L personnel; A. Magro 11/29/2023 deposition, pp. 86, 109-110; Bressler Report, ¶ 55; discussion with Dr. Bressler.

[43] www.preservision.com; www.amazon.com/preservision; discussion with John Ferris; Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, Response to Interrogatory No. 1; A. Magro 11/29/2023 deposition, pp. 109-110, 114; A. Magro 11/30/2023 deposition, pp. 28-29, 31; A. Magro 11/30/2023 deposition, Ex. 30.

[44] Discussion with B+L personnel.

[45] Discussion with John Ferris.

[48] *See* for example, ███████████████ Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, Response to Interrogatory No. 13.

HIGHLY CONFIDENTIAL INFORMATION

30.     During the period 2014 through the present, B+L and SBH have competed for doctors'
recommendations relating to PreserVision® and the Accused Products.[49]  SBH attempts to
convince doctors to recommend its Accused Products over PreserVision®.[50]  In addition, in
various internal documents and email correspondence, SBH compares its Accused Products to
PreserVision®.[51]

31.     Bausch & Lomb tracks market sales and share using various sources including
IRI/Nielsen and National Consumer Panel data.[52]  This data reflects that PreserVision®'s share
of the AREDS eye vitamin market during the period 2013 through 2023 ranged from ███████
███████

# 5    ANALYSIS

32.     Damages in patent infringement cases are governed by 35 U.S.C. § 284, which states:
"Upon finding for the claimant the court shall award the claimant damages adequate to
compensate for the infringement, but in no event less than a reasonable royalty for the use made
of the invention by the infringer, together with interest and costs as fixed by the court."

33.     Based on my review of information gathered during my work on this matter, my expert
opinions regarding the damages that B+L is owed because of SBH's infringement of the Patents-
in-Suit are as follows:

## 5.1    Damages Period

34.     I have assumed that the damages period should begin on October 28, 2014, which is six
years prior to the date that the Complaint was filed in Delaware.  SBH has produced revenue data

---

[49] Discussion with B+L personnel; Z. Denning 11/30/2023 deposition, p. 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.
[50] Z. Denning 11/30/2023 deposition, pp. 95-97, 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.
[51] *See* for example, SBH 00110; SBH 00051-51a; SBH 00113; SBH 00049; SBH 00048; SBH 00079; SBH 00080.
[52] Discussion with B+L personnel. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
██ ████████████████

**HIGHLY CONFIDENTIAL INFORMATION**

relating to the sales of its Accused Products through March 23, 2021.[54]  Therefore, my damages calculations extend through this date.  To the extent updated or revised revenue data is produced by SBH, I will supplement my damages calculations, if warranted.

## 5.2  Lost Profits

35.     A lost profits damages award requires a showing that, to a reasonable probability, the patent owner would have made all or some portion of the infringer's sales, but-for the infringement.  Courts often consider the following four factors, set forth in the *Panduit* case, as a starting point for determining the appropriateness of a lost profits award:[55]

  1.  Demand for the patented product;

  2.  Absence of acceptable non-infringing substitutes;

  3.  Manufacturing and marketing capability to meet the demand; and

  4.  Quantification of lost profits the patent owner would have made from sales lost due to the infringement.

36.     I have concluded that B+L should be awarded lost profits for a portion of SBH's Accused Product sales in the U.S. for at least the following reasons:

  • There is a strong demand for products covered by the Patents-in-Suit;

  • There is a lack of acceptable non-infringing substitutes for the patented invention (in preparing my lost profits calculation, I use a market share approach);

  • B+L had more than sufficient manufacturing and marketing capacity to make the claimed additional sales of PreserVision® that it lost due to SBH's infringement; and,

---

[54] ████████████     I understand that the '297 Patent expired on March 23, 2021.  However, I understand that the '522 Patent does not expire until January 31, 2026.  I further understand that B+L requested updated sales data from March 23, 2021 through the most recent date available, but SBH has not provided such information.  To the extent B+L is entitled to damages after March 23, 2021, I reserve the right to determine such damages.

[55] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

**HIGHLY CONFIDENTIAL INFORMATION**

- The profits that would have been made by B+L, but-for SBH's infringement, can be determined from B+L's and SBH's financial and accounting records.

### 5.2.1  There is a Strong Demand for the Products Covered by the Patents-in-Suit

37.    As discussed above, B+L's PreserVision® Eye Vitamins and SBH's Accused Products are recommended by doctors to their patients.[56]  I understand that this recommendation is made by doctors based on the proven safety and efficacy of those formulations, which contain the amounts of the ingredients claimed by the Patents-in-Suit.[57]

38.    Thus, the sales of B+L's PreserVision® Eye Vitamins and SBH's Accused Products are reflective of demand for the patented technology.  I understand that this is not a situation in which the patent covers only a small component of an otherwise complicated device; the patent covers the entire product.[58]  While SBH's formulations contain other ingredients, such as multivitamins in MPC, SBH's promotional materials highlight the fact that the Accused Products are based on the formulas reflected in the AREDS and AREDS 2 clinical trials.[59]  I understand that the AREDS and AREDS 2 formulas are covered by the Patents-in-Suit.[60]  In other words, SBH relies on and highlights the patented features in marketing its products.  I further understand that without the formula covered by the Patents-in-Suit, the products would not meet the formulas covered by the AREDS and AREDS 2 studies which as discussed above, are the basis for the doctor recommendations of the products at issue in this case.[61]

39.    During the period 2014 through October 2023, B+L sold ███████ █████ of PreserVision® Eye Vitamins generating net revenue of ██████████

---

[56] Discussion with John Ferris; A. Magro 11/29/2023 deposition, pp. 86, 109-110; Bressler Report, ¶ 55; discussion with Dr. Bressler.
[57] Bressler Report, ¶ 55; Johnson Report, ¶¶ 48-51; discussion with Dr. Bressler.
[58] Johnson Report, ¶¶ 48, 51.
[59] A. Magro 11/29/2023 deposition, pp. 80-81, 83, 94; A. Magro 11/29/2023 deposition, Ex. Nos. 11-13; SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.
[60] Johnson Report, ¶ 51.
[61] Johnson Report, ¶ 51; Bressler Report, ¶ 55; discussion with Dr. Bressler.



**HIGHLY CONFIDENTIAL INFORMATION**

██  ████████████████████████  ███
████████████████████

41.     The actual sales of products covered by the Patents-in-Suit demonstrate strong demand for the patented invention.

### 5.2.2   The Absence of Acceptable, Non-Infringing Alternatives

42.     As discussed above, evaluating a lost profits claim involves the consideration of the availability of acceptable non-infringing alternatives to the technology and/or products covered by the Patents-in-Suit.

43.     As discussed above, doctors recommend an appropriate treatment regimen to their patients with AMD, including a recommendation that patients take an AREDS eye vitamin. Doctors recommend eye vitamins that are based on the AREDS or AREDS 2 formula because doing so allows doctors to make their recommendations based on a peer reviewed study reflecting the safety and efficacy of the studied formula for treating AMD.[66]

44.     I understand that there are no acceptable, non-infringing alternatives to the inventions claimed in the patents-in-suit for eye vitamins used to treat AMD.[67]  A consumer of eye vitamins would only find acceptable those formulations shown to be effective in the AREDS and AREDS 2 trials.[68]  It is my understanding that those formulations are covered by the Patents-in-Suit.[69]

45.     Even though there are no acceptable, non-infringing alternatives, I have conservatively assumed in my analysis of B+L's lost profits that but for SBH's alleged infringement some of the sales of the Accused Products would have gone to other companies in the market.

46.     As discussed above, there are numerous entities that sell AREDS-based eye vitamins in the AREDS vitamin market.  I have concluded that but for SBH's infringement, Accused Product sales would have been made by B+L and other competing companies based on each of those companies' relative share of a market without SBH's Accused Products.  I describe my quantification of B+L's lost PreserVision® sales below.

---

██
██████

[66] Bressler Report, ¶ 55; discussion with Dr. Bressler.
[67] Johnson Report, ¶ 51.
[68] Johnson Report, ¶ 51.
[69] Johnson Report, ¶ 51.

**HIGHLY CONFIDENTIAL INFORMATION**

### 5.2.3 Manufacturing and Marketing Capacity to Exploit Demand

#### 5.2.3.1 Manufacturing

47.

48.

49.



---

[70] Discussion with B+L personnel.



**HIGHLY CONFIDENTIAL INFORMATION**

### 5.2.3.2  Marketing

50. ███████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

### 5.2.4  Quantification of Lost Profits

### 5.2.4.1  Lost Revenue and Units

51.     During the period 2014 through the present, B+L and SBH have competed for doctors'
recommendations relating to PreserVision® and the Accused Products.[79]  SBH attempts to
convince doctors to recommend its Accused Products over PreserVision®.[80]  In addition, in
various internal documents and email correspondence, SBH compares its Accused Products to
PreserVision®.[81]  As a result of the competition between the parties and SBH's sales of its
Accused Products, patients have switched from PreserVision® to the Accused Products.[82]

52.     Given the level of competition between B+L and SBH, the level of demand for AREDS-
based eye vitamins and the lack of acceptable non-infringing alternatives, it is reasonable to
conclude that, but for SBH's infringement, B+L would have sold additional PreserVision® Eye
Vitamins.  As discussed above, there are other entities in addition to B+L and SBH which
compete in the AREDS vitamin market.  Thus, but for SBH's infringement, the Accused Product
sales would have been shared by B+L and these other entities based on their relative market
shares.

53.     I prepared an estimate of the share of the AREDS vitamin market held by B+L's
PreserVision® products but for SBH's infringement. ████████████████████████████████

---

[79] Discussion with B+L personnel; Z. Denning 11/30/2023 deposition, p. 109; A. Magro
11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.
[80] Z. Denning 11/30/2023 deposition, pp. 95-97, 109; A. Magro 11/29/2023 deposition, pp. 86-
87, 175-176; SBH 00110.
[81] *See* for example, SBH 00110; SBH 00051-51a; SBH 00113; SBH 00049; SBH 00048; SBH
00079; SBH 00080.
[82] A. Magro 11/29/2023 deposition, pp. 175-176.

**HIGHLY CONFIDENTIAL INFORMATION**

14



54.     In calculating B+L's lost sales, I assumed that B+L would have sold the PreserVision® Eye Vitamins product that corresponded with the SBH Accused Products.  I next determined B+L's average daily selling price for the PreserVision® Eye Vitamins that corresponded with SBH's accused units during the damages period.  I then multiplied the volume of additional PreserVision® Eye Vitamins that B+L would have sold by its average selling price for each respective product to determine the additional revenue that B+L would have realized but for SBH's alleged infringement.

### 5.2.4.2   Lost Profits

55.     Based on an analysis of B+L's financial information relating to PreserVision®, I next determined the costs that B+L would have incurred to manufacture and sell the additional PreserVision® Eye Vitamins it would have sold but for SBH's alleged infringement.



56.     Finally, I calculated B+L's lost profits by subtracting the additional costs B+L would have incurred to manufacture and sell the additional PreserVision® Eye Vitamins from the revenue that B+L would have earned from sales of these products.



**HIGHLY CONFIDENTIAL INFORMATION**

57.    █████████████████████████████████████████████████████
████████████████████████████████████████████████   ████████

### 5.3    Reasonable Royalty

58.    To the extent that SBH sold Accused Products for which lost profits are not claimed, or to the extent that the jury decides that lost profit damages are not an appropriate remedy for some portion of SBH's allegedly infringing sales, B+L is entitled to a reasonable royalty for those infringing sales.

### 5.3.1    Hypothetical Negotiation

59.    A reasonable royalty is the amount of compensation that a willing licensor (the patentee) would have agreed to accept and a willing licensee (the infringer) would have agreed upon to use the Patents-in-Suit.  The agreement is often characterized as arising from a "hypothetical negotiation" between the parties on the eve of the alleged infringement, or about the time that the alleged infringement began.  The analysis presumes that the parties to the negotiation would have access to the same information, including the knowledge that the patents are valid and would be infringed by the prospective licensee's product(s) unless the infringer obtained a license.

60.    The hypothetical negotiation for a license to the Patents-in-Suit would be between B+L (the owner of the Patents-in-Suit) and SBH (the alleged infringer).

61.    I have assumed that the hypothetical negotiation for the Patents-in-Suit would have taken place on the date of first infringement which according to the 30(b)(6) testimony of Mr. Magro was in 2014 when SBH formulated its products based on AREDS 2.[88]

62.    When valuing intellectual property for purposes of determining a reasonable royalty, experts generally consider three broad approaches: the Market Approach; the Cost Approach; and the Income Approach.  These approaches constitute methods that are commonly used by experts in this field and have been accepted by the Courts under similar circumstances.

63.    I have also analyzed the *Georgia-Pacific* factors (including a consideration of the results of the above approaches), which are discussed below.  The results of my reasonable royalty analysis are as follows:

---

█ ████████████
[88] A. Magro 11/29/2023 deposition, pp. 25, 39.

**HIGHLY CONFIDENTIAL INFORMATION**

16

### 5.3.2   Market Approach

64.     The market approach values assets based on transactions involving similar assets.  In the case of royalties for intellectual property assets, the rate for particular intellectual property rights may be based on the amounts paid for similar intellectual property in actual licensing or sale transactions.  The degree of reliance on comparable transactions depends on an assessment of whether the assets being conveyed and the circumstances of the transactions are sufficiently similar to provide a reliable indicator of value for the assets in question.  In analyzing potential comparable transactions in this matter, I considered among other things, the nature of the patented technology, the scope of rights conferred, and the relationship between the parties to determine their relevance.

65.     B+L has entered numerous agreements involving the Patents-in-Suit.  I discuss these agreements below.

#### 5.3.2.1   B+L - NIH License Agreement



---

68.

69.

70.

71.    The parties to the hypothetical negotiation would understand that the royalty rates reflected in the above agreement would need to be adjusted upward during the hypothetical negotiation for the Patents-in-Suit to reflect: 1) that the parties to the above-described agreement, B+L and NIH, are not competitors.  The parties to the hypothetical agreement, B+L and SBH are competitors;

**HIGHLY CONFIDENTIAL INFORMATION**

18

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ The

hypothetical license between B+L and SBH assumes the Patents-in-Suit are both valid and

infringed.

72.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

### 5.3.2.2    B+L – Alcon Settlement and License Agreement

73.    ████████████████████████████████████████████████████

████████████████████████████ ████████████████████████████████

███████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ █ ███████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ █ ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

74.    ██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████



■ ████████████████████

■ ██████████████████████

■ ██████████████████████

■ ████████████████████████

■ ██████████████████████

■ ████████████████████

**HIGHLY CONFIDENTIAL INFORMATION**

### 5.3.2.3   B+L – Settlement Agreements Involving the Patents-in-Suit

75.    Bausch & Lomb entered settlement agreements relating to the Patents-in-Suit with numerous entities.



### 5.3.3   Cost Approach

78.    In general, a party at the hypothetical negotiation for a license to the Patents-in-Suit would not pay more for a license than the cost of buying/licensing or building an equivalent asset.  The cost approach, when applied to patents, usually requires a consideration of the next-best acceptable non-infringing alternative to using the patent.  During the hypothetical negotiation the parties would have evaluated whether SBH had available and could have implemented an acceptable alternative technology that provided similar benefits to the Accused



**HIGHLY CONFIDENTIAL INFORMATION**

Products without infringing the Patents-in-Suit. The cost associated with implementing such an alternative (if one were available) would be considered during the negotiation to determine the reasonable royalty that would be paid to use the Patents-in-Suit.

79.    As discussed above in my discussion of non-infringing alternatives in my determination of lost profits, I concluded that SBH did not have any available acceptable non-infringing alternatives.  Thus, under the cost approach, the parties would realize during the hypothetical negotiation that SBH did not have an acceptable alternative to the Patents-in-Suit.

### 5.3.4    Income Approach

80.    Under the Income Approach, a reasonable royalty can be derived as a portion of the anticipated economic benefits or profit generated by the licensed patent.  The following is a discussion of the economic benefits received by those who use the Patents-in-Suit.

81.    I understand that it is important in the marketplace for both B+L and SBH to be able to say that their respective eye vitamin products are based on the formulas identified by the AREDS and AREDS 2 clinical trials.  According to the 30(b)(6) deposition testimony of SBH personnel, its Accused Products are intended to provide the benefit of the AREDS and AREDS 2 formulas found to reduce the risk of developing advanced AMD.[114]  SBH further testified that if a patient sees the word AREDS, they would understand that the product is used to treat AMD.[115]  The importance of being able to highlight that the products are based on the AREDS and AREDS 2 clinical trials is also reflected in SBH's marketing materials.[116]  As discussed above, I understand that use of the Patents-in-Suit allows SBH to manufacture and sell its Accused Products.  Without use of the Patents-in-Suit, SBH would be unable to sell a product that meets the formulas based on the AREDS and AREDS 2 clinical trials.

82.     Because of the level of competition between the parties, if

---

[114] A. Magro 11/29/2023 deposition, pp. 27, 29, 50-51, 53.
[115] A. Magro 11/29/2023 deposition, p. 174.
[116] *See* for example, SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.

**HIGHLY CONFIDENTIAL INFORMATION**

B+L entered a license with SBH, it would understand that it risked losing profits as a result of SBH being able to sell competing AREDS and AREDS 2 eye vitamins.



84.     Furthermore, as discussed above, SBH did not have an acceptable available non-infringing alternative to the use of the Patents-in-Suit.  To the extent it could not use the Patents-in-Suit, it would risk losing all of the profits generated on the sales of its Accused Products.  Thus, SBH would be willing to pay a large portion of its profits to B+L as a royalty to use the Patents-in-Suit.

85.     The parties would consider these data points during their hypothetical negotiation for the Patents-in-Suit and understand that the revenues and profits associated with the Accused Products are largely attributable to the use of the Patents-in-Suit.

### 5.3.5   Georgia-Pacific Analysis

86.     The *Georgia-Pacific* case reflects commonly used guidelines for determining a reasonable royalty in a litigation context.[119]  I evaluated the *Georgia-Pacific* factors to determine what impact they would have on the reasonable royalty rate to which the parties at the hypothetical negotiation would agree.  As discussed above in my analysis of the Market Approach, the parties would focus their negotiations on a starting point reasonably royalty rate range of ██████ and adjust the rate based on the outcome of the *Georgia-Pacific* analysis below.

**Factor 1:     The royalties received by the patentee for the licensing of the Patents-in-Suit, proving or tending to prove an established royalty.**

87.     I incorporate by reference my analysis of the Market Approach above.

---

[119] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

**HIGHLY CONFIDENTIAL INFORMATION**

88.     At the hypothetical negotiation, the parties would consider the B+L/NIH License
Agreement.  However, the parties would understand that the royalty rates reflected in this
agreement would need to be adjusted upward during the hypothetical negotiation for the Patents-
in-Suit to reflect: 1) that the parties to the agreement, B+L and NIH, are not competitors.  While
the parties to the hypothetical agreement, B+L and SBH are competitors; ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The hypothetical
license between B+L and SBH assumes the Patents-in-Suit are both valid and infringed.

89.     Thus, this factor would have an upward impact on the reasonable royalty rate for use of
the Patents-in-Suit by SBH.

**Factor 2:       The rates paid by the licensee for the use of other patents comparable to the
                  Patents-in-Suit.**

90.     I am not aware that SBH has entered into any licenses or settlement agreements related to
patents.

91.     This factor would have a neutral impact on the reasonable royalty rate for the Patents-in-
Suit.

**Factor 3:       The nature and scope of the license, as exclusive or non-exclusive; or as
                  restricted or non-restricted in terms of territory or with respect to whom the
                  manufactured product may be sold.**

92.     The license that would result from the hypothetical negotiation would be a non-exclusive
license to the Patents-in-Suit.  Royalty rates associated with a non-exclusive license are generally

**HIGHLY CONFIDENTIAL INFORMATION**

23

lower than royalty rates associated with an exclusive license. ▮▮▮▮▮▮▮▮▮▮



**Factor 4:**     **The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

93.     I am not aware of a policy established by B+L not to license its patented technology. However, as discussed in the Market Approach section above, B+L entered settlement agreements with numerous entities ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ These agreements indicate ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

94.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

95.     When negotiating a license with SBH for use of the Patents-in-Suit, B+L would demand a reasonable royalty rate which would compensate it for its potential lost sales and profits. I have concluded that this factor would have an upward impact on the reasonable royalty rate for the Patents-in-Suit.

**Factor 5:**     **The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

96.     The analysis under Factor 5 focuses on the commercial relationship between the parties, which can impact the royalty agreed to at the hypothetical negotiation. For example, a licensor, in general, may face more economic exposure in granting patent rights to a competitor than to a non-competitor, and thus will typically demand a higher royalty from a competitor than from a non-competitor.

97.     As discussed above, both B+L and SBH promote their AREDS eye vitamins to healthcare and eye professionals. During the period 2014 through the present, B+L and SBH have competed for doctors' recommendations relating to PreserVision® and the Accused

**HIGHLY CONFIDENTIAL INFORMATION**

24

に

Products.[120]  SBH attempts to convince doctors to recommend its Accused Products over PreserVision®.[121]  In addition, in various internal documents and email correspondence SBH compares its Accused Products to PreserVision®.[122]  As a result of the competition between the parties and SBH's sales of its Accused Products, patients have switched from PreserVision® to the Accused Products.[123]

98.    At the hypothetical negotiation, B+L would understand that if it granted a license to SBH, it would risk economic exposure in the form of potential lost revenue and profits from sales of its PreserVision® Eye Vitamins.  Because B+L, at the time of the hypothetical negotiation, would recognize that it risked losing profits if it were to license SBH, it would not want to license the Patents-in-Suit to SBH unless the royalties it received in return for the licensed rights were sufficient to offset this economic exposure.

99.    ██████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████

**Factor 6:    The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

100.    I have seen no evidence that the sale of AREDS eye vitamins covered by the Patents-in-Suit generate sales of other products.

101.    This factor would have no impact on the reasonable royalty rate the parties would agree to for use of the Patents-in-Suit at the hypothetical negotiation.

**Factor 7:    The duration of the patent and the term of the license.**

102.    The '297 Patent issued on December 9, 2003 (reexamination certificate – April 30, 2013) and expired on March 23, 2021.[124]  The '522 Patent issued on December 10, 2013 and expires on

---

[120] Discussion with B+L personnel; Z. Denning 11/30/2023 deposition, p. 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.

[121] Z. Denning 11/30/2023 deposition, pp. 95-97, 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.

[122] *See* for example, SBH 00110; SBH 00051-51a; SBH 00113; SBH 00049; SBH 00048; SBH 00079; SBH 00080.

[123] A. Magro 11/29/2023 deposition, pp. 175-176.

[124] U.S. Patent No. 6,660,297; Google Patents (https://patents.google.com/patent/US6660297/).

**HIGHLY CONFIDENTIAL INFORMATION**

January 31, 2026.[125]  The hypothetical license would extend through the earlier of the expiration date of the Patents-in-Suit or the date of SBH's last Accused Product sale.

103.    This factor would have a neutral impact on the reasonable royalty rate the parties would agree to at the hypothetical negotiation.

**Factor 8:**    **The established profitability of the product made under the patent; its commercial success; and its current popularity; and,**

**Factor 11:**    **The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

104.    Because *Georgia-Pacific* Factors 8 and 11 relate to similar information, I have analyzed them together.  The more profitable and commercially successful a patented product is, generally, the higher the reasonable royalty rate would tend to be.

105.    Both B+L and SBH make extensive use of the Patents-in-Suit.

106.    PreserVision® Eye Vitamins are important products for B+L.[126]



---

[125] U.S. Patent No. 8,603,522; Google Patents (https://patents.google.com/patent/US8603522/).
[126] Discussion with B+L personnel; *see* for example, Bausch Health Companies Inc. 2019 Form 10-K, p. 12; B+L 12/31/2022 Form 10-K, p. 2.



**HIGHLY CONFIDENTIAL INFORMATION**

108.    Given the amount of revenues and profits associated with B+L's PreserVision® and SBH's Accused Products, this factor would have an upward impact on the reasonable royalty rate for the Patents-in-Suit.

**Factor 9:**    **The utility and advantages of the patent over the old modes or devices, if any, which had been used for working out similar results; and**

**Factor 10:**    **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

109.    Because *Georgia-Pacific* Factors 9 and 10 relate to similar information, I have analyzed them together.

110.    I understand that the patents-in-suit generally relate to a nutritional supplement intended to promote retinal health.[135]  I understand that B+L's PreserVision® Eye Vitamins and SBH's Accused Products make use of the technology taught by the patents-in-suit.

111.    I understand that it is important in the marketplace for both B+L and SBH to be able to say that their respective AMD eye vitamin products are based on the formulas identified by the AREDS and AREDS 2 clinical trials.  According to the 30(b)(6) deposition testimony of SBH personnel, its Accused Products are intended to provide the benefit of the AREDS and AREDS 2 formulas found to reduce the risk of developing AMD.[136]  SBH further testified that if a patient sees the word AREDS, they would understand that the product is used to treat AMD.[137]  The importance of being able to highlight that the products are based on the AREDS and AREDS 2 clinical trials is also reflected in SBH's marketing materials.[138]  I understand that the Patents-in-Suit cover the AREDS and AREDS 2 based vitamins.[139]

112.    The '297 patent issued on December 9, 2003 and relates to a "Nutritional Supplement to Treat Macular Degeneration."  The '297 patent was reexamined by the patent office between 2007 and 2013, and a reexamination certificate was issued on April 30, 2013.  The '297 patent

---

[135] Unless otherwise noted, the discussion in this section is based on the patents-in-suit, the Johnson Report, ¶¶ 42-47, discussion with Dr. Bressler and the Bressler Report, ¶¶ 48-58.
[136] A. Magro 11/29/2023 deposition, pp. 27, 29, 50-51, 53.
[137] A. Magro 11/29/2023 deposition, p. 174.
[138] *See* for example, SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.
[139] Johnson Report, ¶ 48.

**HIGHLY CONFIDENTIAL INFORMATION**

discloses and claims nutritional dietary supplement compositions that strengthen retinal health. The '297 patent claims formulations containing amounts of vitamin A in the form of beta-carotene (substituted or supplemented with lutein, zeaxanthin or a combination thereof), vitamin C and vitamin E, as well as zinc and copper.  I understand that B+L asserts that SBH infringes the following claims of the '297 Patent: 19, 24 and 31-32.[140]

113.     The '522 patent issued on December 10, 2013 and is also titled "Nutritional Supplement to Treat Macular Degeneration."  The '522 patent is related to the '297 patent and arose from the same patent application.  The '522 patent discloses and claims various methods of addressing AMD, including methods "for stabilizing visual acuity loss in persons with early age-related macular degeneration," "for treating visual acuity loss," and for "treating age-related macular degeneration."  The '522 patent is a "method" or "process" patent.  The invention of the '522 patent provides methods of using a formulation of vitamin A in the form of beta-carotene (substituted or supplemented with lutein, zeaxanthin or a combination thereof), vitamin C and vitamin E, as well as zinc and copper.  I understand that B+L asserts that SBH infringes the following claims of the '522 Patent: 1, 4-6, 8, 11, 15-16 and 20.[141]

114.     The Patents-in-Suit cover the AREDS and AREDS 2 formula, and formulations that fall outside of the claims of the Patents-in-Suit would not be associated with the AREDS and AREDS 2 studies.[142]

115.     Based on the above, the use of the Patents-in-Suit provide significant benefits.  This factor would have an upward impact on the reasonable royalty rate agreed to by the parties at the hypothetical negotiation for the Patents-in-Suit.

**Factor 12:**     **The portion of the profits or of the selling price that may be customary in the particular business or in comparable businesses to allow for use of the invention or analogous inventions.**

116.     I am not aware of any license agreements for intellectual property analogous to the Patents-in-Suit and no such evidence has been provided in this case.

117.     This factor has a neutral impact on the reasonable royalty rate for the Patents-in-Suit.

---

[140] Bausch & Lomb's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-13), Response to Interrogatory No. 8; Johnson Report, ℙ 44.
[141] Bausch & Lomb's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-13), Response to Interrogatory No. 8; Johnson Report, ℙ 47.
[142] Johnson Report, ℙ 51.

**HIGHLY CONFIDENTIAL INFORMATION**

**Factor 13:**    **The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

118.    As discussed in Factors 9 and 10 above, the Patents-in-Suit provide significant benefits to customers who use them.

119.    I incorporate into this factor my analysis and discussion in the Income Approach Section above.

120.    I understand that it is important in the marketplace for both B+L and SBH to be able to say that their respective AMD eye vitamin products are based on the formulas identified by the AREDS and AREDS 2 clinical trials.  According to the 30(b)(6) deposition testimony of SBH personnel, its Accused Products are intended to provide the benefit of the AREDS and AREDS 2 formulas found to reduce the risk of developing AMD.[143]  SBH further testified that if a patient sees the word AREDS, they would understand that the product is used to treat AMD.[144]  The importance of being able to highlight that the products are based on the AREDS and AREDS 2 clinical trials is also reflected in SBH's marketing materials.[145]  I understand that use of the Patents-in-Suit allows SBH to manufacture and sell its accused AREDS and AREDS 2 products. Without use of the Patents-in-Suit, SBH would be unable to sell a product that meets the AREDS and AREDS 2 requirements.

121.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████    Because of the level of competition between the parties, if B+L entered a license with SBH, it would understand that it risked losing profits as a result of SBH being able to sell competing AREDS and AREDS 2 eye vitamins.

---

[143] A. Magro 11/29/2023 deposition, pp. 27, 29, 50-51, 53.
[144] A. Magro 11/29/2023 deposition, p. 174.
[145] *See* for example, SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.

**HIGHLY CONFIDENTIAL INFORMATION**



123.    Furthermore, as discussed above, SBH did not have an acceptable available non-infringing alternative to the use of the Patents-in-Suit.  To the extent it could not use the Patents-in-Suit, it would risk losing all of the profits generated on the sales of its Accused Products.  Thus, SBH would be willing to pay a large portion of its profits to B+L as a royalty to use the Patents-in-Suit.

124.    The parties would consider these data points during their hypothetical negotiation for the Patents-in-Suit and understand that the revenues and profits associated with the Accused Products are largely attributable to the use of the Patents-in-Suit.

125.    Given the significant level of profits and importance of using the Patents-in-Suit, this factor would suggest an upward impact on the reasonable royalty rate.

**Factor 14:    The opinion testimony of qualified experts.**

126.    This factor includes by reference all the opinions as stated in this report.  In addition, I have relied on the opinions of Dr. Elizabeth Johnson and Dr. Susan Bressler as reflected in their expert reports and my discussions with them.  I have also relied upon discussions with B+L personnel.

**Factor 15:    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would**

**have been acceptable by a prudent patentee who was willing to grant a
license.**

127.    I have assumed that the hypothetical negotiation for the Patents-in-Suit would have taken place on the date of first infringement which according to the 30(b)(6) testimony of Mr. Magro was in 2014 when SBH formulated its products based on AREDS 2.[148]

128.    The license resulting from the hypothetical negotiation would grant SBH the non-exclusive right to manufacture and sell its Accused Products.

129.    Based on the premise of a hypothetical negotiation as described above, the analyses discussed above (including the market, cost and income approaches), an analysis of the revenues and profits earned by SBH, and an analysis of the *Georgia-Pacific* factors, I have determined that a reasonable royalty for SBH's use of the Patents-in-Suit would be 12.0% of SBH's Accused Product (apportioned) revenue (as discussed below in the Royalty Base section).

130.    The information I relied upon in determining this reasonable royalty rate includes, among other things, the following:

- The license would be a bare license to practice the Patents-in-Suit, without know-how or technical assistance being transferred.  Such a license would be non-exclusive and limited to the U.S.;

- B+L and SBH are competitors as it relates to doctors' recommendations and sales of PreserVision® and the Accused Products;

- The importance that healthcare and eye care professionals and patients place on the ability to recommend and take an eye vitamin that are covered by the Patents-in-Suit to treat AMD that are based on formulas from the AREDS and AREDS 2 clinical trials;



---

[148] A. Magro 11/29/2023 deposition, pp. 25, 39.

**HIGHLY CONFIDENTIAL INFORMATION**

- B+L entered numerous settlement agreements ███████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████████████████

- The benefits and advantages received by customers from use of the products with the patented technology;

- At the hypothetical negotiation, both B+L and SBH would have been aware that there were no acceptable non-infringing alternatives available to SBH. Thus, use of the Patents-in-Suit provided SBH the ability to meet healthcare and eye care professionals' (and their patients') demand for eye vitamins to treat AMD that are based on the formula covered by the Patents-in-Suit;

- The revenue and profits B+L would risk losing if it licensed the Patents-in-Suit to SBH. ███████████████████████████████████████████████████████
  ████████████████████████████████████████

- The revenues and profits SBH would risk losing if it did not enter a license for the Patents-in-Suit. The gross profit that SBH earns on the sale of its Accused Products is 64.5% of revenue; and,

- On balance, the *Georgia-Pacific* factors indicate an upward influence on the royalty rate.

131.    Based on my analysis of the *Georgia-Pacific* factors including the fact that hypothetical license is between two competitors, ████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████

**HIGHLY CONFIDENTIAL INFORMATION**

███████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ Thus, I have concluded that the royalty rate for SBH's use of the

Patents-in-Suit is 12%.

132.    This rate would apply to the use of the '297 Patent, the '522 Patent, and/or both Patents-in-Suit.

### 5.3.6    Royalty Base

133.    For purposes of determining the royalty base to apply the above determined royalty rate to, I apportioned the revenue generated by SBH from sale of the Accused Products to eliminate the revenue associated with the multivitamin component of the MPC product.  In order to prepare this apportionment analysis, I applied SBH's average per unit net revenue generated from the sale of its MP product to the number of MPC product units included in the royalty base. I also performed the same analysis relating to SBH's MPC Drink Mix products.

134.    I note that apportioning the SBH Accused Product revenue to determine the royalty base is conservative ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

135.    ██████████████████████████████████████████

███████████████████████████████████████

███████████████████████    ████████████████████████████████████████
████████████████

### 5.3.7  Reasonable Royalty Damages

136.    I calculated the dollar amount of reasonable royalty damages SBH owes B+L for the period October 28, 2014 through March 23, 2021 by applying the reasonable royalty rate of 12.0% that I determined in *Georgia-Pacific* Factor 15 above to SBH's Accused Product apportioned revenue earned in the U.S for which lost profits are not awarded. ████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████  ████████████████

137.    If it is determined that lost profits damages are not an appropriate remedy for SBH's infringement of the Patents-in-Suit, B+L is entitled to reasonable royalty damages on all of SBH's Accused Product apportioned revenue in the U.S.  █████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

## 6    CONCLUSION

138.    █████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

139.    █████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████

## 7    PREJUDGMENT INTEREST

140.    A prevailing patent owner in a patent infringement case is generally entitled to an award of prejudgment interest on the damages it suffered.  Since the amount of damages that will be

-----



**HIGHLY CONFIDENTIAL INFORMATION**

awarded to B+L is not known at this time, I have not prepared a determination of prejudgment interest.  Once the amount of damages owed is determined, and if requested, I will calculate prejudgment interest at a rate consistent with an instruction of the Court or otherwise consistent with case law.

Respectfully submitted,

Michael E. Tate

Vice President

Charles River Associates

February 20, 2024

**HIGHLY CONFIDENTIAL INFORMATION**

# Tab 1

# Charles River Associates

## MICHAEL E. TATE
Vice President

M.S. Industrial Administration,
Purdue University

B.B.A. Finance,
University of Houston

Mr. Tate has served as a consultant and expert witness in a wide range of litigation matters including commercial success, antitrust, patent and copyright infringement, breach of contract, bid rigging, trade secrets, lost profits, securities fraud, construction disputes, lender liability, personal injury, wrongful death, wrongful termination, and a nuclear power plant prudence review.

This experience includes testifying as an expert witness and consulting on accounting and economic issues involved in the determination of damages. This experience also includes revenue, cost and pricing determinations, the determination or evaluation of claims for economic loss, valuation of intellectual property rights, as well as the determination of incremental costs, cost allocations, cost of capital and lost profits, and reasonable royalties.

Other experiences in the litigation process include assisting counsel in discovery, fact-finding and information management, as well as providing assistance to counsel at deposition and trial.

## EXPERIENCE

1999–Present    *Vice President*, Charles River Associates

1994–1999    *Principal*, Economic Consulting Group, A.T. Kearney, Inc.

1992–1994    *Manager*, Dispute Analysis & Corporate Recovery Services Group
Price Waterhouse

1987–1992    *Executive Consultant*, Peterson Consulting

## PROFESSIONAL AFFILIATIONS

- *Member*, Licensing Executives Society

# Tab 2

# DEPOSITION TESTIMONY – LAST FIVE YEARS

1.  Smith International, Inc. v. Baker Hughes, A GE Company LLC
    United States District Court, District of Delaware

2.  Bristol-Myers Squibb Company and Pfizer Inc. v. Aurobindo Pharma USA Inc., et al.
    United States District Court, District of Delaware

3.  Koninklijke Philips N.V. and U.S. Philips Corporation v. Microsoft Corporation
    United States District Court, Northern District of California

4.  Koninklijke Philips N.V. and U.S. Philips Corporation v. ASUSTek Computer Inc. and ASUS Computer International
    United States District Court, Northern District of California

5.  Koninklijke Philips N.V. and U.S. Philips Corporation v. HTC Corp. and HTC America
    United States District Court, Northern District of California

6.  Magna Mirrors of America, Inc. v. Samvardhana Motherson Reflectec Group Holdings, Limited, et al.
    United States District Court, Western District of Michigan

7.  Amgen Inc. v. Piramal Healthcare UK Ltd. and Slate Run Pharmaceuticals, LLC
    United States District Court, District of Delaware

8.  Astellas US LLC; Astellas Pharma US, Inc.; and Gilead Sciences, Inc. v. Apotex Inc., et al.
    United States District Court, District of Delaware

9.  Nuance Communications, Inc. v. MModal LLC
    United States District Court, District of Delaware

10. Huber Engineered Woods LLC v. Louisiana-Pacific Corporation
    United States District Court, District of Delaware

11. The Chamberlain Group LLC v. Overhead Door Corporation and GMI Holdings Inc.
    United States District Court, Eastern District of Texas, Marshall Divison

12. Exelixis, Inc. v. MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.
    United States District Court, District of Delaware

13. Alkermes, Inc. and Alkermes Pharma Ireland Limited v. Teva Pharmaceuticals USA, Inc.
    United States District Court, District of New Jersey

14. Astellas US LLC; Astellas Pharma US, Inc.; and Gilead Sciences, Inc. v. Mylan Pharmaceuticals Inc., et al.
    United States District Court, Northern District of West Virginia – Clarksburg

15. National Oil Well Varco, L.P. v. Schlumberger Technology Corp.
    Ad Hoc Arbitration

16. Groove Digital, Inc. v. King.Com, King.Com Inc. and King.Com (US) LLC
    United States District Court, District of Delaware

17. Exelixis, Inc. v. MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.
    United States District Court, District of Delaware

18. Cameron International Corporation v. Nitro Fluids LLC
    United States District Court, Southern District of Texas – Houston Division

# TRIAL TESTIMONY – LAST FIVE YEARS

1. Cystic Fibrosis Foundation and Cystic Fibrosis Foundation Therapeutics, Inc. v. Shire Orphan and Rare Diseases Gmbh, Shire International Gmbh, Shire Human Genetic Therapies, Inc., Shire PLC and Takeda Pharmaceutical Company Ltd.
   Conflict Prevention & Resolution Arbitration, Washington, D.C.

2. Amgen Inc. v. Piramal Healthcare UK Ltd. And Slate Run Pharmaceuticals, LLC
   United States District Court, District of Delaware

3. M-I LLC v. FPUSA, Inc.
   United States District Court, District of Western Texas

4. The Chamberlain Group LLC v. Overhead Door Corporation and GMI Holdings Inc.
   United States District Court, Eastern District of Texas, Marshall Divison

5. Exelixis, Inc. v. MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.
   United States District Court, District of Delaware

6. National Oil Well Varco, L.P. v. Schlumberger Technology Corp.
   Ad Hoc Arbitration

7. Magna Mirrors of America, Inc. v. Samvardhana Motherson Reflectec Group Holdings, Limited, et al.
   United States District Court, Western District of Michigan

8. Exelixis, Inc. v. MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.
   United States District Court, District of Delaware

**Tab 3**

Bausch & Lomb Incorporated and PF Consumer Healthcare 1 LLC v. SBH Holdings LLC

Schedule 3.0
**Information Reviewed and/or Relied Upon**

**Bates Documents:**

| Beginning Bates: | Beginning Bates: | Beginning Bates: | Beginning Bates: | Beginning Bates: | Beginning Bates: |
|---|---|---|---|---|---|
| BAUSCH0003832 | BAUSCH0121689 | BAUSCH0121809 | BAUSCH0122054 | SBH 00054 | SBH 00086 |
| BAUSCH0003856 | BAUSCH0121690 | BAUSCH0121810 | BAUSCH0122055 | SBH 00055 | SBH 00087 |
| BAUSCH0003866 | BAUSCH0121691 | BAUSCH0121811 | BAUSCH0122056 | SBH 00056 | SBH 00088 |
| BAUSCH0003868 | BAUSCH0121692 | BAUSCH0121918 | BAUSCH0122057 | SBH 00057 | SBH 00089 |
| BAUSCH0003876 | BAUSCH0121693 | BAUSCH0121919 | BAUSCH0122090 | SBH 00058 | SBH 00090 |
| BAUSCH0003878 | BAUSCH0121737 | BAUSCH0121920 | BAUSCH0122091 | SBH 00059 | SBH 00091 |
| BAUSCH0003886 | BAUSCH0121738 | BAUSCH0121921 | BAUSCH0122092 | SBH 00060 | SBH 00092 |
| BAUSCH0003888 | BAUSCH0121739 | BAUSCH0121922 | BAUSCH0122093 | SBH 00061 | SBH 00093 |
| BAUSCH0003896 | BAUSCH0121740 | BAUSCH0121923 | BAUSCH0122119 | SBH 00062 | SBH 00094 |
| BAUSCH0003898 | BAUSCH0121741 | BAUSCH0121924 | BAUSCH0122120 | SBH 00063 | SBH 00095 |
| BAUSCH0003910 | BAUSCH0121742 | BAUSCH0121925 | BAUSCH0122121 | SBH 00064 | SBH 00096 |
| BAUSCH0003920 | BAUSCH0121743 | BAUSCH0121926 | BAUSCH0122122 | SBH 00065 | SBH 00097 |
| BAUSCH0003922 | BAUSCH0121744 | BAUSCH0121927 | BAUSCH0122123 | SBH 00066 | SBH 00098 |
| BAUSCH0003930 | BAUSCH0121745 | BAUSCH0121928 | SBH 00001 - 00023(a) | SBH 00067 | SBH 00099 |
| BAUSCH0003932 | BAUSCH0121746 | BAUSCH0121929 | SBH 00024 | SBH 00068 | SBH 00100 |
| BAUSCH0003942 | BAUSCH0121747 | BAUSCH0121930 | SBH 00025 | SBH 00069 | SBH 00101 |
| BAUSCH0003944 | BAUSCH0121793 | BAUSCH0121931 | SBH 00026 | SBH 00070 | SBH 00102 |
| BAUSCH0003956 | BAUSCH0121794 | BAUSCH0121932 | SBH 00027 | SBH 00071 | SBH 00103 |
| BAUSCH0003958 | BAUSCH0121795 | BAUSCH0121933 | SBH 00028 | SBH 00072 | SBH 00104 |
| BAUSCH0003966 | BAUSCH0121796 | BAUSCH0122001 | SBH 00029 | SBH 00073 | SBH 00105 |
| BAUSCH0005164 | BAUSCH0121797 | BAUSCH0122002 | SBH 00030 | SBH 00074 | SBH 00106 |
| BAUSCH0008466 | BAUSCH0121798 | BAUSCH0122003 | SBH 00031 | SBH 00075 | SBH 00107 |
| BAUSCH0012218 | BAUSCH0121799 | BAUSCH0122004 | SBH 00043 | SBH 00076 | SBH 00108 |
| BAUSCH0012259 | BAUSCH0121800 | BAUSCH0122005 | SBH 00044 | SBH 00077 | SBH 00109 |
| BAUSCH0018849 | BAUSCH0121801 | BAUSCH0122006 | SBH 00046 | SBH 00078 | SBH 00110 |
| BAUSCH0119659 | BAUSCH0121802 | BAUSCH0122007 | SBH 00047 | SBH 00079 | SBH 00111 |
| BAUSCH0119661 | BAUSCH0121803 | BAUSCH0122008 | SBH 00048 | SBH 00080 | SBH 00112 |
| BAUSCH0119662 | BAUSCH0121804 | BAUSCH0122049 | SBH 00049 | SBH 00081 | SBH 00113 |
| BAUSCH0120425 | BAUSCH0121805 | BAUSCH0122050 | SBH 00050 | SBH 00082 | SBH 00114 |
| BAUSCH0121681 | BAUSCH0121806 | BAUSCH0122051 | SBH 00051 | SBH 00083 | SBH 00115 |
| BAUSCH0121682 | BAUSCH0121807 | BAUSCH0122052 | SBH 00052 | SBH 00084 | SBH 00116 |
| BAUSCH0121683 | BAUSCH0121808 | BAUSCH0122053 | SBH 00053 | SBH 00085 | SBH 00117 |

HIGHLY CONFIDENTIAL INFORMATION

*Bausch & Lomb Incorporated and PF Consumer Healthcare 1 LLC v. SBH Holdings LLC*

Schedule 3.0
**Information Reviewed and/or Relied Upon**

**Expert Reports:**

Opening Expert Report of Elizabeth J. Johnson, Ph.D., February 20, 2024.
Opening Expert Report of Susan B. Bressler, M.D., February 20, 2024.

**Depositions (Including Exhibits):**

Alain Magro, November 29, 2023.
Alain Magro, November 30, 2023.
Zac Denning, November 30, 2023.
Zac Denning, December 1, 2023.

**Legal Filings:**

Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, April 3, 2023.
Bausch & Lomb's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-13), April 10, 2023.

**Public Sources:**

Bausch & Lomb 12/29/2001 Form 10-K, Exhibit 13.
Bausch + Lomb 12/31/2022 Form 10-K.
Bausch Health Companies Inc. 2019 Form 10-K.
cvs.com.
drugstore.com.
*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).
Google Patents (https://patents.google.com/patent/US6660297/).
Google Patents (https://patents.google.com/patent/US8603522/).
Nutra Manufacturing - LinkedIn.
Nutraceutical Business Review, "Chinese Consortium IVC to acquire Nutra Manufacturing from GNC", dated March 7, 2019.
*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).
U.S. Patent No. 6,660,297.
U.S. Patent No. 8,603,522.
Valeant 12/31/2013 Form 10-K.
Valeant 12/31/2016 Form 10-K.
walgreens.com.

HIGHLY CONFIDENTIAL INFORMATION

*Bausch & Lomb Incorporated and PF Consumer Healthcare 1 LLC v. SBH Holdings LLC*

Schedule 3.0
**Information Reviewed and/or Relied Upon**

**Public Sources:**

www.amazon.com/preservision.
www.bausch.com/about-bausch-lomb/history-heritage/.
www.mayoclinic.org.
www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/what-to-know-about-age-related-macular-degeneration.
www.nei.nih.gov.
www.nei.nih.gov/research/clinical-trials/age-related-eye-disease-studies-aredsareds2/aredsareds2-frequently-asked-questions.
www.preservision.com.
www.preservision.com/Why-PreserVision/The-AREDS-Story/.
www.sciencebasedhealth.com..
www.sciencebasedhealth.com/AboutUs.aspx?index=1.

HIGHLY CONFIDENTIAL INFORMATION

# Tab 4

REDACTED

**Tab 5**

REDACTED

# Tab 6

REDACTED

# Tab 7

REDACTED

# Tab 8

REDACTED

# Tab 9

REDACTED

# Tab 10

REDACTED

# Tab 11

REDACTED

# Tab 12

REDACTED

# Tab 13

REDACTED

# EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BAUSCH & LOMB INCORPORATED AND
PF CONSUMER HEALTHCARE 1 LLC,

                    **Plaintiffs,**

        **v.**

SBH HOLDINGS LLC,

                    **Defendant.**

CIVIL ACTION NO: 1:20-cv-01463

## REPLY EXPERT REPORT OF MICHAEL E. TATE

## April 26, 2024

**Highly Confidential Information**

**Table of Contents**

1    PROFESSIONAL AND EDUCATIONAL BACKGROUND ................................................ 1
2    INFORMATION RELIED UPON ................................................................................. 1
3    REPLY TO BUSS REPORT – LOST PROFITS ................................................................ 2
4    REPLY TO BUSS REPORT – REASONABLE ROYALTY ............................................... 7
5    CONCLUSION ..................................................................................................... 11

**Highly Confidential Information**

1.      My name is Michael E. Tate.  I am the same Michael E. Tate who submitted the Expert Report of Michael E. Tate dated February 20, 2024 ("Initial Expert Report").

2.      The following report, unless otherwise noted herein, is consistent with my Initial Expert Report as to the amount of financial harm Bausch & Lomb Incorporated ("B+L") suffered because of SBH Holdings LLC's ("SBH") infringement of B+L's U.S. Patent Nos. 6,660,297 ("the '297 Patent") and 8,603,522 ("the '522 Patent") (collectively, the "Patents-in-Suit").  The conclusions and analyses in my Initial Expert Report remain unchanged.  In this report, I respond to various assertions and opinions contained in the Expert Report of Brian Buss which was submitted on behalf of SBH on April 5, 2024 ("Buss Report").

3.      As a preliminary matter, the Buss Report includes numerous statements that are unsupported.  I have not addressed in this report every disagreement I have related to the Buss Report.  Instead, my discussion below focusses on the central themes in the Buss Report.  However, to be clear, any failure to address an opinion or assertion raised by Mr. Buss is not an agreement with such opinion or alleged fact.  I reserve the right to rely upon any additional information that becomes available to me after the date of this report, and to amend or modify this report to reflect such information or if further research or analysis warrants.

## 1    PROFESSIONAL AND EDUCATIONAL BACKGROUND

4.      My professional and educational background is the same as reflected in my Initial Expert Report.

## 2    INFORMATION RELIED UPON

5.      In preparing this report, I reviewed the Buss Report and the documents relied upon by Mr. Buss (including, among others, BAUSCH0122124-154 and SBH 00118-123).  I have also reviewed and relied upon the Reply Expert Report of Elizabeth J. Johnson, Ph.D. dated April 25, 2024 ("Johnson Reply Report").  I incorporate by reference the information relied upon in my Initial Expert Report and attached thereto at Tab 3 or referenced in that report.

6.      I also incorporate certain terms used herein that are defined in my Initial Expert Report.

**HIGHLY CONFIDENTIAL INFORMATION**

1

## 3    REPLY TO BUSS REPORT – LOST PROFITS

7.    Mr. Buss concludes that economic damages in this case should not be calculated based on a measure of lost profits.[1]

8.    I disagree with Mr. Buss' conclusion that lost profits are not appropriate in this case. Based on my analysis of the Panduit Factors as reflected in my Initial Expert Report, I concluded that as a result of SBH's infringement of the Patents-in-Suit, B+L suffered lost sales and profits.

9.    I note that Mr. Buss agrees that three of the four Panduit Factors have been met and agrees with the results of my analysis as it relates to those three factors.[2]  Mr. Buss concludes that there was demand for the patented product (Factor 1), B+L's manufacturer had the capacity to manufacture sufficient additional product (Factor 3) and sales of B+L's PreserVision® are profitable (Factor 4).[3]  He then concludes that each of these factors "is not at issue".[4]  I agree with Mr. Buss as it relates to his conclusion with regard to these Panduit Factors.

10.    The only disagreement that Mr. Buss has with respect to my analysis of the Panduit Factors relates to Factor 2.  As it relates to Factor 2, Mr. Buss concludes that there are acceptable non-infringing alternatives in the market and Factor 2 of the Panduit Test prevents use of a lost profits methodology to calculate economic damages.[5]

11.    A discussion of my disagreements with Mr. Buss' conclusion with regard to Factor 2 of the Panduit Factors follows below.

12.    Assuming for the purpose of the discussion in this paragraph that there are acceptable non-infringing alternatives available in the market (which as discussed below, I disagree with), I disagree with Mr. Buss that it prevents use of a lost profits methodology to calculate economic damages.  I understand that a patent owner in a multi-supplier market with available non-infringing alternatives can seek lost profits for a portion of the accused infringers sales based on the patent owner's share of the market absent the infringement.  Under a market share approach,

---

[1] Buss Report, p. 8.
[2] Buss Report, p. 6.
[3] Buss Report, p. 6.
[4] Buss Report, p. 6.
[5] Buss Report, p. 8.  I note that this excerpt in the Buss Report actually states that "factor 3 of the Panduit Test prevents use of a lost profits methodology to calculate economic damages".  I assume that use of "factor 3" in this sentence which relates to B+L's capacity is a typo and Mr. Buss meant to use factor 2 in this sentence.

**HIGHLY CONFIDENTIAL INFORMATION**

the patent owner receives lost profits on a portion of the infringing sales and a reasonable royalty on the remaining infringing sales. As discussed in my Initial Expert Report, I have determined the lost profits suffered by B+L as a result of SBH's infringement of the Patents-in-Suit based on a market share approach.

13.    I disagree with Mr. Buss' assertion that there are acceptable non-infringing alternatives available in the market. As discussed in my Initial Expert Report, doctors recommend an appropriate treatment regimen to their patients with AMD, including a recommendation that patients take an AREDS eye vitamin. Doctors recommend eye vitamins that are based on the AREDS or AREDS 2 formula because doing so allows doctors to make their recommendations based on a peer reviewed study reflecting the safety and efficacy of the studied formula for treating AMD.[6] I understand that there are no acceptable, non-infringing alternatives to the inventions claimed in the patents-in-suit for eye vitamins used to treat AMD.[7] A consumer of eye vitamins would only find acceptable those formulations shown to be effective in the AREDS and AREDS 2 trials.[8] It is my understanding that those formulations are covered by the Patents-in-Suit.[9]

14.    Ignoring my use of the market share approach to determine lost profits and my discussion on the lack of acceptable non-infringing alternatives, Mr. Buss asserts in the Buss Report that he has identified 22 different products that are not manufactured or sold by B+L or SBH.[10] He concludes that based on the product descriptions and packaging of several alternative products shown at Schedule 6 of his report, consumers have been able to purchase alternative products that reference the AREDS and AREDS 2 studies.[11]

15.    Based on my review of the reply report submitted by Dr. Johnson in this case, I understand that the products listed by Mr. Buss in Schedule 6 of his report are either: (1) based on a formula that would be covered by the Patents-in-Suit and thus would not be considered a

---

[6] Bressler Report, ¶ 55; discussion with Dr. Bressler.
[7] Johnson Report, ¶ 51.
[8] Johnson Report, ¶ 51.
[9] Johnson Report, ¶ 51.
[10] Buss Report, p. 7 and Schedule 6.
[11] Buss Report, p. 7.

**HIGHLY CONFIDENTIAL INFORMATION**

3

non-infringing alternative;[12] or, (2) are based on formulas that are not covered by the Patents-in-Suit and would not be considered as acceptable alternatives because they either omit entire ingredients from the AREDS or AREDS 2 formulations (e.g., vitamin E, zinc, or copper are omitted) or contain ingredients at levels that have not been clinically proven to be safe and effective (e.g., copper, vitamin C, or vitamin E levels are too low or copper is too high).[13]



[14] Buss Report, pp. 7-8.
[15] Buss Report, pp. 7-8.
[16] Buss Report, p. 7.
[17] Buss Report, p. 8.
[18] Initial Expert Report, ¶ 76.

**HIGHLY CONFIDENTIAL INFORMATION**



As such, similar to the above discussion with regard to some of the products reflected in Mr. Buss's Schedule 6, products based on formulas that are not covered by the Patents-in-Suit do not provide the same benefits as the AREDS and AREDS 2 products that are covered by the Patents-in-Suit and thus would not be considered as acceptable alternatives.



19.     Mr. Buss also contends that all of the ingredients included in the AREDS 2 formula are readily available on their own, common in the marketplace and are non-proprietary.[22]  While this may be true, such ingredients can not be used in a manner which would infringe the Patents-in-Suit.  Similar to the above discussion, the ingredients alone do not provide the benefits of the formula reflected in the AREDS and AREDS 2 studies as covered by the Patents-in-Suit.  As a result, the fact that they are available on their own in the market is meaningless.

20.     He also states that there are additional supplement products targeting eye care and macular degeneration that do not reference the AREDS and AREDS 2 studies.[23]  He concludes that these other eyecare products are likely substitutes for consumers.[24]  Mr. Buss does not



[22] Buss Report, p. 8.
[23] Buss Report, p. 8.
[24] Buss Report, p. 8.

**HIGHLY CONFIDENTIAL INFORMATION**

provide any support or citation for this assertion and conclusion. He does not identify what products he is referring to, so I am unable to respond directly to this contention. However, to the extent that these unidentified products do not provide the same benefit as a product covered by the Patents-in-Suit, they would not be considered as acceptable alternatives.

21.    Mr. Buss states that SBH management indicates that B+L and SBH competed for sales in doctors' offices and doctor referral sales channels before and during the damages period.[25] I agree with Mr. Buss and SBH management that the parties compete. However, Mr. Buss then concludes that because B+L and SBH may rely on different sales channels for the bulk of their revenues, direct competition between the parties may be limited.[26] I disagree with Mr. Buss' conclusion regarding limited direct competition between the parties.

22.    As discussed in my Initial Expert Report, during the period 2014 through the present, B+L and SBH have competed for doctors' recommendations relating to PreserVision® and the Accused Products.[27] SBH attempts to convince doctors to recommend its Accused Products over PreserVision®.[28] In addition, in various internal documents and email correspondence, SBH compares its Accused Products to PreserVision®.[29] As a result of the competition between the parties and SBH's sales of its Accused Products, patients have switched from PreserVision® to the Accused Products.[30] Based on the doctor's recommendation the patient then makes a purchase decision.[31] Patients then source the recommended product through various channels.[32] In the marketplace, whether the product is sold at retail, at the doctor's office or online is a very

---

[25] Buss Report, p. 8.
[26] Buss Report, p. 8.
[27] Discussion with B+L personnel; Z. Denning 11/30/2023 deposition, p. 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.
[28] Z. Denning 11/30/2023 deposition, pp. 95-97, 109; A. Magro 11/29/2023 deposition, pp. 86-87, 175-176; SBH 00110.
[29] *See* for example, SBH 00110; SBH 00051-51a; SBH 00113; SBH 00049; SBH 00048; SBH 00079; SBH 00080.
[30] A. Magro 11/29/2023 deposition, pp. 175-176.
[31] Discussion with B+L personnel; A. Magro 11/29/2023 deposition, pp. 86, 109-110; Bressler Report, ¶ 55; discussion with Dr. Bressler.
[32] www.preservision.com; www.amazon.com/preservision; discussion with John Ferris; Defendant's Responses to Plaintiff's First Set of Interrogatories, 1 through 14, Response to Interrogatory No. 1; A. Magro 11/29/2023 deposition, pp. 109-110, 114; A. Magro 11/30/2023 deposition, pp. 28-29, 31; A. Magro 11/30/2023 deposition, Ex. 30.

**HIGHLY CONFIDENTIAL INFORMATION**

minor distinction.[33]  The term "omni-channel" retail refers to the fact many consumers shop in different channels interchangeably.[34]  PreserVision® can be purchased by patients online (through the PreserVision® store at Amazon.com, walgreens.com, cvs.com, kroger.com, riteaid.com, target.com, and samsclub.com, among others[35]), in a retail store (including Walmart, Rite Aid, Costco, Target, Sam's Club, CVS, Kroger and Walgreens) and through direct purchase at the B+L PreserVision® store (order through a toll-free telephone number or online[36]).[37]

## 4    REPLY TO BUSS REPORT – REASONABLE ROYALTY

23.      Mr. Buss concludes that damages should be based on a reasonable royalty of ▮ applied to the apportioned revenue generated by SBH from the sale of its Accused Products.[38] Mr. Buss apportioned SBH's Accused Product revenue by using a ratio comprised of the cost of the AREDS ingredients components as a percentage of the total average cost per Accused Product.[39]  I disagree with Mr. Buss' conclusion as it relates to the reasonable royalty rate and base.

24.      Mr. Buss concludes that the reasonable royalty for use of the Patents-in-Suit should be ▮ ▮.[40]  It is not clear how specifically Mr. Buss determined the royalty rate should be ▮

25.      ▮
▮ ▮

---

[33] Discussion with B+L personnel.
[34] Discussion with John Ferris.
[35] Based on discussions with John Ferris, B+L launched the PreserVision® brand store at Amazon in June 2014 and the product is available as a shopper subscription service.  Currently, 10% to 15% of B+L's PreserVision® sales are made through the Amazon store.  In addition, PreserVision® was available online through drugstore.com, walgreens.com and cvs.com, among others since at least 2011.
[36] Based on discussions with John Ferris, PreserVision® direct 1-800 number has been operational since April 2013.  In October 2020, the 1-800 number was transitioned to www.shop.preservision.com.  E-commerce purchases represent greater than 10% of B+L's Vision Care segment revenues (B+L 12/31/2022 Form 10-K, p. 62).
[37] www.preservision.com; www.amazon.com/preservision; discussion with John Ferris.
[38] Buss Report, Schedule 3.
[39] Buss Report, Schedule 3.
[40] Buss Report, p. 10.
[41] Buss Report, p. 10.

**HIGHLY CONFIDENTIAL INFORMATION**



26.     Another key observation regarding a reasonable royalty considered by Mr. Buss is that SBH had been selling AMD supplements since 2004.[42]  He further states in his analysis of Georgia-Pacific Factor 9 that SBH sold AMD supplements with a non-infringing formulation and that it could maintain market share with a product based on this formulation.[43]  However, I note that Mr. Buss has not identified the formulas of the SBH AMD supplements that were sold since 2004 and he has done no analysis to show that such products do not infringe the Patents-in-Suit.

27.     Similar to his assertions as it relates to lost profits, a prevalent theme used by Mr. Buss in his assessment of a royalty rate (including throughout his analysis of the Georgia-Pacific Factors) is that SBH could change its Accused Products to use a non-infringing formula and that there are other products on the market that do not use the Patents-in-Suit.[44]  As I discuss above in the lost profits section, at the hypothetical negotiation, the parties would understand that products based on formulas that are not covered by the Patents-in-Suit do not provide the same benefits as the AREDS and AREDS 2 products that are covered by the Patents-in-Suit and thus would not be considered as acceptable alternatives.  Products not covered by the Patents-in-Suit would not allow a doctor to recommend an eye vitamin that is based on the AREDS or AREDS 2 formula and would not allow a doctor to make their recommendation based on a peer reviewed study reflecting the safety and efficacy of the studied formula for treating AMD.  The parties at the hypothetical negotiation would understand this.

---

[42] Buss Report, pp. 9-10 and Schedule 5 – Factor 9.
[43] Buss Report, Schedule 5 – Factor 9.
[44] See for example, Buss Report, p. 10 and Schedule 5.

**HIGHLY CONFIDENTIAL INFORMATION**

28.    Mr. Buss contends that the Accused Products could be reformulated to contain AREDS study recommended ingredients outside the ranges claimed in the Patents-in-Suit.[45]  As discussed above, I understand that such a product would not provide the same benefits to products covered by the Patents-in-Suit.  In addition, Mr. Buss makes this statement without quantifying the cost of implementing such a change or identifying the formula that the reformulated product would be based on.  He has not considered for example, the impact that a reformulated product would have on SBH's sales and profits given that doctors could no longer recommend a product based on a peer reviewed study reflecting the safety and efficacy of the studied formula for treating AMD.

29.    Mr. Buss apportioned SBH's Accused Product revenue by using a ratio comprised of the cost of the AREDS ingredient components as a percentage of the total average cost per Accused Product.[46]  I disagree with Mr. Buss' apportionment analysis.  Mr. Buss' apportionment methodology assumes that the relative value (in terms of revenue) of each of the Accused Products' ingredients is equal to their relative cost.  The cost of an ingredient is not necessarily reflective of the value of that component.  In this case, I understand that the value of the Accused Products is based on the formulas covered by the Patents-in-Suit.  As I discussed in my initial report, the sales of B+L's PreserVision® Eye Vitamins and SBH's Accused Products are reflective of demand for the patented technology.  As it relates to apportionment, I understand that this is not a situation in which the patent covers only a small component of an otherwise complicated device; rather, the patent covers the entire product.[47]  While SBH's formulations contain other ingredients, such as multivitamins in MPC, SBH's promotional materials highlight the fact that the Accused Products are based on the formulas reflected in the AREDS and AREDS 2 clinical trials.[48]  I understand that the AREDS and AREDS 2 formulas are covered by the Patents-in-Suit.[49]  My apportionment analysis more appropriately focuses not on the cost of ingredients but on the revenue associated with certain aspects of the Accused Product.  As discussed in my Initial Expert Report, I apportioned the revenue generated by SBH from sale of

---

[45] Buss Report, p. 10 and Schedule 5 – Factor 11.
[46] Buss Report, Schedule 3.
[47] Johnson Report, ¶¶ 48, 51.
[48] A. Magro 11/29/2023 deposition, pp. 80-81, 83, 94; A. Magro 11/29/2023 deposition, Ex. Nos. 11-13; SBH 00022-22a; SBH 00020-20a; SBH 00012; SBH 00011; SBH 00010-10a; SBH 00009-9a; SBH 00008-8a; SBH 00059-59a.
[49] Johnson Report, ¶ 51.

HIGHLY CONFIDENTIAL INFORMATION

the Accused Products to eliminate the revenue associated with the multivitamin component of the MPC product. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████    ██  ██

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████

██    ████████████████████████  ████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

<hr>

[50] Buss Report, Schedule 5 – Factor 2.
[51] Buss Report, Schedule 4 and Schedule 5 – Factor 1.

**HIGHLY CONFIDENTIAL INFORMATION**



## 5    CONCLUSION

33.    The conclusions reflected in my Initial Expert Report remain unchanged.

34.    As reflected in my Initial Expert Report, based on my lost profits and reasonable royalty analyses, during the period October 28, 2014 through March 23, 2021[53], SBH owes B+L lost profits of ████████ and reasonable royalty damages of ████████ for total damages of ████ ████.[54]

---

[52] Buss Report, Schedule 4 and Schedule 5 – Factor 1.
[53] The most recent sales data provided by SBH. I understand that the '297 Patent expired on March 23, 2021. However, I understand that the '522 Patent does not expire until January 31, 2026. I further understand that B+L requested updated sales data from March 23, 2021 through the most recent date available, but SBH has still not provided such information. To the extent B+L is entitled to damages after March 23, 2021, I reserve the right to determine such damages.
[54] Initial Expert Report, Schedule 4.0.

**HIGHLY CONFIDENTIAL INFORMATION**

11

35.    Alternatively, if it is determined that lost profits damages are not an appropriate remedy for SBH's infringement of the Patents-in-Suit, SBH would owe B+L reasonable royalty damages of ███████ during this same period.[55]

Respectfully submitted,

Michael E. Tate

Vice President

Charles River Associates

April 26, 2024

---

[55] Initial Expert Report, Schedule 4.0.

**HIGHLY CONFIDENTIAL INFORMATION**